1  TYSON C. LANGHOFER, AZ Bar No. 32589*
2  tlanghofer@ADFlegal.org
   ALLIANCE DEFENDING FREEDOM
3  15100 N. 90th Street
4  Scottsdale, Arizona 85260
   (480) 444-0020
5  (480) 444-0021 Fax
6
   *Attorneys for Plaintiffs*
7  *admitted Pro Hac Vice*
8
             **UNITED STATES DISTRICT COURT**
9             **SOUTHERN DISTRICT OF CALIFORNIA**
10
11  **NATHAN APODACA; and**            Case No. 3:17-CV-01014-L-NLS
    **STUDENTS FOR LIFE AT**
12  **CALIFORNIA STATE**               Honorable M. James Lorenz
    **UNIVERSITY-SAN MARCOS,**
13
14        Plaintiffs,                  **DEMAND FOR JURY TRIAL**
15  v.
16  **TIMOTHY P. WHITE**, Chancellor   **FIRST AMENDED VERIFIED**
    of California State University, in his  **COMPLAINT FOR INJUNCTIVE**
17  official and individual capacities;  **AND DECLARATORY RELIEF,**
    **KAREN S. HAYNES**, President of  **MONETARY DAMAGES, AND**
18  California State University-San     **ATTORNEYS' FEES AND COSTS**
    Marcos, in her official and individual
19  capacities; and **ASSOCIATED**
    **STUDENTS, INC. OF**
20  **CALIFORNIA STATE**
    **UNIVERSITY SAN MARCOS**, a
21  California nonprofit corporation,
22        Defendants.
23
24
25
26
27
28
                        1

Plaintiffs Nathan Apodaca and Students for Life at California State University-San Marcos, by and through counsel, and for their Verified Complaint against the Defendants, hereby state as follows:

## INTRODUCTION

1.     The cornerstone of higher education is the ability of students to participate in the "marketplace of ideas" on campus. In the context of facilitating funding of student advocacy from mandatory student activity fees the First Amendment dictates that the university can collect such a mandatory student activity fee only if they proactively ensure that those funds are allocated in a viewpoint-neutral manner, bridling the discretion of those who allocate the funds. In violation of these principles, California State University-San Marcos ("University" or "CSU-SM") unconstitutionally compels Mr. Apodaca and the other students members of Plaintiff Students for Life at CSU-SM to subsidize speech that they disagree with through its assessment of a mandatory Student Activity Fee through a policy which grants Associated Students, Inc. of California State University San Marcos ("ASI") unbridled discretion in allocating these funds for student advocacy, allowing it to favor popular views and to exclude unpopular views.

2.     ASI has exercised this unbridled discretion to allocate the Student Activity Fees in a viewpoint discriminatory manner. ASI favors the viewpoints of two student community centers, the Gender Equity Center and the LGBTQA Pride Center, by allocating more than $296,000 to them, which is more than 53% of the Student Activity Fees allocated to fund student advocacy, and by creating special rules to favor only them – including allowing the two centers to use Student Activity Fees to bring in speakers to advocate for certain viewpoints. ASI also allocates Student Activity Fees to sponsor the Arts & Lectures Series to bring speakers to campus to advocate for certain viewpoints. However, ASI denied Students for Life at CSU-SM's request for funding because ASI limits all other student-run organizations to

2

$500 per semester and they are not allowed to use the fees to pay speakers to advocate for their own viewpoints.

3.     As a student at CSU-SM, Mr. Apodaca and other members of Students for Life at CSU-SM are required to subsidize the speech of the Gender Equity Center and the LGBTQA Pride Center through payment of the mandatory Student Activity Fee. Mr. Apodaca disagrees with their viewpoints which include advocating for abortion and sexually promiscuous behavior.

4.     When Plaintiff Students for Life at CSU-SM applied for funding to host a nationally recognized columnist and speaker, Professor Mike Adams, to speak about the issue of abortion, ASI denied the request. Yet, ASI provides funding through Student Activity Fees to the Gender Equity Center and the LGBTQA Pride Center, allowing them to pay for numerous speakers to speak on campus over the last two semesters, reflecting their own views on a variety of topics that conflict with those of Mr. Apodaca, including abortion and human sexuality.

5.     Defendants have violated Plaintiffs' constitutional rights and caused them irreparable injury by forcing Mr. Apodaca and the members of Students for Life at CSU-SM to subsidize speech with which they disagree without affording them the opportunity to respond by bringing in their own speakers; by favoring the views of the Gender Equity Center and the LGBTQA Pride Center by giving those centers far more funding than other student-run organizations and permitting only those centers to pay costs to bring in speakers; by granting the Gender Equity Center and the LGBTQA Pride Center unbridled discretion to co-sponsor the advocacy of other student organizations; by denying Students for Life at CSU-SM funding for its event with Professor Adams; and by allocating Student Activity Fees without objective criteria or standards to ensure against viewpoint discrimination.

6.     This action is based on the denial of Plaintiffs' fundamental rights to free speech and equal protection of the laws under the United States Constitution.  The policies and actions detailed below are challenged on their face and as applied to

Plaintiffs. Defendants' policies and actions have deprived and will continue to deprive Plaintiffs of their paramount rights and guarantees under the United States Constitution. Each and every act of Defendants alleged herein was committed by Defendants, each and every one of them, under the color of state law and authority.

## Jurisdiction and Venue

7.     This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

8.     This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

9.     This Court has authority to award the requested damages pursuant to 28 U.S.C. § 1343; the requested declaratory relief pursuant to 28 U.S.C. §§ 2201–02; the requested injunctive relief pursuant to 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and costs and attorneys' fees under 42 U.S.C. § 1988.

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because all of the Defendants reside in this district and/or all of the acts described in this Complaint occurred in this district.

## Plaintiffs

11.     Plaintiff Nathan Apodaca is a member of Students for Life at CSU-SM and a full-time student at the University.

12.     Mr. Apodaca pays the mandatory Student Activity Fees at the University and has paid this fee every semester in which he has been enrolled.

13.     Mandatory Student Activity Fees paid by Mr. Apodaca have been and will be allocated to student groups for causes to which he objects, including advocacy for the right to abortion and against his own pro-life views.

14.     Mr. Apodaca is entitled to the viewpoint-neutral distribution of the mandatory Student Activity Fees he has been and will be required to pay or to the repayment of fees he has paid and to be exempt from paying such fees in the future.

15.    Plaintiff Students for Life at California State University-San Marcos is an unincorporated expressive student organization comprised of CSU-SM students.

16.    Students for Life at CSU-SM is recognized as an official student organization at the University. It is a student-led, non-partisan, pro-life expressive student organization.

17.    Every student member of Students for Life at CSU-SM pays mandatory Student Activity Fees at the University.

18.    Students for Life at CSU-SM and each of its members is entitled to viewpoint-neutral access to and allocation of mandatory Student Activity Fees collected by the University or to the repayment of the fees they have paid and to be exempt from paying such fees in the future.

19.    Part of Students for Life at CSU-SM's mission is to be an expressive student organization at the University and to protect its members' constitutional rights on campus.

20.    If Students for Life at CSU-SM succeeds in this lawsuit, it will be able to obtain viewpoint-neutral access to the mandatory Student Activity Fee funding, and its members will not be compelled to pay for others' expression in a system that permits viewpoint discriminatory allocation of those funds to views they oppose.

21.    Students for Life at CSU-SM brings this suit on behalf of itself as a registered student organization at the University and on behalf of its individual student members, all of whom are compelled to pay mandatory student fees for the expression of viewpoints they oppose and are denied viewpoint-neutral access to the University's organizational funding mechanism through a system that permits discrimination against them because of the viewpoint of their speech activities and which actually does advantage others' opposing views over their own.

**Defendants**

22.     Defendant Timothy P. White is, and was at all times relevant to this Complaint, the Chancellor of California State University, a public university organized and existing under the laws of the State of California.

23.     Defendant White is responsible for the establishment, oversight and adjustment of mandatory Student Activity Fees imposed pursuant to the Student Activity Fee Policy and related procedures challenged herein and their application to Students for Life at CSU-SM in denying its application for funding.

24.     As Chancellor, Defendant White is responsible for reviewing the annual report prepared by the University which sets forth the allocation of the mandatory Student Activity Fees assessed on the University's students, including Mr. Apodaca and the other student members of CSU-SM.

25.     Defendant White has enforced the Student Activity Fee Policy in a viewpoint-discriminatory manner by establishing the policy which authorizes the University to require its students, including Mr. Apodaca and the members of Students for Life at CSU-SM, to pay mandatory Student Activity Fees and grants unbridled discretion to discriminate in the allocation of Student Activity Fees by favoring the viewpoints of the Gender Equity Center and the LGBTQA Pride Center, and disfavoring the views of Students for Life at CSU-SM.

26.     Defendant White is sued in his official and individual capacities.

27.     Defendant Karen S. Haynes is, and was at all times relevant to this Complaint, the President of California State University-San Marcos, a public university organized and existing under the laws of the State of California.

28.     Defendant Haynes is responsible for the oversight and enforcement of mandatory Student Activity Fees imposed pursuant to the Student Activity Fee Policy and related procedures challenged herein and their application to Students for Life at CSU-SM in denying its application for funding.

29.    As president of the University, Defendant Haynes is responsible for reviewing and approving the annual budget prepared by ASI which sets forth ASI's proposed allocation of the mandatory Student Activity Fees assessed on the University's students, including Mr. Apodaca and the other student members of CSU-SM.

30.    As president of the University, Defendant Haynes has the authority to review, approve, or reject the funding decisions of ASI.

31.    Defendant Haynes has enforced the Student Activity Fee Policy in a viewpoint-discriminatory manner because she has approved ASI's viewpoint discriminatory allocation of Student Activity Fees which favors the views of, *inter alia*, the Gender Equity Center and the LGBTQA Pride Center, and disfavors the views of Students for Life at CSU-SM, and she has not instructed ASI to change or alter these policies and related procedures to restrict the discretion of University officials in the allocation of Student Activity Fees.

32.    Defendant Haynes is sued in her official and individual capacities.

33.    Defendant Associated Students, Inc. of California State University San Marcos ("ASI") is a California nonprofit corporation.

34.    ASI has the authority assigned it by the other Defendants herein through the Student Activity Fee Policy, to create policies relating to use and allocation of mandatory Student Activity Fees, review funding applications and make funding decisions to student groups applying for Student Activity Fee funding.

35.    ASI applied the Student Activity Fee Policy in a viewpoint discriminatory manner by favoring the viewpoints of the Gender Equity Center and the LGBTQA Pride Center and discriminating against the viewpoints of Students for Life at CSU-SM by denying its application for funding.

7

# Factual Background

## I.  Defendants' Unconstitutional Student Activity Fee Funding System

### A.  California laws and regulations governing mandatory Student Activity Fees

36.  California State University-San Marcos is a public university organized and existing under the laws of the State of California, and it receives funding from the State of California in order to operate.

37.  The University is governed by the California State University Board of Trustees through the enactment of regulations and policies.

38.  The Board of Trustees derives its authority from Cal. Educ. Code § 66600 *et seq.*

39.  The University may establish a student body organization for the purpose of providing essential activities closely related to, but not normally included as part of, the regular instructional program of the university. Cal. Educ. Code § 89300.

40.  A student body organization is considered an "auxiliary organization" of the University. Cal. Educ. Code § 89901(b).

41.  An auxiliary organization is an independently governed corporation that is legally separate from the University. Cal. Educ. Code § 89913(c).

42.  The governing board of a student body organization must consist primarily of students, with a representative of the University president to advise on policy and to provide a liaison between the student governing board and the President of the University. 5 CCR § 42602(a).

43.  The president of the University is responsible for ensuring that the student body organization operates in conformity with the policy of the Board of Trustees and the University. 5 CCR § 42402.

44.  If two-thirds of the student body approves by vote, the Board of Trustees has the authority to establish a mandatory membership fee for the student body

organization that all students are required to pay as a condition of enrollment. Cal. Educ. Code § 89300.

## B.    The Unconstitutional Student Activity Fee Policy

45.    The principle underlying the expenditure of student body organization funds collected through mandatory fees is that such expenditures shall be made in programs that reflect the broadest variety of student interests and that are open to all students who wish to participate. 5 CCR § 42659.

46.    The Board of Trustees has determined that mandatory Student Activity Fees may only be used for the following specific purposes: (a) Programs of cultural and educational enrichment and community service; (b) Recreational and social activities; (c) Support of student unions; (d) Scholarships, stipends, and grants-in-aid for only currently admitted students; (e) Tutorial programs; (f) Athletic programs, both intramural and intercollegiate; (g) Student publications; (h) Assistance to recognized student organizations; (i) Student travel insurance; (j) Administration of Student Activity Fee program; (k) Student government-scholarship stipends, grants-in-aid, and reimbursements to student officers for service to student government; (l) Student employment to provide payment for services in connection with the general administration of Student Activity Fees; (m) Augmentation of counseling services, including draft information, to be performed by the campus; (n) Transportation services; (o) Child day care centers for children of students and employees of the campus; and (p) Augmentation of campus health services. 5 CCR § 42659.

47.    The Board of Trustees has delegated broad authority and responsibility to Defendant White, as Chancellor, to take whatever actions are necessary for the establishment and oversight of campus Student Activity Fees. A true and correct copy of the Standing Orders of the Board of Trustees of the California State University is attached as Exhibit 1 to this Complaint.

48.     Pursuant to this authority, Defendant White issued Executive Order 1102 which governs the establishment and allocation of student activity fees. A true and correct copy of Executive Order 1102 is attached as Exhibit 2 to this Complaint.

49.     But the Student Activity Fee Policy violates the First and Fourteenth Amendment rights of the University's students because it grants University administrators unbridled discretion to discriminate in the allocation of their mandatory student activity fees based on the viewpoint of student speech.

50.     As detailed in subsequent paragraphs, Plaintiffs challenge, facially and as-applied, the Defendants' Student Activity Fee Policy because:

- The policy grants Defendants unbridled discretion to allocate mandatory Student Activity Fees in a viewpoint-discriminatory manner.
- The policy does not include necessary objective criteria, factors, or standards required to guide the Defendants in allocating mandatory Student Activity Fees to fund expressive activity in a viewpoint-neutral manner.
- The policy affords unbridled discretion to favor certain viewpoints by creating student-run "centers" like the Gender Equity Center and the LGBTQA Pride Center, funding them through Student Activity Fees, and creating different rules governing their use of student fees inapplicable to other student groups.
- The policy does not provide for an appeals process if a student organization's request for funding is denied.
- The Defendants apply the policy to favor the speech of the Gender Equity Center and the LGBTQA Pride Center and disfavor alternative viewpoints offered by student organizations like Students for Life at CSU-SM.
- The Defendants apply the policy to allow the Gender Equity Center, the LGBTQA Pride Center, and the Arts & Lectures Series to use mandatory

Student Activity Fees to pay for speakers to speak at their events on a variety of viewpoints including abortion, human sexuality, birth control, and exploitation of women, but forbid Students for Life at CSU-SM and other student organizations from using mandatory Student Activity Fees to pay for speakers to speak on those topics from a different viewpoint.

- The Defendants applied the policy to deny Students for Life at CSU-SM's request for reimbursement of a portion of expenses for Professor Adams to speak at their event, which was open to all CSU-SM students, and Defendants will apply the policy to deny student activity funding for Students for Life at CSU-SM to pay for speakers to present its viewpoints on topics such as abortion and human sexuality, thereby favoring the viewpoints presented by the Gender Equity Center and the LGBTQA Center whose speakers are reimbursed with student activity fees.

- The Defendants applied the policy to require Mr. Apodaca and other members of Students for Life to pay mandatory Student Activity Fees pursuant to a policy which is not viewpoint-neutral.

51. The Student Activity Fee Policy establishes six categories of fees. Campus mandatory fees that must be paid to enroll in or attend the university are classified as Category II fees (hereinafter referred to as "mandatory Student Activity Fees"). Ex. 2 § II. B.

52. ASI is a non-profit, student-run auxiliary student body organization formed pursuant to Cal. Educ. Code § 89300. A true and correct copy of the Bylaws of ASI is attached as Exhibit 3 to this Complaint.

53. ASI is governed by the ASI Board of Directors and Executive Officers. Ex. 3, Art. 10 § 2.

54. One of ASI's stated purposes is "to improve the quality of student life by promoting student intellectual, cultural, recreational, and social welfare." Ex. 3, Preamble.

55.     Pursuant to the Student Activity Fee Policy, the University requires that every student enrolled is automatically a member of ASI and is required to pay a mandatory fee of $75 for each semester that he or she is enrolled as a student.

56.     ASI is completely funded through the payment of mandatory Student Activity Fees.

57.     The total amount of mandatory Student Activity Fees collected by the University on behalf of ASI for the 2016-2017 academic year was approximately $1.31 million. A copy of ASI's Annual Budget for 2016-2017 is attached as Exhibit 4 to this Complaint.

58.     Pursuant to the Student Activity Fee Policy, ASI is responsible for preparing ASI's Annual Budget and presenting it to Defendant Haynes, as the President of the University. Ex. 3, Art. 14 § 2.8.

59.     The Student Activity Fee Policy does not contain provisions requiring that the mandatory Student Activity Fees must be allocated in a viewpoint-neutral manner.

60.     The Student Activity Fee Policy does not contain objective criteria necessary to guide decisionmakers when allocating Student Activity Fees to fund student organization speech or other expressive activities.

61.     Pursuant to the Student Activity Fee Policy, upon information and belief, Mr. Apodaca will pay approximately $300 in mandatory Student Activity Fees in his four semesters at the University, and the other members of Students for Life at CSU-SM will pay approximately $600 during their four years at the University.

62.     Pursuant to the Student Activity Fee Policy, ASI allocates mandatory Student Activity Fees to fund expressive activities and programs through: (1) the Campus Activities Board; (2) the Gender Equity Center; (3) the LGBTQA Pride Center; (4) the Arts & Lectures Series; and (5) ALF Leadership Funding. A copy of ASI's webpage is attached as Exhibit 5 to this Complaint.

63.     For the 2016-2017 academic year, ASI allocated $218,860 in mandatory Student Activity Fees to the Campus Activities Board ("CAB"). Ex. 4.

64.     The duties of the CAB include: (1) developing "programming on campus based on the focus areas and needs of the student body"; (2) developing "engaging and informative campus activities that are representative of diversity of the campus community"; and (3) ensuring that "all events contribute to engaging the campus community." Campus Activities Board Code § VIII, a copy of which is attached as Exhibit 6 to this Complaint.

65.     The CAB also is tasked with organizing a Volunteer Committee for at-large students to assist with campus activities. Ex. 6 § VIII.

66.     In 2005, ASI created the Women's Center to provide resources, advocate for, and express viewpoints on issues related to women. The purpose of the Women's Center was to educate students about social justice issues that affect women such as domestic violence, sexual equality, and eating disorders. A copy of The Cougar Chronicle article dated September 6, 2010 discussing the formation is attached as Exhibit 7 to the Complaint.

67.     In 2015, ASI decided to change the purpose of the advocacy and expression of the Women's Center and renamed it the Gender Equity Center.

68.     The Gender Equity Center is a student-run organization that is governed by the ASI Board of Directors.

69.     The stated purpose of the Gender Equity Center is to "provide a space dedicated to gender equity in which students of all genders and diverse identities feel safe, valued, and respected." Gender Equity Center Code § III, a copy of which is attached as Exhibit 8 to the Complaint.

70.     The Gender Equity Center accomplishes its purpose "through programming, education, and advocacy." Ex. 8 § III.

71.     The duties and responsibilities of the Gender Equity Center include: (1) provide a safe and welcoming space for all students, staff, and faculty; (2) conduct

educational programming and events focused on meeting the needs of students of all genders and diverse identities; (3) increase awareness about issues that primarily affect women, gender nonconforming, and transgender students on campus; and (4) pursue gender equity through dialogue, support, programming, education, and advocacy. Ex. 8 § VIII.

72.    For the 2016-2017 academic year, ASI allocated $147,919 in mandatory Student Activity Fees to the Gender Equity Center. It is funded solely through Student Activity Fees. Ex. 4.

73.    The Gender Equity Center regularly engages in and promotes speech that advocates a pro-abortion viewpoint, and Plaintiffs disagree with this viewpoint. For example, last semester, the Gender Equity Center hosted a pro-abortion lecture by CSU-SM Women's Studies professor Cecili Chadwick entitled "A Feminist History of Reproductive Rights."

74.    Upon information and belief, the Gender Equity Center has not held any event or brought any speaker to campus that expressed or advocated for a pro-life viewpoint.

75.    The Gender Equity Center hosts several annual events. Love Your Body Day is an annual "feminist celebration to raise awareness about health issues, challenge harmful and offensive advertisements and media, and promote positive body image." A copy of Gender Equity Center's Events webpage is attached as Exhibit 9 to this Complaint.

76.    Women's Herstory Month is an annual campus-wide celebration with over a dozen events that is intended to recognize the struggles and celebrate the achievements of women in the U.S. Ex. 9.

77. The Gender Equity Center also hosts other miscellaneous events throughout the year. Some of the events this year include the Safe Zone Training Workshop, ABC's of LGBTQ: Queer Women, and the Pleasure Party. Ex. 9.

78. For the Pleasure Party, students were invited to "[c]ome and learn more about how to increase your pleasure! We will go over different ways to increase your pleasure, whether it's for yourself, for your partner, or both!" A picture of the Pleasure Party advertisement is attached as Exhibit 10 to the Complaint.

79. The Gender Equity Center also provides various resources. One of these resources is LGBTQ Safe Zone which includes educational workshops and training seminars for classes, campus agencies, student organizations, and departments about topics including gender, sexuality, identity, and other topics relating to multicultural competence.

80. Another resource is a training entitled Mask of Marginalization in which attendees participate in a simulation activity where they can identify their roles that mirror those in society of privilege and marginalization.

81. The Gender Equity Center also offers "trans affirming spaces," "gender inclusive restrooms," and a "preferred name policy." A copy of the Gender Equity Center's Trans Resources webpage is attached as Exhibit 11 to the Complaint.

82. In 2007, ASI created the LGBTQA Pride Center to provide resources, advocate for, and express viewpoints on issues related to LGBTQA individuals.

83. The LGBTQA Pride Center is a student-run organization that is governed by the ASI Board of Directors.

84. The purpose of the LGBTQA Pride Center is to "create, sustain, and affirm an open, safe, and inclusive environment for lesbian, gay, bisexual, transgender, queer, questioning, intersex, and ally (LGBTQIA) individuals and communities at CSU San Marcos." LGBTQA Pride Center Code § III, a copy of which is attached as Exhibit 12 to the Complaint.

85. The LGBTQA Pride Center "accomplishes its purpose by building community, service as a voice of advocacy fostering a positive campus climate for LGBTQIA individuals, sponsoring events and programs which reflect the diversity

within LGBTQIA communities, and providing educational resources and opportunities." Ex. 12 § III.

86. The duties and responsibilities of the LGBTQA Pride Center include: (1) conduct educational programming and events focused on meeting the needs of students of all genders, sexual orientations, and diverse identities; (2) increase awareness about issues impacting LGBTQIA students on campus; and (3) pursue equity for LGBTQIA individuals through dialogue, support, programming, education, and advocacy. Ex. 12 § VIII.

87. For the 2016-2017 academic year, ASI allocated $148,579 in mandatory Student Activity Fees to the LGBTQA Pride Center. Ex. 4.

88. The LGBTQA Pride Center hosts several annual events. The Coming Out Monologues is an annual community-based theater project "celebrating the diversity of experience and identity in the coming out journey." A copy of the LGBTQA Pride Center's Event's webpage is attached as Exhibit 13 to the Complaint.

89. Gaypril is an annual month-long celebration of the "lesbian, gay, bisexual, transgender, questioning and allied (LGBTQA+) community through a series of events that will include lectures, discussions, art collaborations and a pride festival." Ex. 13.

90. The LGBTQA Pride Center also hosts miscellaneous events throughout the year, some of which include outside speakers. For example, this semester the LGBTQA Pride Center hosted (1) Dr. Sayaka, a professional sexologist, for a presentation entitled "Kink 101" which was a discussion of BDSM and Kink which included prizes and participation in an interactive workshop, and interested individuals were encouraged to bring a scarf or tie if they wanted to play along; and (2) Dr. Jennifer Gunsaullus, a sexuality speaker, for a presentation entitled "Spice Up Your Valentine's Day" which was an interactive presentation designed to explore mindfulness in your sexuality and included sex quizzes, myth busting, and information on popular aphrodisiacs. The LGBTQA Pride Center used Student

Activity Fees to pay speakers to participate in both of these events. Pictures of the advertisements for these events are attached as Exhibit 14 to this Complaint.

91. The LGBTQA Pride Center also offers "trans affirming spaces," "gender inclusive restrooms," and a "preferred name policy" which are the same resources provided by the GEC. Ex. 11.

92. The LGBTQA Pride Center regularly engages in and promotes speech that advocates for and encourages sexual activities that Plaintiffs believe are immoral and unhealthy.

93. Upon information and belief, the LGBTQA Pride Center has not held any event or brought any speaker to campus that expressed or advocated for the viewpoint that sex should only occur between a man and a woman in a marital relationship.

94. The Gender Equity Center and the LGBTQA Pride Center also publish two annual student-written magazines. The Queery, published by the LGBTQA Pride Center, focuses on artwork and articles related to and advocating for the interests of "LGBTQ, Queer, and Ally issues and identities." The Feminist Agenda, published by the Gender Equity Center, focuses on feminist and gender issues.

95. The CAB, Gender Equity Center, and the LGBTQA Pride Center are all ASI entities. ASI employs a media and communications team that supports the activities of the ASI entities. A copy of the Media and Communications Team Code is attached as Exhibit 15 to this Complaint.

96. The media and communications team designs, develops, and prints promotional items and all marketing materials for all events and services for all ASI entities. Ex. 15 § VIII.

97. The media and communications team also coordinates with each ASI entity to construct a marketing plan for the entity's activities and programs. Ex. 15 § VIII.

98. ASI allocates mandatory Student Activity Fees to pay for outside speakers to speak on campus through its sponsorship of the Arts & Lectures Series which is

produced by the College of Humanities, Arts, Behavioral and Social Sciences. A copy of the Arts & Lectures Series webpage and Spring 2017 brochure is attached to the Complaint as Exhibit 16.

99. The Arts & Lectures Series is a series of events that is designed to offer "eye-opening perspectives on multiple topics, issues, and disciplines by bringing in exceptional guests who are experts in various fields creatively and intellectually." Ex. 16.

100.    The Arts & Lectures Series includes "lectures across various fields, film/video screenings, visual art talks, dance and theatre performances, music concerts, scientific discussions, book readings and more." Ex. 16.

101.    The Spring 2017 series included: (1) Jane Elliott in a lecture entitled "The Anatomy of Prejudice"; (2) storyteller and sociologist Kimberly Dark in a lecture entitled "Things I Learned from Fat People on the Plane"; and (3) hip hop artist and activist Nomis in a performance entitled "The Socially Just."

102.    For the 2016-2017 academic year, ASI allocated $38,629 in mandatory Student Activity Fees to ASI Leadership Funding ("ALF"). Ex. 4.

103.    ALF is a program that provides funding for student organizations to hold on-campus events and for student attendance at professional conferences. A copy of the ASI Leadership Funding Policy is attached to the Complaint as Exhibit 17.

104.    The University has more than 100 recognized student organizations.

105.    The maximum amount that a student organization can receive is $250 for an event that is not open to the entire campus community and $500 for an event that is open to the entire campus community. Ex. 17.

106.    The maximum amount that a student organization may receive in ALF funding is $500 per semester. Ex. 17.

107.     Allocation of ALF funds is determined by the ASI Executive Vice President and professional staff members who meet five times per semester to review applications. Ex. 17

108.     The meetings to review ALF applications are not recorded.

109.     Students are encouraged to apply early in the year because funds are awarded on a first come, first served basis. Ex. 17.

110.     To be eligible for an ALF grant, student organizations must satisfy the following criteria: (1) must be officially recognized by the University; (2) must work with the Student Life and Leadership Coordinator to plan the event; (3) events must be held on-campus; (4) funding is available for consumable items and facility costs, which support the event such as food for attendees, paper products, and advertising specific for the event; (5) programs must not make a profit and the event must be free to attend; (6) funding is not available for individual student organization members; (7) funding is not available for door prizes, raffles, opportunity drawings, honorariums, speaker fees, donations, gifts, or give-away items; (8) only original forms and signatures are accepted; and (9) incomplete applications will be rejected. Ex. 17.

111.     Pursuant to the ASI Leadership Funding Policy, the ASI Executive Vice President and the other members of the committee have the discretion to deny the grant application even if all of the listed criteria are satisfied.

112.     The Student Activity Funding Policy provides no objective criteria or standards to limit the discretion of the ASI Executive Vice President and the other members of the committee in evaluating the applications that meet the threshold criteria above.

113.     Student organizations are required to submit a completed application for ALF funding along with a program description which must be at least two paragraphs and include the following information explaining why the program should be funded: (1) the purpose of the event; (2) how the event benefits students;

(3) whether the organization has put on this event in the past; and (4) if the event has been put on in the past, describe the impact and why it is important to offer this event again. Ex. 17.

114.    An itemized budget must also be included showing the allowable expenses. Ex. 17.

115.    After submitting the completed application, the ASI Executive Vice President and the committee evaluates the request and informs the organization by email whether the funding request was approved. Ex. 17.

116.    Funds are provided on a reimbursement basis to individuals or for payment to a vendor after the event. Ex. 17.

117.    Student organizations may co-sponsor an event with another student organization. The ALF contribution for co-sponsored events is up to $1,000. Ex. 17.

118.    The Student Activity Fee Policy does not contain any provision requiring that the mandatory Student Activity Fees must be allocated in a viewpoint-neutral manner.

119.    The Student Activity Fee Policy does not contain objective criteria, factors, or standards necessary to guide ASI in allocating Student Activity Fees to fund expressive activity in a viewpoint-neutral manner.

120.    Pursuant to the unbridled discretion granted to them in the Student Activity Fee Policy, ASI applies the policy in a viewpoint-discriminatory manner by favoring the speech and expressive activities of the Gender Equity Center, the LGBTQA Pride Center, and the Arts & Lectures Series and disfavoring all other student speech.

121.    For the 2016-2017 academic year, ASI allocated $296,498 to the Gender Equity Center and the LGBTQA Pride Center which is more than 53% of the total mandatory Student Activity Fees allocated to student advocacy.

122.    In contrast, ASI allocated only $38,629 to fund the speech and expressive activities of the more than 100 other student organizations at the

University which is less than 7% of the total mandatory Student Activity Fees allocated to student advocacy. Further, the other student organizations are limited to $500 per semester to fund their speech and expressive activities.

123. ASI also favors the speech and expressive activities of the Gender Equity Center, the LGBTQA Pride Center, and the Arts & Lectures Series by allocating mandatory Student Activity Fees to them to pay speakers for their on-campus events. But, Students for Life at CSU-SM is forbidden from using mandatory Student Activity Fee funds to pay for speakers at its events.

124. Additionally, in creating the Gender Equity Center and the LGBTQA Pride Center as ASI Entities, ASI further favors the speech of these entities by employing a media and communications team which creates a marketing plan and then designs, develops, and prints promotional items and all marketing materials for their events. All of this is paid for through mandatory Student Activity Fees. Yet, other student organizations, specifically Students for Life at CSU-SM, are denied this same benefit.

125. Defendants White and Haynes have the authority to establish the terms of the Student Activity Fee Policy and to require ASI to abide by the policy.

126. Pursuant to the Student Activity Fee Policy, ASI has discretion over the specific allocation of mandatory Student Activity Fees, and thus has control over the viewpoint of the speech and expressive activities funded by those fees.

127. Pursuant to the Student Activity Fee Policy, there is no appeals process if a student organization's funding application for an ALF grant is denied by ASI.

128. Pursuant to the Student Activity Fee Policy, there is no process to punish or remove University officials that violate viewpoint neutrality when making student activity fee funding decisions.

## II.     Background on Students for Life at CSU-SM

129. Students for Life at CSU-SM is a nonprofit, student-led expressive student group at the University and is a recognized student organization.

130.   Students for Life at CSU-SM is founded upon its view that all human life from the point of conception until natural death is sacred and has inherent dignity.

131.   Students for Life at CSU-SM also believes and advocates that sexual activity should only occur between a man and a woman in a marital relationship.

132.   Students for Life at CSU-SM advocates for these views peacefully on campus.

133.   Students for Life at CSU-SM engages in expression on the University's campus through a variety of means including flyers, signs, peaceful demonstrations, hosting tables with information, inviting speakers to campus, and talking with fellow students about its pro-life views.

134.   When engaging in these expressive activities, Students for Life at CSU-SM and its members discuss political, religious, social, cultural, and moral issues, events, and ideas.

135.   For example, in this past year, Students for Life at CSU-SM hosted the Genocide Awareness Project in September 2016 and February 2017 and it also hosted a debate on the topic of abortion between Seth Gruber of the Life Training Institute and Cecili Chadwick of the CSU-SM Women's Studies department.

136.   Students for Life at CSU-SM intends to engage in these types of expressive activities during the remainder of the 2017–2018 academic year and subsequent years thereafter. It wants to apply for grants from mandatory Student Activity Fees to offset the cost of providing these educational opportunities for the CSU-SM campus but has been and will be denied such funding because the Student Activity Fee Policy grants ASI unbridled discretion to allocate funds based upon the viewpoint of the speech. And ASI has utilized such discretion to favor the speech of the Gender Equity Center, the LGBTQA Pride Center, and the Arts & Lectures Series and to disfavor all other student speech reflecting competing viewpoints, including the speech of Students for Life at CSU-SM.

III.   **Defendants' Unconstitutional Denial of Students for Life at CSU-SM's Funding Request**

137.   As required by the ALF Policy, Students for Life at CSU-SM submitted an application for an ALF grant of $500 to host Professor Mike Adams to deliver a speech, open to all students, entitled, "Abortion and Human Equality: A Scientific and Philosophical Defense of the Pro-Life View."

138.   The application indicated that the program was scheduled to be held on March 9, 2017.

139.   The total cost of the event would be approximately $3,000 which includes Professor Adams' speaking fee and travel expenses.

140.   Students for Life at CSU-SM had obtained commitments of $2,000 from other non-university sources to assist with the expenses of the event.

141.   After submitting the application, Mr. Apodaca received an e-mail stating that the application was denied. No explanation was provided. A copy of the e-mail is attached as Exhibit 18 to the Complaint.

142.   Mr. Apodaca inquired about the reason for the denial. The ASI representative responded that the application was not complete because it did not include an itemized list of the expenses. Ex. 18.

143.   Mr. Apodaca responded that the funds were needed to cover the costs of a speaker and asked whether he could resubmit the application with this information. The ASI representative informed Nathan that ALF grants are not available for speaker fees and travel expenses. Ex. 18.

144.   Mr. Apodaca responded that he was surprised that student organizations could not receive funds for speakers because the Pride Center and the GEC both receive funding for speakers. The ASI representative provided the following response:

Well, the BOD, GEC, and Pride Center (and CAB-Campus Activities Board) are all departments of ASI and have their own budgets to do their own programming.

ALF comes from the BOD's programming funds to assist student orgs even though the student orgs technically have nothing to do with ASI since they are run and recognized by Student Life & Leadership (SLL). But, since we believe student life on campus is important, we have the funding available to help events happen as a courtesy to the student orgs. But, we (as BOD-ALF) don't coordinate the event or participate in the event, which is why we can't fund things such as speaker fees or travel expenses. The other ASI entities fully coordinate and run their own events and programming and thus can have speakers and/or other programming events.

Ex. 18.

145.   Mr. Apodaca inquired whether the Gender Equity Center would be willing to co-sponsor the Students for Life at CSU-SM's event, but they declined.

146.   Upon information and belief, the Gender Equity Center and the LGBTQA Pride Center do not have any written policies and procedures governing whether they will co-sponsor an event, and neither ASI nor any of the other Defendants have placed any restriction on their discretion to determine whether to co-sponsor another student group's event. Thus, the Gender Equity Center and the LGBTQA Pride Center, as ASI departments, have unbridled discretion to discriminate in their co-sponsorship with another student group using mandatory Student Activity Fees based upon the viewpoint of the proposed speech.

147.   As a result of ASI's denial of the grant request, Students for Life at CSU-SM canceled the event with Professor Adams because it had insufficient funds to cover the cost of the event.

148.   Pursuant to the Student Activity Fee Policy, Students for Life at CSU-SM could not appeal the denial of funding by ASI or the Gender Equity Center.

149.   Pursuant to the Student Activity Fee Policy, ASI denied Students for Life at CSU-SM's request for funding for Professor Adams' speech.

24

150.   Pursuant to the Student Activity Fee Policy, ASI denied Students for Life at CSU-SM's request for funding, thereby discriminating against the viewpoint intended to be expressed by Students for Life at CSU-SM and its invited speaker.

151.   Pursuant to the Student Activity Fee Policy, ASI allocates mandatory Student Activity Fees to the Gender Equity Center and the LGBTQA Pride Center and allows those student-run entities to use such funds for speakers to discuss topics chosen by those centers and reflecting the viewpoints for which the centers choose to advocate, including advocating for abortion and sexually promiscuous behavior.

152.   Students for Life at CSU-SM plans to apply for Student Activity Fee funding through an ALF grant immediately for its upcoming events on campus which will promote a different viewpoint on abortion and sexual behavior.

153.   Students for Life at CSU-SM is currently working on plans to bring at least two speakers to campus in the fall of 2017 and wants to apply for funding through an ALF grant for those events.

154.   For example, Students for Life at CSU-SM intends to bring pro-life speakers Scott Klusendorf, President of Life Training Institute, and Professor Mike Adams to campus to speak in the fall of 2017, and it intends to apply for an ALF grant to defray the costs of hosting these speakers.

155.   Pursuant to the Student Activity Fee Policy, Defendants will deny Students for Life at CSU-SM's request for an ALF grant to bring Scott Klusendorf and Professor Adams to speak on campus because they will not pay for speaker fees or their travel expenses.

156.   Students for Life at CSU-SM also intends to host an event on campus entitled "Real Sex Week" which will include activities and provide information related to the myths of safe sex and abortion, education about the risk of STDs, and education about the health risks of common forms of birth control. Students for Life at CSU-SM's viewpoints on issues such as sex, human sexuality, birth control, and

abortion will differ from the viewpoints advocated by the Gender Equity Center and the LGBTQA Pride Center.

157.   Pursuant to the Student Activity Fee Policy, Defendants possess unbridled discretion in allocating mandatory Student Activity Fees and in evaluating Students for Life at CSU-SM's future applications for an ALF grant and Defendants possess the authority to deny the applications based upon the viewpoint of Students for Life at CSU-SM's speech.

## Allegations of Law

158.   All of the acts of Defendants, their officers, agents, employees, and servants, were executed and are continuing to be executed by Defendants under the color and pretense of the policies, statutes, ordinances, regulations, customs, and usages of the State of California.

159.   ASI acts under color of state law when carrying out its duties and functions delegated to it by the other Defendants pursuant to the Student Activity Fee Policy with respect to allocating mandatory Student Activity Fees.

160.   Defendants are not engaging in government speech or their own speech in their allocation of mandatory Student Activity Fees.

161.   Defendants knew or should have known that by forcing Mr. Apodaca and the other members of Students for Life at CSU-SM to pay into a viewpoint discriminatory Student Activity Fee system and by denying Students for Life at CSU-SM's application for an ALF grant due to the viewpoint of its guest speaker's expression, Defendants violated Plaintiffs' constitutional rights.

162.   The Student Activity Fee Policy which Defendants applied to violate Plaintiffs' constitutional rights remains in full force and effect.

163.   Plaintiffs are suffering irreparable harm from the Student Activity Fee Policy and conduct of Defendants, which cannot be fully compensated by an award of money damages.

164.   Plaintiffs have no adequate or speedy remedy at law to correct or redress the deprivation of their rights by Defendants.

165.   Defendants' actions and policies, as set forth above, do not serve any legitimate or compelling state interest.

166.   Defendants have deprived, and continue to deprive, Plaintiffs of their clearly established rights under the United States Constitution, as set forth in the causes of action below.

167.   Unless the conduct of Defendants is enjoined, Plaintiffs will continue to suffer irreparable injury.

168.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to appropriate relief invalidating Defendants' Student Activity Fee Policy, along with the related practices and procedures.

### First Cause of Action

**Violation of Plaintiffs' First Amendment Right to Freedom of Speech**

**Compelled Speech and Viewpoint Discrimination**

169.   Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–168 of this Complaint.

170.   The First Amendment's Freedom of Speech Clause prohibits the government from compelling citizens to express or support a message not of their own choosing.

171.   The First Amendment's Freedom of Speech Clause prohibits public universities from collecting a mandatory Student Activity Fee that is used to fund student organization speech, if that mandatory Student Activity Fee is not allocated in a viewpoint-neutral manner.

172.   The First Amendment's Freedom of Speech Clause prohibits viewpoint discrimination in a public forum created for student speech.

173.   When a public university collects mandatory Student Activity Fees and allows registered student organizations to apply for Student Activity Fee funding, or

otherwise makes funds available to student groups to foster a diversity of viewpoints, it creates a public forum for student speech and expression.

174.   The government is not speaking when it allows registered student organizations promoting a multiplicity of views to apply for funding, whether through Student Activity Fees or otherwise. Instead, it creates a public forum for student speech and expression.

175.   The funds that a public university collects through a mandatory Student Activity Fee and uses to fund student organizations do not constitute government funds.

176.   The government's ability to restrict speech in a public forum is limited.

177.   A public university may not apply viewpoint-based standards in allocating student organization funding, including through mandatory Student Activity Fees.

178.   The Defendants have created a public forum for student speech through its Student Activity Fee Policy.

179.   Through the Student Activity Fee Policy, the Defendants compel Plaintiff Nathan Apodaca, the other members of Plaintiff Students for Life at CSU-SM, and all University students to pay a mandatory Student Activity Fee that is used in part to fund student organization speech on campus pursuant to a policy which is not viewpoint-neutral.

180.   Defendants' policies governing the allocation of mandatory Student Activity Fees, including the Student Activity Fee Policy, confer unbridled discretion on Defendants or other government officials charged with allocating those funds to suppress and/or discriminate against disfavored speech based on viewpoint.

181.   The lack of objective criteria, factors, or standards for determining who may access a student organization funding forum gives government officials unbridled discretion to exclude or prohibit speech based on its viewpoint in violation of the First Amendment.

182.   The lack of a process to remove officials who violate viewpoint neutrality when deciding student organization funding requests indicates that the government has unbridled discretion to govern the speech forum.

183.   The lack of advanced notice for meetings, public meetings, and recording of meetings of government officials charged with allocating student organization funding indicates that the government has unbridled discretion to govern the speech forum.

184.   The lack of an appeals process in a student organization funding forum indicates that the government has unbridled discretion to govern the speech forum.

185.   Defendants' policies governing the allocation of funds, including the Student Activity Fee Policy, confer unbridled discretion on Defendants or other government officials charged with allocating those funds to suppress and/or discriminate against disfavored speech because of its viewpoint.

186.   Defendants' policies governing the allocation of funds, including the Student Activity Fee Policy, grant Defendants unbridled discretion to promote or create student organizations that advocate for Defendants' favored viewpoints, such as the Gender Equity Center and the LGBTQA Pride Center, and to favor those viewpoints over the viewpoints of all other student organizations.

187.   Defendants' policies governing the allocation of funds, including the Student Activity Fee Policy, grant Defendants unbridled discretion to allow the Gender Equity Center and the LGBTQA Pride Center to favor certain viewpoints over others by co-sponsoring the events of certain student organizations but declining to co-sponsor events of other disfavored student organizations.

188.   Defendants' policies governing the allocation of funds, including the Student Activity Fee Policy, do not provide a process through which Defendants or other government officials may remove an official for violating the constitutional prohibition against viewpoint discrimination.

189.  Defendants' policies governing the allocation of funds, including the Student Activity Fee Policy, do not provide that ALF grant meetings be announced in advance to the public, be open to the public, or be recorded.

190.  Defendants' policies governing the allocation of funds, including the Student Activity Fee Policy, do not provide student organizations with the ability to appeal student organization funding decisions by ASI.

191.  ASI has exercised the unbridled discretion granted by the remaining Defendants through the challenged policies to deny Plaintiff Students for Life at CSU-SM the opportunity to receive mandatory Student Activity Fees for speakers, but they still force students, including Plaintiff Apodaca and members of Plaintiff Students for Life at CSU-SM, to support other speakers reflecting the views of the Gender Equity Center, the LGBTQA Pride Center, the Arts & Lectures Series, and other student organizations through the mandatory Student Activity Fee.

192.  ASI has exercised the unbridled discretion granted by the remaining Defendants through the challenged policies to deny Plaintiff Students for Life at CSU-SM the opportunity to receive mandatory Student Activity Fees in the same manner as the Gender Equity Center and the LGBTQA Pride Center, but they still force students, including Plaintiff Apodaca and members of Plaintiff Students for Life at CSU-SM, to support the speech of the Gender Equity Center and the LGBTQA Pride Center through the mandatory Student Activity Fee.

193.  Defendants' Student Activity Fee Policy compels Plaintiff Apodaca and the student members of Plaintiff Students for Life at CSU-SM to fund and support speech and viewpoints with which they disagree and which they find offensive and objectionable.

194.  Pursuant to the Student Activity Fee Policy, Defendants engaged in content- and viewpoint-based discrimination by favoring the expressive activities of the Gender Equity Center and the LGBTQA Pride Center, but not providing Plaintiff Students for Life at CSU-SM the same treatment.

195.   Defendants applied the Student Activity Fee Policy, and procedures, practices, and customs to Plaintiff Students for Life at CSU-SM in a discriminatory manner by (1) allocating more than $296,000 to the Gender Equity Center and the LGBTQA Pride Center to fund their advocacy but limiting Plaintiff Students for Life at CSU-SM to $500 per semester; (2) granting the student-operated Gender Equity Center and the LGBTQA Pride Center special benefits, such as use of the media and communications team, that are not available to Students for Life at CSU-SM; and (3) allowing the Gender Equity Center, the LGBTQA Pride Center, and the Arts & Lectures Series to use mandatory Student Activity Fees to pay for speakers but denying funding to Students for Life at CSU-SM to pay for speakers.

196.   Defendants' Student Activity Fee Policy permits viewpoint discrimination in the allocation of Student Activity Fees because it grants unbridled discretion to University administrators and ASI.

197.   Defendants have no legitimate interest to support by favoring the speech of the Gender Equity Center, the LGBTQA Pride Center, and the Arts & Lectures Series and disfavoring the speech of Plaintiff Students for Life at CSU-SM.

198.   Accordingly, Defendants' Student Activity Fee Policy and their enforcement of those policies against Plaintiffs, violates Plaintiffs' right to freedom of speech guaranteed by the First Amendment.

199.   Because of Defendants' actions, Plaintiffs have suffered, and continue to suffer, economic injury and irreparable harm. They are entitled to an award of monetary damages and equitable relief.

200.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to a declaration that Defendants violated their First Amendment right to freedom of speech and an injunction against Defendants' policy and actions. Additionally, Plaintiffs are entitled to damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

**Second Cause of Action**

**Violation of Plaintiffs' Fourteenth Amendment**

**Right to Equal Protection of the Law**

201. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–168 of this Complaint.

202. The Fourteenth Amendment to the United States Constitution guarantees Plaintiffs the equal protection of the laws, which prohibits Defendants from treating Plaintiffs differently than similarly situated students and student organizations.

203. The government may not treat someone disparately as compared to similarly situated persons when such disparate treatment burdens a fundamental right, targets a suspect class, or has no rational basis.

204. Plaintiff Nathan Apodaca and the other student members of Students for Life at CSU-SM are similarly situated to all other students at the University because they pay Student Activity Fees as a condition of enrollment at the University.

205. Pursuant to the Student Activity Fee Policy, Defendants treated Plaintiff Nathan Apodaca and the other student members of Students for Life at CSU-SM disparately than other students because Defendants have used Plaintiffs' fees to fund the speech of students that agree with the viewpoints advocated for by the Gender Equity Center and the LGBTQA Pride Center but have denied funding to advocate for Plaintiffs' viewpoints on those same topics.

206. Defendants' Students Activity Fee Policy and related practices violate Plaintiff Nathan Apodaca and the other student members of Students for Life at CSU-SM's fundamental right to freedom of speech.

207. Plaintiff Students for Life at CSU-SM is similarly situated to the Gender Equity Center and the LGBTQA Pride Center at the University because they are all student-led organizations that engage in expressive activity on campus to advocate for their own viewpoints.

208. Pursuant to the Student Activity Fee Policy, Defendants granted mandatory Student Activity Fee funding to the Gender Equity Center and the LGBTQA Pride Center, but denied the same to Plaintiff Students for Life at CSU-SM.

209. Pursuant to the Student Activity Fee Policy, Defendants granted mandatory Student Activity Fee funding to the Gender Equity Center and the LGBTQA Pride Center to bring in speakers for events advocating viewpoints on political, ideological, and social issues, but denied the same funding to Plaintiff Students for Life at CSU-SM for its speech by Professor Adams, which also would have focused on political, ideological, and social issues, but from a different viewpoint.

210. Pursuant to the Student Activity Fee Policy, Defendants treated Plaintiff Students for Life at CSU-SM disparately when compared to the Gender Equity Center and the LGBTQA Pride Center by denying Plaintiff Student Activity Fee funding.

211. Defendants' Student Activity Fee Policy and related practices violate Plaintiff Students for Life at CSU-SM's fundamental right to freedom of speech.

212. When government regulations, like Defendants' mandatory Student Activity Fee funding policy and practices challenged herein, infringe on fundamental rights, discriminatory intent is presumed.

213. Defendants' mandatory Student Activity Fee funding policy and practices have also been applied to discriminate intentionally against Plaintiffs' rights to freedom of speech.

214. Defendants lack a rational or compelling state interest for such disparate treatment of Plaintiffs.

215. Defendants' Student Activity Fee Policy and their practices are not narrowly tailored as applied to Plaintiffs because Plaintiffs' speech does not implicate any of the compelling or even legitimate interests Defendants might have.

216. Defendants have applied the Student Activity Fee Policy and their procedures, practices, and customs to Plaintiff Students for Life at CSU-SM in a discriminatory and unequal manner, allowing the Gender Equity Center and the LGBTQA Pride Center to receive preferred treatment, including preferred funding allocations, and authorization to use those funds to pay speakers to advocate for their views, while providing only the opportunity for far less funding for Plaintiff and subjecting it to restrictions on using those funds to bring in its own speakers in violation of Plaintiff's right to equal protection of the laws under the Fourteenth Amendment.

217. Because of Defendants' actions pursuant to the Student Activity Fee Policy, Plaintiffs have suffered, and continue to suffer, economic injury and irreparable harm. Plaintiffs are entitled to an award of monetary damages and equitable relief.

218. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to a declaration that Defendants violated their Fourteenth Amendment right to equal protection of law and an injunction against Defendants' Student Activity Fee Policy and actions. Additionally, Plaintiffs are entitled to damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

## **Prayer For Relief**

Wherefore, Plaintiffs respectfully request that this Court enter judgment against Defendants and provide Plaintiffs with the following relief:

(A)    A declaratory judgment that Defendants' Student Activity Fee Policy, facially and as-applied, violates Plaintiffs' rights under the First and Fourteenth Amendments;

(B)    A declaratory judgment that Defendants' denial of Student Activity Fee funding to Plaintiff Students for Life at CSU-SM violated Plaintiff's rights under the First and Fourteenth Amendments;

34

(C)  A preliminary and permanent injunction prohibiting Defendants, their agents, officials, servants, employees, and any other persons acting on their behalf from enforcing the Student Activity Fee Policy challenged in this complaint;

(D)  Actual compensatory damages in the amount of $500.00 for infringing Plaintiff Students for Life at CSU-SM's exercise of its First and Fourteenth Amendment rights;

(E)  Actual compensatory damages in the amount of mandatory Student Activity Fees paid by each of Plaintiff Students for Life at CSU-SM's student members, including Plaintiff Apodaca, that was collected pursuant to a viewpoint-discriminatory policy that infringed Plaintiffs' First Amendment rights;

(F)  Nominal damages for the violation of Plaintiffs' First and Fourteenth Amendment rights;

(G)  Plaintiffs' reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988; and

(H)  All other further relief to which Plaintiffs may be entitled.

Respectfully submitted this 9th day of August 2017.

By: s/ Tyson C. Langhofer

DANIEL R. WATKINS
CA Bar No. 163571
WATKINS & LETOFSKY, LLP
2900 S. Harbor Blvd., Ste. 240
Santa Ana, CA 92704-6418
(866) 439-1295
(949) 476-9407 Fax
dw@wl-llp.com

TYSON C. LANGHOFER
AZ Bar No. 32589*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0021 Fax
tlanghofer@ADFlegal.org

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MICHAEL CASEY MATTOX
D.C. Bar No. 1033672*
ALLIANCE DEFENDING FREEDOM
440 1st Street NW, Suite 600
Washington, D.C. 20001
(202) 393-8690
(202) 347-3622 Fax
cmattox@ADFlegal.org

*Admitted Pro Hac Vice


Attorneys for Plaintiffs

1

**DEMAND FOR TRIAL BY JURY**

2

Plaintiffs demand trial by jury of all matters so triable herein.

3

By: s/ Tyson C. Langhofer

4

TYSON C. LANGHOFER

5

*Attorney for Plaintiffs*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFICATION OF COMPLAINT**

I, Dylan Steinecke, President of Students for Life at California State University-San Marcos, and a citizen of the United States and a resident of the State of California, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing Verified Complaint and the factual allegations therein, and the facts as alleged are true and correct.

Executed this 9 day of August, 2017, at San Marcos , California.

Dylan Steinecke, President
Students for Life at CSU-SM

38

1
2

## **VERIFICATION OF COMPLAINT**

3
4

    I, Nathan Apodaca, a citizen of the United States and a resident of the State

5

of California, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746

6

that I have read the foregoing Verified Complaint and the factual allegations

7

therein, and the facts as alleged are true and correct.

8
9

    Executed this _08_ day of August, 2017, at _San Marcos_, California.

10
11
12
13

                Nathan Apodaca

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28