RICHARD A. PAUL (SBN 057976)
JEFFREY P. MICHALOWSKI (SBN 248073)
KARA SIEGEL (SBN 296126)
**PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP**
101 West Broadway, Ninth Floor
San Diego, California 92101-8285
Telephone:  619-237-5200
Facsimile:   619-615-0700

Attorneys for Defendants TIMOTHY P. WHITE, CHANCELLOR; KAREN S. HAYNES, PRESIDENT; and ASSOCIATED STUDENTS, INC. OF CALIFORNIA STATE UNIVERSITY SAN MARCOS

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATHAN APODACA; and STUDENTS FOR LIFE AT CALIFORNIA STATE UNIVERSITY - SAN MARCOS,<br><br>Plaintiffs,<br><br>v.<br><br>TIMOTHY P. WHITE, Chancellor of California State University, in his official and individual capacities; KAREN S. HAYNES, President of California State University-San Marcos, in her official and individual capacities; and ASSOCIATES STUDENTS, INC. OF CALIFORNIA STATE UNIVERSITY SAN MARCOS, a California nonprofit corporation,<br><br>Defendants. | Case No. 3:17-cv-01014-L-NLS<br><br>**CONSOLIDATED REPLY IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Date:           December 10, 2018<br>Time:          11:00 a.m.<br>Judge:         Hon. M. James Lorenz<br>Courtroom:  5-B<br>Trial Date:   Not Set<br><br>**EXEMPT FROM FEES GOVT. CODE § 6103** |

# TABLE OF CONTENTS

I.  INTRODUCTION ......................................................................................... 1

II. WHAT THE UNDISPUTED RECORD ACTUALLY SHOWS ..................... 4

A.  The Centers Prepare Their Co-curricular Programming In Accordance With Defined Campus Standards ......................................... 4

B.  Plaintiffs' Description of the Centers' Programming Is A Caricature Of What They Actually Do. ................................................... 4

  1.  Plaintiffs identify only a handful of events—out of hundreds—to which they purport to object. ............................... 4

  2.  Plaintiffs object to language from marketing materials (which serve to pique curiosity) but ignore the actual content of the programs (which serve to educate). ....................... 6

  3.  Plaintiffs fail to identify *any* Center program that promoted abortion or sexual activity. ........................................... 7

C.  Plaintiffs Fail to Produce Evidence of Discriminatory Intent. ............. 10

  1.  Plaintiffs requested funds from ASI well after its budget had been finalized, and plaintiffs do not proffer any comparator. ....................................................................................... 10

  2.  Plaintiffs admit that their ALF request was non-compliant. ...... 10

  3.  Plaintiffs' request to the GEC was disingenuous, and the timing was unrealistic. ................................................................ 11

    a.  *Plaintiffs asked the GEC to fund an imaginary event* .................................................................................. 11

    b.  *The GEC's response was not discriminatory.* ................. 13

D.  The Campus Has Robust Procedures To Address Discrimination. Plaintiffs Ignored Them, And Instead Opted To Sue. .......................... 14

## PLAINTIFFS' CLAIMS LACK MERIT

I.  UNIVERSITY SPEECH VERSUS STUDENT SPEECH ............................. 14

A.  The *Purpose* For Which Funds Are Expended—Student Speech versus Educational Speech—Determines The Constitutional Test. ....................................................................................................... 15

B.  The ASI Fee Is No Monolith – It Supports Both Student Speech

and Educational Government Speech. ...................................................17

   1.   ASI acts as independent administrator of ALF funds to RSOs.  A viewpoint-neutrality requirement thus attaches. ........18

   2.   ASI has a voice in the budgeting process, but the campus makes the decisions.  This constitutes government speech........19

   3.   ASI expresses positions via unfunded resolutions.  Neither *Southworth* nor government speech doctrine apply. ..................20

II.   THE UNIVERSITY AS EDUCATOR (AND GOVERNMENT SPEAKER) ............................................................................................21

   A.   Plaintiffs' Challenge to the Center Funding Fails at the Threshold..................................................................................21

      1.   Plaintiffs' challenge is at best premature....................................21

      2.   Plaintiffs' admissions foreclose a facial challenge.....................22

   B.   Plaintiffs Concede That Universities Are Entitled to Great Deference In The Classroom And Beyond. ............................24

   C.   The Decision To Fund The Centers Is University Speech. ..................25

   D.   The Centers' Programming Decisions Are University Speech. ...........26

      1.   The Centers' decisions constitute university speech because the campus has authority to control them. ...................26

      2.   The campus does more than the government speech doctrine requires – it exercises *actual* control...........................28

      3.   The Centers' programming is an educational co-curriculum.  It is not a "forum" open to private speech. ...........29

      4.   The law affords broad discretion for educational decisions, and the Centers fall squarely within those boundaries. ..............30

III.   ASI AS ADMINISTRATOR OF FUNDING FOR PRIVATE SPEECH ......31

   A.   Plaintiffs Lack Standing. .......................................................................31

   B.   Defendants' funding criteria are viewpoint neutral as written, and plaintiffs venture no viable argument to the contrary...........................32

   C.   Plaintiffs Have Abandoned Their Claim Of Discrimination As-Applied – A Striking Reversal From Their Complaint. ......................33

1

IV.     PLAINTIFFS' EQUAL PROTECTION CLAIMS LIKEWISE FAIL...........33

2

V.      PLAINTIFFS' DRACONIAN PROPOSAL—PERMITTING FEES
ONLY ON AN OPT-IN BASIS—RESTS ON A FLAGRANT
MISREADING OF *JANUS* AND *SOUTHWORTH*. .....................................34

3

4

VI.     CONCLUSION ....................................................................................35

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

iii

Case No. 3:17-cv-01014-L-NLS
DEFENDANTS' REPLY ISO DEFENDANTS' MSJ AND OPPOSITION TO PLAINTIFFS' CROSS-MSJ

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Alpha Delta Chi-Delta Chapter v. Reed*
648 F.3d 790 (9th Cir. 2011) ................................................................... 8

*Amidon v. Student Ass'n of State Univ. of New York at Albany*
508 F.3d 94 (2007) ...................................................................... 16, 29

*Associated Students of the University of Calif. at Santa Barbara v. Regents of Univ. of Calif.*
2007 WL 196747 (N.D. Cal. Jan. 23, 2007) ........................................ 25

*Badger Catholic, Inc. v. Walsh*
620 F.3d 775 (7th Cir. 2010) ...................................................... 16, 24

*Board of Regents of Univ. of Wisconsin Sys.v. Southworth*
529 U.S. 217 (2000) ................................................................... passim

*Carroll v. Blanken*
957 F.2d 991 (2d. Cir. 1992) ........................................................... 6

*City of Lakewood v. Plain Dealer Publishing Co.*
486 U.S. 750 (1988) ....................................................................... 30

*Coleman v. Quaker Oats Co.*
232 F.3d 1271 (9th Cir. 2000) .......................................................... 20

*DaimlerChrysler Corp. v. Cuno*
547 U.S. 332 (2006) ................................................................. 24, 34

*Delano Farms Co. v. Calif. Table Grape Comm'n*
586 F.3d 1219 (2009) .............................................................. 27, 28

*Demers v. Austin*
746 F.3d 402 (9th Cir. 2014) ........................................................... 24

*Every Nation Campus Ministries at San Diego State Univ. v. Achtenberg*
597 F. Supp. 2d 1075 (S.D. Cal. 2009) .............................................. 34

*Forsyth County v. National Movement*
505 U.S. 123 (1992) ....................................................................... 30

*Freedom from Religion Foundation, Inc. v. City of Warren, Mich.*
707 F.3d 686 (6th Cir. 2013) ............................................................. 8

*Griffin v. Secretary of Veterans Affairs*
 288 F.3d 1309 (Fed. Cir. 2002) ........................................................ 30

*Hein v. Freedom from Religion Foundation, Inc.*
 551 U.S. 587 (2007) ......................................................................... 24

*Hosty v. Carter*
 412 F.3d 731 (7th Cir. 2005) ........................................................... 24

*Johanns v. Livestock Marketing Ass'n*
 544 U.S. 550 (2005) ......................................................................... 17

*Kaahumanu v. Hawaii*
 682 F.3d 789 (9th Cir. 2012) ........................................................... 30

*Lujan v. Defenders of Wildlife*
 504 U.S. 555 (1992) ......................................................................... 31

*N.H. Right to Life PAC v. Gardner*
 99 F.3d 8 (1st Cir. 1996) ................................................................. 22

*Nat'l Endowment for the Arts v. Finley*
 524 U.S. 569 (1998) ......................................................................... 22

*Nat's Park Hospitality Ass'n v. Dep't of Interior*
 538 U.S. 803 (2003) ......................................................................... 23

*Paramount Land Co. LP v. Calif. Pistachio Comm'n*
 491 F.3d 1003 (9th Cir. 2007) ................................................... 27, 28

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*
 460 U.S. 37 (1983) ........................................................................... 33

*Regan v. Taxation with Representation of Washington*
 461 U.S. 540 (1983) ................................................................... 24, 25

*Rosenberger v. Rector and Visitors of Univ. of Va.*
 515 U.S. 819 (1995) ............................................................... 4, 16, 28

*Shuttlesworth v. City of Birmingham*
 394 U.S. 147 (1963) ......................................................................... 30

*Skyline Wesleyan Church v. Calif. Dep't of Managed Health Care*
 313 F. Supp. 3d 1225 (S.D. Cal. 2018) ........................................... 23

*Sweezy v. State of New Hampshire*
 354 U.S. 234 (1957) ......................................................................... 24

*Texas v. United States*
 523 U.S. 296 (1998) ......................................................................... 21

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*US West Communications v. MFS Intelenet, Inc.*
    193 F.3d 1112 (9th Cir. 1999) ............................................................... 13

*Widmar v. Vincent*
    454 U.S. 263 (1981) ............................................................................... 30

**STATE CASES**

*Smith v. Regents of Univ. of Calif.*
    4 Cal.4th 843 (1993)............................................................................... 21

**STATE: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS**

5 CCR § 42402 ................................................................................... 26, 27

5 CCR § 42500 ........................................................................................ 25

CAL. EDUCATION CODE § 89756................................................................. 27

CAL. EDUCATION CODE § 89300 ................................................................. 17

## I.      INTRODUCTION

Legally, plaintiffs fail to separately evaluate the two distinct governmental activities at issue here—the government as *educator*, versus the government as *administrator* of funding to private groups—and conflate the two very different bodies of law that govern those distinct activities.  Factually, counsel's argument *sounds* like a plea that his clients are not able to express their views on campus.  But the undisputed facts show that defendants have provided them with extensive support for their expressive activities in any number of ways.[1]

This litigation has never been about expanding SFL's ability to speak.  It is rather a strike suit to upend defendants' efforts to promote inclusion of vulnerable and excluded populations, just because some of those populations might espouse notions of equality or social tolerance with which plaintiffs disagree.  Plaintiffs' suggestion that the Court extend the *Southworth* model into the uncharted waters of *bona fide* student resource centers and their educational programming is neither called for by that precedent, nor does it make any sense.

In reality, plaintiffs claim an individual veto power over the instructional and enrichment decisions vested by the First Amendment in the university, not in them. *Someone* gets to decide whether to have these programs and what they will teach.  It is the university, not each individual student asserting that his or her view trumps that of professional educators in deciding matters of curriculum and student support. The proper balance of speech rights under the Constitution does not countenance such a radical departure from settled law.  Sound judicial principles caution that the Court should resist being drawn into constitutional confusion when a few simple

---

[1] Apodaca 206:18-22 ("Q. In terms of getting your message out, did the university provide you with the space and resources that you needed in order to get your message out in the way that you wanted to get your message out? A. Yes.").  All deposition testimony cited herein is attached to the Michalowski Supplemental Declaration at Exhibits 16(a)-16(g).

rules suffice to guide its decision in this case.

Plaintiffs' false equivalence between the *private* rights of CSUSM's 110+ recognized student organizations ("RSOs") to event support, on the one hand, and the *campus-endorsed* GEC and Pride Center on the other, is not only legally untenable, but would have unfathomably large repercussions. Why? Because if, as plaintiffs argue, defendants may not prioritize *bona fide* resource centers over student organizations, and must treat and fund them equally with private clubs, then the full run of centers at CSUSM would need to be reduced to club status. The Black Student Center, the Latin@ Center, and the Center for Children and Families—all of which are funded by mandatory student fees at CSUSM, just like the Pride Center and GEC—would succumb to the same funding caps as RSOs. The campus could no longer exercise its academic judgment to promote equal access to education or to support Centers' co-curricular programming. Instead, in service of a hollow concept of equality, fees would need to be disbursed pro-rata to whichever RSOs (*e.g.*, the Improv Society, the Volleyball Club, or the Gardening Society) requested them.

Worse still, under this regimen, any student that disagrees with the positions taken in any Center on any given day in the course of educating students (about, say, women's rights, or African-American history, or support for veterans) could cry foul. This is not what the constitutional balance contemplates, let alone requires. The undisputed facts show that proper respect for individual speech rights and the university's right to speak and teach has been struck in the CSUSM approach. It is unnecessary to dismantle academic freedom and government speech rights to ensure that plaintiffs can speak freely and well – while their counsel might disagree, plaintiffs have admitted as much.

The facts remain undisputed. It is only plaintiffs' characterization of them that needs unpacking. Here are four examples of spun facts or untrue statements:

- Plaintiffs claim that ASI's Executive Director described ASI as the "voice

of students at CSUSM." Opptn. 4:1-2. Not so. The actual testimony was that ASI is the "voice of students at CSUSM" in "*university decisions regarding the functioning of the university.*" In reality, ASI is far from autonomous, and has no independent authority to allocate funds. It is a creature of statute, and the university maintains decision-making authority with respect to all ASI expenditures.

- Plaintiffs paint a caricature of the work of the Centers by highlighting four events that included discussion of sexuality, while ignoring *320* other Center programs (which addressed art, literature, poetry, sociology, health, safety, parenting, career development, and more).

- Plaintiffs claim that "ASI allocated almost $300,000 to the Centers that was used to fund events and speakers." Opptn 12:6-8. That is simply not true. Most money went to non-speech or administrative activities. The Centers each had budgets of $23,310 for all student activities (presentations and otherwise) over the course of a year, and only a small fraction of that was allocated to speakers.

- Plaintiffs' claim that the Centers denied their request to sponsor a pro-life event is simply not true. The Center declined to sponsor an event on plaintiffs' unrealistic timeline, but the Center specifically encouraged SFL to "keep contacting us . . . and probably the fall would be a lot better." Plaintiffs *never returned* to ask about a fall event. (And at the ALF level, when plaintiffs made a timely, compliant request, it was *granted* in full.)

Finally, Plaintiffs' Opposition tries to tiptoe around the ripeness and standing issues, but cannot evade those barriers. As Plaintiffs would have it, Apodaca's payment of a mandatory fee marks both the beginning and the end of the constitutional standing analysis in this case. Citing no authority, plaintiffs claim that payment of the fee alone—regardless of injury or injury-causation—satisfies the "case or controversy" requirement of Article III. But plaintiffs must show that an actual controversy exists, and that it is ripe for resolution. Here, they have not.

We will end by returning to the place we began: Plaintiffs' conflation of two very different constitutional doctrines. Plaintiffs claim that *all* student fees, merely because they are mandatory, must be expended in a viewpoint-neutral manner. But the controlling authority recognizes that payment of a fee is only the beginning of the analysis. One must also determine the purpose for which the fee was spent. In *Southworth*, a mandatory fee was used for the purpose of funding private *student* speakers, and the Court held that a requirement of viewpoint neutrality attached.

(This is the RSO part of this case.)  If funds are used, instead, to fund *government* speakers (including *public university* speakers, whether employees or adjuncts), the analysis is altogether different.  *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 834 (1995) ("A holding that the University may not discriminate based on the viewpoint of private persons whose speech it facilitates does not restrict the University's own speech, which is controlled by different principles.").

To summarize the rules as we see them:  In ASI's capacity as <u>administrator of funding for student speech</u> through its ASI Leadership Fund ("ALF"), the rules of viewpoint neutrality attach.  <u>The university as educator</u>, however, is not subject to such rules.  Rather, when a public university makes academic judgments about what to teach and how to teach it—as it does when it prioritizes equal access to education, and when it provides educational programming— the university engages in *government speech*, and has the broadest of discretion.  Plaintiffs' challenges to both types of conduct fail.

## II.   WHAT THE UNDISPUTED RECORD ACTUALLY SHOWS

### A.   The Centers Prepare Their Co-curricular Programming In Accordance With Defined Campus Standards.

Unlike RSOs at CSUSM—which may host events on whatever topics they wish—the Centers are obligated to serve the campus's educational mission.  Aiello-Hauser ¶ 18.  Their programming decisions are made not by students, but by professional educators.  *Id.* ¶¶ 3, 19.  And at all times, Center programs must conform to campus-wide learning outcomes, which were developed after extensive study by CSUSM's Division of Student Affairs.  *Id.* ¶ 20.  Haynes ¶¶ 19-20.

### B.   Plaintiffs' Description of the Centers' Programming Is A Caricature Of What They Actually Do.

#### 1.   Plaintiffs identify only a handful of events—out of hundreds—to which they purport to object.

Through discovery in this action, plaintiffs requested and received

information about over five years of programming by the Centers, including over 320 events.  Michalowski Supp. Decl. ¶ 2.  Out of these, plaintiffs identify only a handful to which they claim to object (Opptn. 8:26-9-8).  But even if these cherry-picked events were what plaintiffs assumed them to be—and they are not (*see* pp. 6-8, below)—they amount to a tiny sliver of what the Centers do.

Center programming includes events addressing arts and literature (such as discussions of Puerto Rican literature, a poetry performance by a leading artist, and screenings of art films); health and safety issues (including eating disorders, drug and alcohol use, and sexual violence); career development (including a salary negotiation workshop); and parenting while a student (including discussions about Title IX, and a reading of Dr. Seuss stories for children of students).  The Centers welcome religious discussion – they sponsored discussions by Father Gregory Boyle (a Jesuit priest) and Abby Stein (an orthodox Jew), and hosted Bible studies in the Center.  So too have they welcomed a representative of the Log Cabin Republicans.  Aiello-Hauser Decl. ¶¶ 16, 22-25; Aiello-Hauser Supp. Decl. ¶ 4.  Indeed, at deposition, plaintiffs acknowledged that they *support* and even *admire* much of the work of the Centers.  Apodaca 71:17-74:25; 76:1-3; Steinecke 40:9-42:1-3.

In viewing the Centers' offerings as a whole—*i.e.*, as an inclusive co-curriculum of events, addressing a broad range of topics from a broad range of perspectives—it is clear that the Centers are anything but hostile to plaintiffs and their views.  Although plaintiffs identify a few programs to which they purport to object, students and student organizations who hold very different political and religious perspectives could surely do the same.  Atheist students may object to the Bible Study; the College Democrats may object to the Log Cabin Republicans; and even Dr. Seuss is not immune from protest.[2]

Such student objections are unavoidable if a university is properly carrying

---

[2] DR. SEUSS MUSEUM WILL REMOVE MURAL AFTER AUTHORS OBJECT TO 'RACIAL STEREOTYPE,' NEW YORK TIMES (Oct. 6, 2017).

out its educational mission.  A professor, curriculum, or center that offends *no one* could do so only by avoiding issues on which students are prone disagree.  That would be an abdication of the university's responsibility, and a disservice to First Amendment values.  *Cf. Carroll v. Blanken*, 957 F.2d 991, 1001 (2d. Cir. 1992) (a university that facilitates exploration of challenging issues is "fulfilling its traditional mission in a free society.  Were it otherwise, college would be a very quiet, intellectually diminished and ultimately irrelevant place.").

>  **2.    Plaintiffs object to language from marketing materials (which serve to pique curiosity) but ignore the actual content of the programs (which serves to educate).**

Plaintiffs' objections rest almost exclusively on assumption – plaintiffs have no knowledge of the actual content of the programs, because they did not attend.  Apodaca 64:11-65:5; Steinecke 39:22-40:1.  Instead, they emphasize sound bites from *marketing* materials.  And is often the case with advertising—especially when the intended audience consists of college students—the promotional materials for the events emphasized sexuality in an effort to pique interest.[3]

In reality, though, the events plaintiffs challenge were rich in educational content.  The "Pleasure Party" was not the student-led frivolity that plaintiffs suggest – it was led by a licensed sex educator and therapist (with a M.S.W. in Behavioral Health), and included discussion of safer sex.  The Kink 101 discussion, too, addressed sexual health and safety, and was led by a licensed Marriage and Family Therapist with a Ph.D. in Human Sexuality.  Aiello-Hauser Decl. ¶¶ 23-24.

Plaintiffs are dismissive of Professor Jane Ward's program on "Sex Between

---

[3] Plaintiffs appear to be well-aware that one way to attract attention and to initiate conversations is through hyperbole and shock value.  *See* Michalowski Supp. Decl. ¶ 19, Exh. 19 (after displaying graphic images related to abortion in the center of campus, Apodaca published an editorial stating – "Many who stopped by the Genocide Awareness Project display last week while it was on campus were shocked to see abortion compared to genocides performed throughout history.").

Straight White Men."  Opptn. 8:26-28.  But that discussion was presented in collaboration with CSUSM's Sociology Department, upon the suggestion of a CSUSM Sociology Professor.  Monzón 103:14-24; 106:4-17.  The discussion grew out of a scholarly book ("Not Gay: Sex Between Straight White Men") written by a respected professor (tenured at UC Riverside).  The book was published by one of the most prestigious academic publishers in the country (NYU Press).  Aiello-Hauser Supp. Decl. ¶ 2.

Plaintiffs likewise frown upon what they call "the Bottomhood event" (Opptn. 9:1-4).  But the event was led by Dr. Tan Hoang Nguyen, a tenured professor of Literature and Cultural Studies at UCSD, and was suggested by a CSUSM Communications Professor.  At the event, Dr. Nguyen discussed his book, "A View From the Bottom: Asian American Masculinity and Sexual Representation," which was published by Duke University Press.  The event also included a viewing of one of Dr. Nguyen's experimental films, which have also been screened at the Getty Museum in Los Angeles; the deYoung in San Francisco; and the Pompidou in Paris.  Aiello-Hauser Supp. Decl. ¶ 3.

These events were not the exercises in frivolity or advocacy that plaintiffs (without evidence) assumed.[4]  Rather, these programs served CSUSM's mission of providing an environment for discussion, exploration, and open-ended inquiry.

### 3.    Plaintiffs fail to identify *any* Center program that promoted abortion or sexual activity.

Plaintiffs fail to recognize fundamental distinctions that go to the heart of academic inquiry at universities.  Open-minded exploration of a topic is not the

---

[4] Plaintiffs go so far as to state that the Centers paid a speaker "to discuss *how* straight white men can perform homosexual contact in heterosexual ways."  Opptn. 8:26-28 (emphasis supplied).  That is a dramatic misstatement of what the program entailed.  Had plaintiffs attended the event or sought via discovery to understand it, perhaps this misreading could have been avoided.  Instead, plaintiffs rely on sound bites and quotation (indeed, even mis-quotation) of marketing materials.

same as advocacy for a viewpoint.  Exposing students to a subject is not the same as indoctrination.  A professor who teaches a course on North Korean dictators would not be accused of promoting the North Korean dictatorship (at least not unless there was evidence of such promotion).  Nor should a professor who studies homosexual contact be assumed to be promoting such contact (again, unless there is specific evidence of such promotion).[5]

Here, plaintiffs offer no evidence of promoting abortion or sexual activity, and instead proffer only their assumptions that Center events would offend them (if they had attended).  Their Opposition states that the Centers hosted a lecture to discuss "reproductive rights from a pro-choice viewpoint," but presents no evidence regarding the content of the lecture.  Apodaca 199:10-14 ("Q: And do you know what she said at that discussion?  A: I'm not entirely sure.  But from the advertisements, it looked like it was going to be arguing in favor of a pro-choice point of view.").  *Compare* Monzón Supp. Decl. ¶¶ 2-3  ("I attended Professor Chadwick's discussion.  It was an academic discussion on the history of reproductive rights, and did not advocate for or against abortion rights.").[6]

_____

[5] Plaintiffs note that the Centers' purpose statements refer to "advocacy," but advocating for inclusion of students in the CSUSM educational experience has nothing to do with advocacy for particular viewpoints on abortion or sexual practices.  *See* Haynes Decl. ¶ 24; *Cf. Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 801 (9th Cir. 2011) (SDSU's nondiscrimination policy incidentally burdens groups that wish to exclude others . . . but this assertion is insufficient to prove viewpoint discrimination. . . [The policy] instead serves to remove access barriers imposed against groups that have historically been excluded.").

[6] Plaintiffs correctly note that the Centers have not presented programs with a pro-life viewpoint.  Opptn. 20:21-22.  *But nor have they presented programs with a pro-choice viewpoint.*  Advocacy related to abortion is simply not what the Centers do – the Centers exist to educate, not indoctrinate.  Monzón Supp. Decl. ¶ 2.  *Cf. Freedom from Religion Foundation, Inc. v. City of Warren, Mich.*, 707 F.3d 686, 798 (6th Cir. 2013) ("Were we to grant the Foundation's request to add the Winter Solstice sign, moreover, that would place it in a *preferred* position, as no other part

Plaintiffs also claim to object to a lecture by artist Favianna Rodriguez.  They assume that because some of her artwork includes political messages, her lecture at CSUSM must have been an exercise in political advocacy.  But again plaintiffs rest on conjecture – they did not attend the event, and present no evidence that she advocated for abortion.  In reality, Rodriguez discussed her personal experiences and its relationship to her art; and the Centers provided participating students with materials and supplies to create their own poster art.  Monzón 58:19-59:14.[7]

Likewise, plaintiffs are mistaken in their assumption that the Centers encourage students to engage in sexual activity to which plaintiffs object.  The GEC has participated in the campus-wide Safe Sex Week, and encouraged safer practices *for those who wish to engage in sexual activity at all*.  But that is a far cry from favoring or disfavoring particular sexual identities or practices.  *Consider* Monzón 98:13-22 ("Q. And has the community centers ever put on an event relating to Safe Sex Week that discusses abstinence as an option?  A. I believe that this event [the Pleasure Party] talks about abstinence as an option as part of her lesson.  Not all of it is about engaging in sexual intercourse.  Q.  Do you believe that or it did happen? A. It did.  Yes.  She talks about different ways to still engage in pleasure without

_____

of the existing display contains a . . . written advertisement . . . for its stance on the holidays.") (emphasis in original).

[7] Plaintiffs claim to be offended by a provocative poster that Rodriguez donated to the Gender Equity Center, but the poster is not relevant here.  First, no funds were expended on the poster, so it has no relevance to plaintiffs' theory of the case – *i.e.*, that the Centers use of mandatory student fees amounts to compelled speech. Second, plaintiffs acknowledge that there was nothing discriminatory about the poster.  *See* Steinecke 106:10-107:13 (plaintiffs never asked the Centers to take the poster down, and never asked the Centers to display art that reflected SFL's viewpoints).  *Compare* Aiello-Hauser 60:20-62:13 ("Q: Would a poster that says 'Build the wall' be a good fit for the [GEC] ?  . . . A: I would consider it.  We would look at it, we would see the educational value of it, and there – there's probably a stronger chance that it would be put up than not . . . The reality is, it's out there, and students need to know what's out there and what they may have to face.").  *See also* Apodaca 246:3-14 (SFL permitted to distribute event fliers in the Centers).

1  engaging in sexual intercourse.").

2  **C.    Plaintiffs Fail to Produce Evidence of Discriminatory Intent.**

3  Plaintiffs' claim of discrimination rests on three incidents: (1) the request for

4  funding from the ASI "Plan An Event" page; (2) the request for ALF funding; and

5  (3) the purported request to the GEC.  But defendants had legitimate reasons their

6  responses, and there is no evidence of any hostility or animus toward plaintiffs'

7  views.  Indeed, the undisputed evidence is to the contrary.  *See* Apodaca 206:18-22;

8  Herrscher Decl. ¶ 6; Aiello-Hauser Decl. ¶¶ 16-17.  Plaintiffs bear the burden of

9  introducing evidence of discrimination, and they default on that burden.

10  **1.    Plaintiffs requested funds from ASI well after its budget had**

11  **been finalized, and plaintiffs do not proffer any comparator.**

12  Apodaca purported to request funding directly from ASI in November 2016,

13  but did not direct his request through available funding channels – *i.e.*, via the ASI

14  Leadership Fund ("ALF") or via either the GEC or Pride Center.  Instead, he clicked

15  a link called "Plan an Event" on ASI's website, and sent an email to a general inbox

16  asking for money.  *See* Austin Decl. ¶¶ 2, 3, 5.

17  As of November 2016, however, ASI's budget for the academic year had long

18  been settled – ASI submits its budget for each academic year in April of the *prior*

19  academic year.  The campus President then assesses and approves the budget, in

20  May of the *prior* academic year.  Accordingly, the student worker who fielded

21  Apodaca's request correctly advised him that ASI was not able to provide direct

22  assistance.  Austin Decl. ¶ 4.  Plaintiffs present no evidence of *any* RSO that

23  received funding directly from ASI, or by requesting funding via the "Plan an

24  Event" page to which Apodaca directed his request.  This is because there were

25  none.  Austin Decl. ¶ 5.

26  **2.    Plaintiffs admit that their ALF request was non-compliant.**

27  As defendants explained in their opening Motion (Mtn. pp. 13-14), Apodaca's

28  request for ALF funding was denied because he failed to itemize expenses, and

because the requested funding was for a speaker fee.  Apodaca acknowledges that his request did not comply with the rules, and says he too would have denied it under the funding criteria.  Apodaca 118:20-119:15.  When Apodaca notified Steinecke (his successor as SFL President) that the application was rejected, Steinecke responded: "Maybe you weren't explicit enough in what your expenses would be."  Michalowski Decl. ¶ 20, Exh. 20.

In Opposition, plaintiffs offer no response.[8]  They introduce no evidence of bias by Fennell or Herrscher, nor do they proffer any comparator.[9]  The evidence thus remains undisputed – the decision-maker denied SFL's request for funding because SFL had failed to include an itemized budget, in violation of the ALF funding criteria.  Fennell Decl. ¶¶ 24-25, Exh. 15; Herrscher ¶ 19.  In any event, the real purpose of the funding request—reimbursement of a speaker fee—was likewise inconsistent with the neutral funding criteria.  Fennell Decl. ¶ 26, Exh. 16.

### 3.  Plaintiffs' request to the GEC was disingenuous, and their timing was unrealistic.

#### a.  *Plaintiffs asked the GEC to fund an imaginary event.*

After Apodaca (then, the SFL President) informed Steinecke (the current President) on February 9, 2017 that his request for ALF funding had been "denied,"

_____

[8] Instead, plaintiffs venture only a footnote (Opptn. p. 13, fn. 3), which states only that Mr. Apodaca does not recall whether he suggested to his staff advisor that SFL lie about the purpose for which the requested funds would be spent.  Even if that could somehow salvage his discrimination claim (and it cannot), plaintiff's efforts at rehabilitation are contrary to his own testimony.  Apodaca 117:2-18 ("[M]aybe even I had suggested it and said 'Hey, you know, maybe we could still use this' but she said – she goes, 'No.  We need to be honest about it.'").

[9] Defendants could rest on plaintiffs' default alone, but instead proffered their own comparators, showing that ASI denies applications from liberal and pro-LGBT RSOs that fail to comply with the criteria, and grants funding to conservative and religious RSOs that do comply with the criteria.  See Fennell Decl. ¶¶ 19-21, Exhs. 6-12.  See also Apodaca 227:5-15.  Moreover, SFL's previous request for ALF funding (which complied with the rules) was *granted* (Fennell Decl. ¶ 23, Exh. 14).

Steinecke did not express dismay.  He did not ask about hosting the event at a later time.  Rather, Steinecke *congratulated* him.  "You could have a case and apply the *Southworth* case to this.  Great work."  Michalowski Supp. Decl. ¶ 20, Exh. 20.

Plaintiffs claim that "on February 24, 2017, Mr. Apodaca emailed the Centers' Assistant Director requesting that the GEC co-sponsor the event with Dr. Mike Adams."  Opptn. 10:27-28.  But by that time, Mike Adams had already cancelled.  Michalowski Decl. ¶ 6, Exh. 5 at 000934 (Mike Adams: "I am afraid we are not going to be able to pull off a March event . . .").  Plaintiffs understood that the event would not occur.  Apodaca 167:12-24 ("**Q. And you understood at this point [February 18] that it wasn't going to happen?  A. Yeah.").**  In other words, plaintiffs approached the Centers not in a genuine effort to obtain funding – there was no need for funding, as there would be no event.  Instead, plaintiffs approached the Centers—armed with a secret recording device (Apodaca 144:24-145:19)—presumably with the hopes of documenting hostility toward their views.

What they found, however, was exactly the opposite.  Apodaca's recording shows that the Centers were welcoming to plaintiffs; that staff expressed enthusiasm about the prospects for an event with SFL; and encouraged SFL to remain in contact, because an event in the Fall semester would be more realistic.  *See* Michalowski Supp. Decl. ¶ 18, Exh. 18, 5:20-6:6 (GEC employee states: "Keep contacting us . . . and probably the fall would be a lot better.  . . . Because we can like plan it out over the summer.  . . . That gives us a lot more time.  Trying to put you guys on the calendar [this spring] is kind of impossible.").

Shortly after this conversation, Donna Bearman (the Staff Advisor to SFL) e-mailed her prayer group and confirmed that the GEC was welcoming to pro-life and conservative viewpoints.  *See* Bearman Decl. ¶ 2, Exh. 1 ("The GEC was welcoming to us . . . We asked if they would consider ever funding any speakers from other opinions and they said sure.  They want their students to hear everything, just not any hate message.").  *See also* Michalowski Supp. Decl. ¶ 18, Exh. 18, 8:14-

24 (GEC student worker states: "We don't take conservative or liberal. We're for the students. . . . All of our students have different opinions."). Still, despite the student worker's request—that SFL "[k]eep contacting us . . . the fall would be a lot better" (*id.* 5:20-6:5)—plaintiffs never asked either Center to co-sponsor an event in the Fall semester. Indeed, *to this day,* the plaintiffs have never returned to the Centers to request co-sponsorship, collaboration, or funding. Monzón Supp. Decl. ¶ 13; Aiello-Hauser Supp. Decl. ¶ 5.[10]

### b.   *The GEC's response was not discriminatory.*

Even if plaintiffs could sue for denial of funding for an imaginary event, they present no evidence of discrimination. Defendants declined to sponsor an SFL event in fall of 2017 because he waited until the end of the academic year, and because the proposed event appeared to be in its infancy. Monzón Decl. ¶¶ 5, 7. Had Apodaca proposed a fall event, that likely could have been achieved. *Id.* ¶ 6; Michalowski Supp. Decl. ¶ 18, Exh. 18, 5:20-23 ("Keep contacting us . . . the fall would be a lot better"). But plaintiffs made no such request.

In Opposition, plaintiffs present no evidence of discrimination, and fail to identify any proper comparators. Indeed, there are none – no other student organization had approached either Center at the end of the semester, and asked the Centers to add a new event to their calendar. Plaintiffs cite events in their Opposition (9:17-27) for which the Centers provided funding, but (i) none of the requests were by RSOs; (ii) the events were in more mature stages of planning; and (iii) none of them came as late in the academic year as SFL's request. Monzón Supp. Decl. ¶¶ 4-10. Funding an existing event—especially one that has professional, non-student support— is a world apart from working with an RSO to create an event from whole cloth. Here, SFL sought unspecified funding for an

---

[10] *Compare US West Communications. v. MFS Intelenet, Inc.,* 193 F.3d 1112, 1118 (9th Cir. 1999) ("A claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final.").

unspecified event on an unspecified date – and waited until the end of February 2017 to do so.  Although the Centers were not able to commit resources so late in the academic year, they invited plaintiffs to further discuss, and suggested setting a more realistic target date in the fall semester.  Plaintiffs never did.[11]

### D.    The Campus Has Robust Procedures To Address Discrimination. Plaintiffs Ignored Them, And Instead Opted To Sue.

Apodaca felt that CSUSM discriminated against him because of his Christian worldview.  Apodaca 41:9-17.  He was aware that the University provides multiple channels for raising concerns of such discrimination (*id.* 186:24-187:7; 188:1-17), and investigates all such complaints (Blanshan Decl. ¶¶ 2-5, Exh. 1).  Still, Apodaca did not avail himself of any such appeals processes, nor did he raise his concerns with ASI, CSUSM or CSU.  Apodaca 234:10-239:23; Blanshan Decl. ¶¶ 7-8.

Had he done so, his concerns could well have been resolved; at a minimum, they would have been investigated exhaustively.  But plaintiffs were not focused on resolution.  Michalowski Supp. Decl. ¶ 20, Exh. 20 ("You could have a case and apply the *Southworth* case to this.  Great work.").  Instead, they opted to sue.

### PLAINTIFFS' CLAIMS LACK MERIT

## I.    UNIVERSITY SPEECH VERSUS STUDENT SPEECH

The parties agree that when ASI funds RSO speech via ALF, viewpoint-neutrality requirements attach.  They disagree, however, as to whether funding of

---

[11] Plaintiffs' remaining argument for pretext rests not on reason, but on sleight of hand.  They argue that "contrary to ASI's December 8, 2016 denial of SFL's request for funds because of its budget, as of December 20, 2016, the Centers had not spent more than 50% of the allocated amount of programming funds for either of the Centers."  But plaintiffs' December 8, 2016 request was directed not to the Centers, but to ASI generally.  See p. 10, above.  Had plaintiffs approached the Centers in December or earlier, perhaps an event in the Spring semester would have been possible.  They did not, and instead waited until February 24, 2017.  *Cf.* Apodaca 166:15-167:5 (delay was "a little bit of [a] mistake on my part.  We hadn't planned it out far enough in advance that we could have gotten these issues taken care of.").

Centers and construction of a co-curriculum of programming must likewise be viewpoint neutral.  Do such decisions constitute the educational speech of a public university (a species of government speech)?  Or are they, as plaintiffs contend, no different than ALF allocations – the independent decisions of students, conferring benefits on student actors?  These are the fundamental questions in this case, and plaintiffs rely on a fundamentally false equivalence.  As defendants explain below, under the undisputed facts and under settled doctrines of jurisprudence—all of which align in protecting the right of a university to determine what to teach and how to teach it—the Centers are a product of and a vehicle for university speech.

## A.      The *Purpose* For Which Funds Are Expended—Student Speech Versus Educational Speech—Determines The Constitutional Test.

As plaintiffs would have it, the inquiry in this case begins and ends with the fact that ASI receives funding via mandatory student fees.  Because of this, plaintiffs argue, each and every action in which ASI is involved must be constrained by the principle of viewpoint neutrality.  Citing *Southworth*, plaintiffs claim that "it is well established that the University must ensure that mandatory student fees are distributed in a viewpoint neutral manner."  Opptn. 1:19-20.  But *Southworth* says no such thing.  Rather, *Southworth* recognizes that the constitutional rules differ depending on the purposes for which fees are expended.  While funding of extracurricular *student* speech is constrained by the principle of viewpoint neutrality, the educational programs of a public university are not.

Funding of Pure Student Speech.  If fees are expended to foster purely *student* speech—*i.e.*, expression that "springs from the initiative of the students, who *alone* give it purpose and content" (*Southworth*, 529 U.S. at 229)—then the principles of viewpoint neutrality apply.  At issue in *Southworth* was such student speech (not university speech).  *Id.*  ("The University of Wisconsin exacts the fee at issue for the sole purpose of facilitating the free and open exchange of ideas by, and among, its students.").  Moreover, the *Southworth* Court repeatedly emphasized that its holding

1  was limited to student speech.  *Id.* at 231 ("students who attend the university cannot

2  be required to pay subsidies for the speech *of other students* without some First

3  Amendment protection . . ."); *id.* ("If the University conditions the opportunity to

4  receive a college education . . . on an agreement to support objectionable,

5  extracurricular expression by *other students*, the [First Amendment] rights . . .

6  become implicated."); *id.* at 233 ("When a university requires its students to pay

7  fees to support the extracurricular speech *of other students*, all in the interest of open

8  discussion, it may not prefer some viewpoints to others.") (emphasis supplied).

9    *Southworth* does not hold, as plaintiffs contend, that any and all mandatory

10  student fees are subject to the requirement of viewpoint neutrality.  Nor do the other

11  cases upon which plaintiffs rely.[12]  Rather, *Southworth* requires viewpoint neutrality

12  only when mandatory fees are expended on the private speech of student groups.

13    Funding Of Educational Speech.  If funds are instead used to support the

14  educational offerings of a public university, the government speech doctrine applies,

15  and the First Amendment simply does not attach.  "Choosing which programs to

16  support and which not, whether by having a department of philosophy but not a

17  seminary, or by granting scholarships to study theology but not prepare for the

18  ministry, is a form of government speech."  *Badger Catholic, Inc. v. Walsh*, 620

19  F.3d 775, 779 (7th Cir. 2010) (Easterbrook, J.).  Judgments about extracurricular

20  activities, too, qualify as protected government speech.  *Id.* at 779 ("A university

21  can define the kind of extracurricular activity that it chooses to promote.").

22    Plaintiffs suggest that the government speech/private speech dichotomy is

23

24  [12] *See Amidon v. Student Ass'n of State Univ. of New York at Albany*, 508 F.3d 94,
    101 (2007 ("A university's viewpoint-discriminatory decision respecting how much
25  funding to allocate *to an RSO* raises the same concerns as a viewpoint-
    discriminatory decision respecting whether to fund an RSO at all."); *Rosenberger*,
26  515 U.S. at 834 ("A holding that the University may not discriminate based on the
27  viewpoint of private persons whose speech it facilitates does not restrict the
    University's own speech, which is controlled by different principles.").
28

driven not by the purpose of the expenditures—*i.e.,* funding of education, versus funding of purely student speech—but instead by mere labels. As plaintiffs would have it, funds characterized as "tuition" can constitute government speech, while funds characterized as "fees" cannot. Opptn. 35:2-9. But plaintiffs offer no basis in logic or reason for why labels would matter more than the actual purposes for which the funds are expended.[13] In truth, the cases foreclose so reductive a reading:

> Our decision ought not to be taken to imply that in other instances the university, its agents or employees, or—of particular importance—its faculty, are subject to the First Amendment analysis which controls in this case. Where the University speaks, either in its own name through its regents or officers, or in myriad other ways through its diverse faculties, the analysis would likely be altogether different.

*Southworth*, 529 U.S. 234-35. *See also Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550, 562 (2005) (the "analysis is altogether unaffected by whether the funds . . . are raised by general taxes or through a targeted assessment.").

## B.    The ASI Fee Is No Monolith – It Supports Both Student Speech and Educational Government Speech.

Plaintiffs acknowledge, as they must, that universities have broad discretion in setting priorities and allocating funds. Opptn. 34:27-28. Plaintiffs' entire case, then, relies on the premise that the university is not the actual decision-maker in funding decisions. Rather, plaintiffs contend, ASI is a student-created and student-run organization that acts autonomously in allocating all revenue from the ASI fee.

That is simply not the case. As an initial matter, ASI was not created by students. It was authorized by statute, established by CSU, and continues to exist only pursuant to an operating agreement with CSUSM. *See* Cal. Education Code § 89300; Executive Order 1000. And while the campus chooses (on pedagogical

---

[13] Relying on labels would lead to absurd results. If a university uses mandatory fees to support core classroom functions—*as CSUSM in fact does*—use of such fees (rather than tuition) does not authorize any objecting student to impose a viewpoint-neutrality requirement on the classroom. *See* Hoss Supp. Decl. ¶¶ 3-4 (CSUSM employs a mandatory fee to support core curricular and instructional functions).

grounds) to carve out a forum for student group activities that is free from university control—and thus grants ASI the autonomy to allocate a small portion of funds (*i.e.*, the ALF funds) to student organizations *without* oversight from the university—the balance of the ASI fee may be expended only with university approval, oversight and control.  Defendants explain below.

### 1.  ASI acts as <u>independent</u> administrator of ALF funds to RSOs.  A viewpoint-neutrality requirement thus attaches.

Each year, ASI allocates funding to its ASI Leadership Fund ("ALF"), which is used to support events by RSOs.  The campus President has no say in the administration of ALF funds, nor does Student Affairs, nor any campus representative.  Rather, ASI acts as independent administrator, and the campus relinquishes control over the content of RSO events.  Haynes Decl. ¶¶ 42-45.

To be sure, RSOs are subject to certain minimum requirements.  They could not, for example, receive funding for an event that excluded African-Americans or Christians.  But other than these basic obligations, student organizations have *carte blanche* to host whatever events they wish.  The campus has no control over content or message, and instead provides students a forum through which they can organize and grow organically.  Creation of this forum reflects a pedagogical judgment by the campus – *i.e.,* that "maintaining a forum for students that is substantially independent from university oversight and control is crucial to enriching campus life and promoting student engagement."  Haynes Decl.  ¶ 43.  To that end:

> Student organizations are not expected or required to support or align to the campus Strategic Plan or any Division's Institutional Alignment.  They are not expected or required to support or align to the CSUSM mission or values.  Nor are they expected or required to support or adhere to any learning outcomes.  Nor are they required to support or adhere to the objectives of the Co-Curricular model.

*Id.* ¶ 44.  Because ALF funds serve to promote *student* speech—*i.e.*, expression that "springs from the initiative of the students, who alone give it purpose and content" (*Southworth*, 529 U.S. at 229)—their allocation is governed by *Southworth* and the

requirement of viewpoint neutrality.  Defendants address ASI's compliance with this requirement at pp. 32-33, below.

2.     **ASI has a voice in the budgeting process, but the <u>campus</u> makes the decisions.  This constitutes government speech.**

Plaintiffs' Opposition repeatedly states that ASI is the "student voice" of CSUSM.  The testimony on which plaintiffs, rely, however, is not so simplistic.  Rather, Dr. Kimberly Clark (Executive Director of ASI) testified that ASI is the "student voice of CSUSM" in *university decisions* regarding the functioning of the university.  Clark 17:2-13; 17:24-18:3.

ASI's involvement in the budgeting process illustrates the interplay between "student voice" and "university decision."  The ASI Board of Directors—in shared governance with the ASI Executive Director and a representative of the CSUSM CFO—develop a *proposed* budget, including an allocation to the Centers and their programming.  Clark Decl. ¶ 7.  But the budget must be vetted by the campus CFO, and must be approved by the campus President.  *Id.*; Hoss Decl. ¶ 10-15; Haynes Decl. ¶ 34.  While the students have a voice in the process, it is the university that makes the decisions.  Without the President's authorization, the Centers would not exist; they would not be funded; and they would not carry out any programming.  Haynes Decl. ¶¶ 37-38; Hoss Decl. ¶ 11.  Conversely, if ASI wished to defund or discontinue the Centers, they would be free to voice that preference, and could submit a budget that excluded the Centers entirely.  That proposal, however, would have no effect unless and until the President endorsed it.  Hoss Decl. ¶ 11.

Moreover, the decision to fund the Centers and support their programs reflects a *pedagogical* and *academic* judgment by the campus.  As President Haynes attests: "In my judgment as an academician and University President, and based on our continued commitment to diversity, inclusion, and campus climate, the [Centers] are key components of the campus's commitment to fostering full access."  She further explains that "The Pride Center and GEC are required to serve the

1 educational mission of the campus," and operate with the "full support and
2 approval" of the Office of the President."  Haynes Decl. ¶¶ 25-26.

3      *Southworth*, by its express terms, does not apply here.  In *Southworth*, "The
4 University . . . disclaimed that the speech is its own," so the Court did not address
5 "the principle that the government can speak for itself."  *Southworth*, 529 U.S. at
6 229.  Here, the President of CSUSM—in her undisputed testimony—testifies that
7 the university employs the Centers to implement the Campus's educational mission
8 and to advance its commitment to inclusion.  *Id.* ¶¶ 11, 16, 22-26, 32-39.
9 Accordingly, the decision to fund and maintain the Centers constitutes government
10 speech, and is immune from First Amendment inquiry.  And because the campus
11 maintains control over the programming decisions of the Centers (see pp. 26-29,
12 below), those selections, too, constitute government speech.  The application of the
13 government speech doctrine is further addressed at pp. 26-31, below.

14        **3.**     **ASI expresses positions via <u>unfunded</u> resolutions.  Neither**
15               ***Southworth* nor the government speech doctrine applies.**

16     Citing no authority under federal law, plaintiffs take the extraordinary
17 position that elected student governments at public universities are barred from
18 expressing views to which any fee-paying student objects.  *Southworth* comes
19 nowhere near creating such a prohibition – it requires viewpoint neutrality in the
20 allocation of fees to student organizations, but imposes no restrictions on the speech
21 activities of student body representatives themselves.

22     But even if plaintiffs could raise this challenge now (they cannot[14]), ASI
23

---

24 [14] Plaintiffs argue for the first time in this 18-month old litigation that they object to
25 ASI's Resolutions.  They made no mention of this in their complaints, nor in
disclosures, nor in discovery.  Michalowski Decl. ¶¶ 9-11, Exhs. 8-10; Michalowski
26 Supp. Decl. ¶ 13, Exh. 17.  Plaintiffs may not rely on this new theory now.  *See*
27 *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000) ("Because
[plaintiffs] raised the [theory] for the first time at summary judgment, the district
28 court did not err when it did not allow them to proceed on it.").

1  Resolutions have no relevance to plaintiffs' own theory of the case.  ASI

2  Resolutions are not funded, are not budgeted, and have no financial impact.  Macias

3  Supp. Decl. ¶¶ 2-3.  Plaintiffs' theory in this litigation is that ASI's *expenditures*

4  constitute a form of compelled speech, but they have made no argument that ASI's

5  unfunded expression could somehow infringe upon their rights.  *Compare Smith v.*

6  *Regents of Univ. of Calif.*, 4 Cal.4th 843, 867 (1993) ("There would be no need to

7  address plaintiffs' claims if . . . no income from mandatory fees has been used to

8  support the [student body's] political activities.").[15]

9  **II.     THE UNIVERSITY AS EDUCATOR (AND GOVERNMENT SPEAKER)**

10       **A.     Plaintiffs' Challenge to Center Funding Fails at the Threshold.**

11            **1.     Plaintiffs' challenge is at best premature.**

12       Plaintiffs object to the funding and privileges that the Centers receive, but

13  these benefits are afforded only after a Center demonstrates (through organization

14  and great effort) (Checa Decl. ¶¶ 8-12) the contributions that it will make to the

15  campus.  So too do the privileges carry with them corollary responsibilities –

16  Centers at CSUSM are accountable to the university's mission and learning

17  outcomes, and operate under its supervision and control.  Haynes Decl. ¶¶ 25-26,

18  30-39; Hoss Decl. ¶¶ 4-15.

19       Plaintiffs have not undertaken any such efforts, nor have they undertaken any

20  such responsibilities.  Their request to this Court for the same privileges as a *bona*

21  *fide* student center is thus premature, at best.  *See Texas v. United States*, 523 U.S.

22  296, 300 (1998) (claim is unripe if harm depends on "contingent future events that

23  may not occur as anticipated, or indeed may not occur at all").  If plaintiffs took

24

25  _____

26  [15] Plaintiffs' citation to *Smith* leaves defendants scratching their heads for an
    additional reason, too – *Smith* is a state case, and relies on the "germaneness"

27  analysis that *Southworth* found inapplicable in the academic context.  *Southworth*,
    529 U.S. at 232 ("It is not for the Court to say what is or is not germane to the ideas

28  to be pursued in an institution of higher learning.").

steps toward forming a Center and were rebuffed, this Court could assess the lawfulness of defendants' denial.  But plaintiffs never took any such steps.

### 2.  Plaintiffs' admissions foreclose a facial challenge.

Plaintiffs do not dispute that facial challenges are "a last resort," and are available only when a policy imposes "a substantial risk" of "suppression of speech."  *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998). *See also N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 13 (1st Cir. 1996) ("A party's subjective fear . . . will not be held to constitute an injury for standing purposes unless that fear is objectively reasonable").  Moreover, plaintiffs have acknowledged that there is no risk of suppression here.  Apodaca 234:4-9 ("Q: Did anyone discourage you from asking about forming a center? A. No. Q. Did anyone discourage you from initiating efforts to from a center? A. No.").

Nonetheless, plaintiffs never discussed forming a Center with anyone (231:18-234:3), and *never even considered it:*

> Q.  Have you ever considered forming a center at Cal State University San Marcos that advocates for messages that that you support, such as a pro-life center?
>
> A.  **We have not considered that** because that option has never been offered to us.
>
> Q.  Any other reason?
>
> A.  Primarily that reason.  Also, because **we never really thought that we needed one in order to communicate our views.**
>
> Q.  Why would you say that?
>
> A.  We thought that we'd be able to communicate our views effectively as a student organization.  **Becoming a center was really more than we were asking for,** and we mostly just wanted to be able to bring speakers to campus to present our views, just like the centers were, but we didn't really feel the need to become a center.

Apodaca 230:25-231:15.[16]

---

[16] Plaintiffs attempt to salvage an argument that they have been "deterred from planning other events" (Opptn. 13:2) by presenting self-serving declarations.  Such declaration testimony is to be disregarded, however, as it conflicts with their prior sworn testimony.  Specifically, plaintiffs cannot attest that they were deterred from

In their Opposition, plaintiffs presume that "asking to become a Center would add another actor in the scheme of unbridled discretion, not fix it."  Opptn. 34:8.  But in so arguing, plaintiffs assume away what their case sets out to prove – that the university (if given the opportunity) would discriminate against them because of their views.  That is precisely the type of assumption that the ripeness doctrine seeks to eliminate.  Rather, to present a genuine controversy to this Court, plaintiffs must first suffer an injury, rather than presuming that an injury will occur.  *See Skyline Wesleyan Church v. Calif. Dep't of Managed Health Care*, 313 F. Supp. 3d 1225, 1231 (S.D. Cal. 2018) (ripeness is "designed to prevent the courts through avoidance of premature adjudication, from entangling themselves in abstract disagreements . . . and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.") (quoting *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003)).  A facial challenge would be premature and inappropriate.

Citing no authority, plaintiffs raise an alternative argument – they claim that payment of the ASI Fee alone confers standing to challenge the funding of the Centers.  Opptn. 33:21-22.  But that theory is no different than that of a taxpayer

---

planning events, when their own verified complaints and testimony demonstrate the opposite.  *See* FAC ¶ 154 (SFL "intends to apply for an ALF grant" to host two pro-life speakers); FAC ¶ 156 ("Students for Life at CSUSM also intends to host an event on  campus entitled 'Real Sex Week' . . ."). Indeed, they continued hosting events, and received *everything they needed* from the campus.  Apodaca 218:4-15 (October 2017 pro-life event – "Q: Was the university fully supportive of that event? A: Yes."); 224:22-226:6 ("Q: And the university provided you everything that you needed to hold a successful event? A: Yes.").  Moreover, plaintiffs' prior admissions reveal the real reasons they did not request funding for certain events.  Michalowski Decl. ¶ 12, Exh. 11 (Michalowski 174) (S-ROG Response – "Plaintiff has not yet applied for funding for these events because Plaintiff has not yet scheduled these events."); Apodaca 226:18-227:4 (SFL did not host the "Real Sex Week" event, because "[w]e just never got around to it.").

1   who protests the way his taxes are used.  Just as any taxpayer could allege such an

2   injury, so too could any public university student.[17]  Such challenges are not viable

3   and fail at the threshold.  *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 346

4   (2006) (taxpayer standing would "interpose the courts as virtually continuing

5   monitors of the wisdom and soundness of state fiscal administration, contrary to

6   the more modest role Article III envisions for federal courts."); *Hein v. Freedom*

7   *from Religion Foundation, Inc.*, 551 U.S. 587, 593 (2007) (if payment of taxes

8   conferred automatic standing, "the federal courts would cease to function as courts

9   of law and would be cast in the role of general complaint bureaus.").

10         **B.      Plaintiffs Concede That Universities Are Entitled to Great**

11                   **Deference In The Classroom And Beyond.**

12         Plaintiffs acknowledge, as they must, that universities are entitled to great

13   discretion in what to teach and how to teach it.  *Sweezy v. State of New Hampshire*,

14   354 U.S. 234, 263 (1957) (Frankfurter, J. concurring).  This is of course true in the

15   curricular context – a university may elect to offer a major in Women's Studies, but

16   not Men's Studies; and may elect to offer a course on the Monetarist economics of

17   Milton Friedman, while declining to offer a course on John Maynard Keynes.  *See*

18   *Badger Catholic, Inc.*, 620 F.3d at 779; *Demers v. Austin*, 746 F.3d 402, 413 (9th

19   Cir. 2014).  Nor do plaintiffs dispute the cases finding that a university education

20   extends outside the four walls of the classroom, and that co-curricular and extra-

21   curricular offerings also reflect *bona fide* academic judgments. *See, e.g., Badger*

22   *Catholic, Inc,* 620 F.3d at 775; *Hosty v. Carter*, 412 F.3d 731, 736 (7th Cir. 2005).

23         Plaintiffs likewise do not contest the cases holding that a decision to fund

24   speech on one topic does not necessitate funding for all.  *Regan v. Taxation with*

25

26   [17] If payment of a mandatory student fee were sufficient to confer standing, any
    CSUSM student could file a federal lawsuit based on claimed objections to a
27   graduation speaker, a field trip sponsored by the Center for Children and Families,
    or a Black Student Center program, all of which are funded by mandatory student
28   fees.  Hoss Supp. Decl. ¶¶ 3, 5-6, 8.

1  *Representation of Washington*, 461 U.S. 540, 549 (1983).  Nor do plaintiffs respond
2  to *Associated Students of the University of Calif. at Santa Barbara v. Regents of*
3  *Univ. of Calif.*, 2007 WL 196747 (N.D. Cal. Jan. 23, 2007), in which the court found
4  that UCSB student fees—because, like the ASI Fee, they was subject to campus
5  control—could be used to support certain programs over others.

6      Plaintiffs do not dispute any of these principles.  Indeed, plaintiffs describe
7  these propositions as *uncontroversial.*  Opptn. 34:26-28.  Instead, plaintiffs attempt
8  to sidestep these doctrines by arguing that CSUSM has no hand in the speech at
9  issue.  As plaintiffs would have it, this is a case involving only *student* speech.  As
10  defendants explain below, the undisputed facts squarely foreclose any such claim.

11      **C.      The Decision To Fund The Centers Is University Speech.**

12      The Centers at CSUSM receive funding because the campus President
13  decided to fund them.  Without her endorsement and approval, they would not
14  receive a dime.  Per California regulation, all auxiliary expenditures "must further
15  the CSU educational mission and comply with trustee and campus policy."  5 CCR
16  § 42500.  ASI's proposed budget is thus reviewed by the CSUSM President, and has
17  no effect until the President approves it.  Hoss Decl. ¶ 11.  The President may not
18  merely rubber-stamp ASI's proposals.  Rather, the President or her delegate is
19  required by Executive Order to be "sufficiently involved in the budget preparation
20  so as to be aware of the items funded or not funded in the budget along with the
21  reasons for their funding or absence of funding."  EXECUTIVE ORDER 369 ¶ A.2.

22      Plaintiffs do not dispute any of this.  Instead, they state only that "President
23  Haynes . . . does not have the authority to add budget items," and has not vetoed an
24  ASI budget item.  Opptn. 18:10-16.  But both points elevate form over substance.
25  The President has the authority and ability to obtain an adjustment of the budget to
26  add items, but of course would not do so by editing the budget herself.  Rather,
27  under Executive Order 369, the President may exercise her authority by deferring or
28  withholding approval of a budget if items are not included for funding.  Similarly, a

presidential veto is an extreme measure, and is hardly the only mechanism by which a president can exercise influence and authority.  This is especially true in the university context, where shared governance and dialogue are key values.  Rather, budgets are pre-vetted by the President, CFO, and Student Affairs before being formally presented to the President for final approval.  The campus's influence and control is exercised through this collaborative process, and an outright veto has not been necessary.  Haynes 13:19-16:2.

### D.    The Centers' Programming Decisions Are University Speech.

#### 1.    The Centers' decisions constitute university speech because the campus has authority to control them.

Pursuant to statute, regulation, university policy, campus policy, and ASI's governing documents, ASI and its Centers are subject to the oversight and control of CSUSM.  Indeed, they are barred from operating "outside the regulation and oversight of the campus"  (EXECUTIVE ORDER 1059 ¶ I.B), and must comply with all CSU and university policy and directives.  5 CCR § 42402.

ASI exists "solely for the benefit of CSUSM," and is responsible for programming that furthers the University's educational mission:

> **Article III.  Purposes**. . . .  Subject to the direction and approval of the University President or designee, to develop, manage and oversee campus programs at California State University San Marcos, for the benefit of students, faculty, staff, and alumni in order to promote and assist the educational program of the University operating as an integrated part of the overall University campus program, and to apply the funds and properties coming into its control toward furthering the educational mission of the University.

Clark Decl. ¶ 8, Exh. 1, Clark 007 (ASI ARTICLES OF INCORPORATION).  *See also* Clark Decl. ¶ 9, Exh. 2, Clark 011 (OPERATING AGREEMENT) (ASI may only engage in "activities essential and integral to the educational mission of the University.").

Rather than addressing ASI's actual responsibilities, plaintiffs suggest that ASI at CSUSM is exempt from "the standard governmental budgetary, purchasing, and other fiscal controls."  But that exemption has no application to ASI at

1   CSUSM.[18]  And in any event, ASI's expenditures are subject to extensive statutory

2   and regulatory controls, as well as the policies of the campus.  Hoss Decl. ¶¶ 5-14.

3   Indeed, ASI is not authorized to spend *any* funds absent approval by the CFO and

4   campus president.  4 CCR § 42402 ("Should the president determine that any

5   program or appropriation planned by an auxiliary organization is not consistent with

6   policy of the Board of Trustees and the campus, the program or appropriation shall

7   not be implemented.").  *See also* CAL. EDUCATION CODE § 89756; Clark Decl. ¶ 11,

8   Exh. 4, Clark 042 – CSU AUXILIARY ORGANIZATIONS COMPLIANCE GUIDE at § 3.2

9   ("Campus presidents are responsible for . . . requiring discontinuance of activities

10  not in conformity with CSU and campus policy."); *id.* at § 11.7.2.

11          These facts are all undisputed.  Rather than confronting them, plaintiffs

12  instead rest on a single fact – that President Haynes has never exercised her veto

13  authority.  Opptn. 3:22-25.  But the law is clear – what matters for purposes of the

14  government speech doctrine is not the level of control exercised in fact.  What

15  matters is whether the government has the *authority* to exercise such control.  *See*

16  *Delano Farms Co. v. Calif. Table Grape Comm'n*, 586 F.3d 1219, 1230 (2009)

17  ("Our focus . . . is the statutorily-authorized control the State has over the

18  Commission, and not the actual level of control evidenced in the record"; "the

19  district court did not err in granting summary judgment . . . on the ground that [the

20  defendant's] promotional activities constitute government speech and are thus

21  immune to challenge under the First Amendment.")  *See also Paramount Land Co.*

22  *LP v. Calif. Pistachio Comm'n*, 491 F.3d 1003, 1011 (9th Cir. 2007) ("Although the

23  Secretary has not rejected or edited proposals, or taken a particularly active role in

24  meetings, this passivity is not an indication that the government cannot exercise

25  _____

26  [18] The Compliance Guide for CSU Auxiliary Organizations identifies the activities
    for which auxiliaries need not comply with "standard government controls" – "(i)
27  investing in equities; (ii) buying, selling, and holding real property without
    legislative action; and (iii) engaging in state wide education bond campaigns."  ASI
28  at CSUSM does not do any of these.  Hoss Supp. Decl. ¶¶ 9-11.

1    authority."). The Supreme Court, too, recognizes that government need not

2    micromanage the speech that it funds. *Rosenberger,* 515 U.S. at 833 ("[w]hen the

3    government disburses public funds to private entities to convey a governmental

4    message," it need only "take legitimate and appropriate steps to ensure that its

5    message is neither garbled nor distorted by the grantee").

6         Here, the campus has authority far in excess of what the government speech

7    doctrine requires. Specifically, the campus reviews and approves ASI's budgets.

8    *Compare Delano,* 586 F.3d at 1230 (grape Commission qualified as government

9    speaker, even though state did not review the Commission's budgets). The campus

10   can veto *any* Center program. *Compare id.* at 1229 (grape Commission could

11   determine its messages without review or approval by the government, and the

12   government had no authority to correct or cease activities of the Commission). And

13   as a matter of organizational structure, the decision-makers at the Centers report to

14   Student Affairs, and are thus subject to managerial oversight by the campus.

15   *Compare Paramount Land*, 491 F.3d at 1010 (no management relationship, and no

16   ability to suspend or discharge eight of the nine Commission members). The

17   campus—including the President, CFO, and Vice President of Student Affairs—

18   oversees the activities of the Centers, and has ample authority to exercise control.

19   The government speech doctrine thus attaches here.

20         **2.      The campus does more than the government speech doctrine**

21              **requires – it exercises *actual* control.**

22         The government's authority to control private speech, taken alone, is

23   sufficient to trigger the government speech doctrine. But here, there is much more

24   than authority to control. Rather, the campus exercises actual control – ASI is

25   intertwined with the campus at the budgeting phase and through ongoing managerial

26   oversight (as explained above); and the Centers are subject to control in their

27   program selections, too. Each and every program put on by the Centers must adhere

28   to the Student Affairs learning outcomes—civic engagement and social

responsibility; leadership and interpersonal development; career and professional development; critical thinking and ethical reasoning; and holistic wellness—which in turn align with the President's Strategic Plan for the campus.  Aiello Hauser-Decl. ¶ 19-20; Haynes Decl. ¶¶ 13-16, Exh. 3.  Both the Executive Director and the Vice President of Student Affairs have the authority to veto any Center program that does not comply.  Haynes 32:3-33:10.

### 3. The Centers' programming is an educational co-curriculum. It is not a "forum" open to private speech.

Plaintiffs argue that the ASI fee constitute a "metaphysical speech forum," but again err in treating the ASI fee as a monolith.  A small *portion* of the ASI fee—*i.e.,* the ASI Leadership Fund ("ALF")—is distributed to facilitate private student expression, and defendants agree that ALF thus qualifies as a forum for private speech.  As such, under *Southworth*, viewpoint neutrality is required in the distribution of ALF funds.  *See Southworth*, 529 U.S. at 229-230 (forum analysis applies because university "exacts the fee at issue for the sole purpose of facilitating the free and open exchange of ideas by, and among, its students.").  *See also Amidon,* 508 F.3d at 100 ("A pool of student activity fees *to fund private speech* is a limited public forum in which forum principles apply.") (emphasis added).

The modest portion of the ASI Fee allocated to Center programming does not constitute a forum for student speech.[19]  Rather, it is designated for programming that adheres to the Student Affairs learning outcomes.  This is not a public forum.  It

---

[19] Plaintiffs claim that "ASI allocated almost $300,000 to the Centers that was used to fund events and speakers."  Opptn. 12:6-7.  That is simply not true.  The Centers each had budgets of $23,310 for all student activities over the course of a year, and only a small fraction of that was allocated to speakers.  Clark Decl. ¶ 7.  Indeed, much of the work of Centers has nothing to do with speech – the Centers serve as a meeting place where students can lounge, study, meet colleagues, prepare meals, and use computers or printers, and the Centers likewise host social events that carry no particular message.  Aiello-Hauser Decl. ¶ 13.

is a co-curriculum that serves the educational mission of the campus.

### 4. The law affords broad discretion for educational decisions, and the Centers fall squarely within those boundaries.

Plaintiffs repeatedly argue that the Centers have unbridled discretion to select certain programs over others. As an initial matter, an "unbridled discretion" standard does not apply to the Centers' educational programming. *See* pp. 26-29, above. And even if it did somehow apply to educational and curricular decisions, it would surely not apply in the same manner as it does in plaintiffs' cases, which are drawn from the permitting and licensing context.[20] *See Griffin v. Secretary of Veterans Affairs*, 288 F.3d 1309, 1323 (Fed. Cir. 2002) (courts need not "apply the unbridled discretion doctrine mechanically," because constitutionality depends on the "nature and function of the particular forum involved"). While permits and licenses are ordinarily "yes" or "no" decisions—which can readily be constrained by a discrete set of factors—decisions about which educational events to pursue are much more complex. Indeed, the Supreme Court has cautioned against equating universities with traditional public forums, and requires only reasonableness of a university. *Consider Widmar v. Vincent*, 454 U.S. 263, 274 n. 5 (1981) ("A university differs in significant respects from public forums such as streets or parks or even municipal theaters. A university's mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities.").

Moreover, the fact that a decision is complex and requires judgment does not mean that the decision-maker is afforded *unbridled* discretion. Here, the Centers exercise no more discretion than is necessary – they retain the level of judgment

---

[20] *Compare Kaahumanu v. Hawaii*, 682 F.3d 789 (9th Cir. 2012) (licenses for wedding permits on public beaches); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1963) (parade permit); *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988) (permit for placing news racks on public property); *Forsyth County v. National Movement*, 505 U.S. 123 (1992) (parade permit).

necessary to engage in dialogue with students, with an overarching goal of constructing a thoughtful co-curriculum of educational events.  At all times, the Centers remain accountable to the university mission and values, and to the learning outcomes required by Student Affairs.  Thus, even if the Centers were subject to an "unbridled discretion" standard—and as educational speakers, they are not—there is simply no unbridled discretion here.

Indeed, the work of the Centers illustrates precisely why a viewpoint-neutrality standard makes no sense in the context of educational and curricular decisions.  Educational and pedagogical decisions are inherently complex, and are ill-suited for legal tests developed in different contexts (*e.g.,* parade licenses or wedding permits).  This is precisely why Courts defer to the educational decisions of universities.  Depriving educators of their ability to make pedagogical judgments and subjecting them to "narrow, objective, and definite standards" (*see* Oppln. 17:8-10) would deprive them of the ability to educate.

## III.   ASI AS ADMINISTRATOR OF FUNDING FOR PRIVATE SPEECH

### A.   Plaintiffs Lack Standing.

For purposes of standing, a claimed injury must be causally connected and "traceable" to the defendant's acts or omissions.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-560 (1992).  Here, the Mike Adams event did not happen due to SFL's own delays in seeking and obtaining funding.  Even if ASI had granted SFL funding, the event still would not have taken place.

With their Opposition, plaintiffs respond: "If we had received, for example, $500 from the ALF fund and $400 from the Centers we would have been able to fully fund the event and invite Mike Adams to speak on March 9 or another date that semester or next."  Apodaca Decl. ¶ 30.  But plaintiffs' position is inconsistent with the undisputed facts – Mike Adams cancelled the event on February 18, *before Apodaca ever requested funding from the Centers*.  Michalowski Decl. ¶ 6, Exh. 5 at 000934 ("It is late in the game to be scrambling for funding.  This is all usually

secured prior to invitation without my involvement."; "I am afraid we are not going to be able to pull off a March event . . . We simply don't have enough time to raise the funds."). By the time plaintiffs requested funding from the Centers (February 24), the purported "injury" (cancellation of the Adams event) had already occurred.

The cancellation was not caused by the conduct of any defendant. Rather, it was caused by plaintiffs' own conduct. *See* Apodaca 166:15-167:5 (the cancellation was "a little bit of [a] mistake on my part. We hadn't planned it out far enough in advance that we could have gotten these issues taken care of."). Plaintiffs default on their burden of presenting facts to support injury-causation, and thus lack standing to challenge the ALF process.

### B. Defendants' funding criteria are viewpoint neutral as written, and plaintiffs venture no viable argument to the contrary.

As defendants explained (Mtn. pp. 11-13), ASI allocates funds to RSOs that comply with the written funding criteria. It denies funds to those that do not. There is no room for discretion, and the viewpoint of the student organization is not part of the analysis. Fennell Decl. ¶ 7, Exh. 3; Herrscher Decl. ¶¶ 13, 17-18.

In response, plaintiffs offer only a single sentence – "[T]he criteria used to distribute ALF funds are subject to discretion, and the policy itself does not purport to contain an exhaustive list of criteria." Opptn. 19:10-12. But the undisputed evidence shows otherwise – the criteria leave no room for discretion, as the EVP must "approv[e] ALF applications which fall within funding guidelines." Fennell Decl. ¶ 4, Exh. 1, Fennell 010. Indeed, after discovery into 240 ALF applications and decisions (Michalowski Supp. Decl. ¶ 3), plaintiffs come nowhere near introducing material evidence of unbridled discretion, and instead proffer only trifles. Fennell 37:25-38:2 ("Q. But you had the discretion to allow an e-mail as a signature? A. Yeah – yes, if the professor isn't on campus, because we have those deadlines by noon."), cited at Opptn. 19:12. This does not qualify as "unbridled discretion," and the First Amendment is not concerned with such minutiae.

### C.   Plaintiffs Have Abandoned Their Claim Of Discrimination As-Applied – A Striking Reversal From Their Complaint.

It is undisputed that when SFL complied with the ALF funding criteria, its application was granted.  So too is it undisputed that plaintiffs' request to fund a speaker fee was in violation of the neutral funding criteria.  And plaintiffs introduce no direct evidence of discrimination, nor evidence of any valid comparator.  *See* pp. 10-14, above.  Indeed, plaintiffs appear to have abandoned wholesale their as-applied challenge to the denial of ALF funding – their Opposition simply makes no mention of discrimination with respect to ALF.  Plaintiffs thus default on their burden, and their as-applied challenge falls under *Celotex*.[21]

## IV.   PLAINTIFFS' EQUAL PROTECTION CLAIMS LIKEWISE FAIL

Plaintiffs' Opposition all but ignores their equal protection claim.[22]  To be sure, the claim falls for all the reasons that the First Amendment claim does.  *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983) ("We

---

[21] This is a striking turn.  Plaintiffs' complaint in this action—which spawned 18 months of litigation—was predicated on the fact that plaintiffs did not receive $500 in funds that they requested from ALF.  FAC ¶ 213 ("Defendants' mandatory Student Activity Fee funding policy and practices have also been applied to discriminate intentionally against Plaintiffs' rights to freedom of speech.").  What happened after the denial of ALF funding—*i.e.*, plaintiffs' request for funding from the Centers for an imaginary event that had already been cancelled—was never a genuine dispute.  With plaintiffs' only real as-applied challenge abandoned, all that remains is manufactured controversy.

[22] Plaintiffs dismiss the dramatic differences between the Centers and RSOs (*see* Mtn. p. 26) by arguing that ASI created the differences (by giving the Centers more funding).  That argument fails for three reasons.  First, only the President (not ASI) can approve Center funding.  Second, plaintiffs ignore the most significant difference – Centers are accountable to Learning Outcomes and the educational mission of the campus, while SFL is not.  Third, plaintiffs never took any steps to try to form a center, and admit that they have no interest in becoming one.  Apodaca 230:25-231:15 ("Becoming a center was really more than we were asking for.").  Plaintiffs cannot claim denial of equal protection – they never sought to be treated the same as a Center, and admit that they do not wish to be.

1  have rejected [plaintiff's] contention when cast as a First Amendment argument, and
2  it fares no better in equal protection garb.").  But it fails for additional reasons too.

3      First, even if plaintiffs could demonstrate standing to pursue their First
4  Amendment claims, they still would need to show standing for purposes of equal
5  protection.  And while First Amendment claims can be subject to relaxed standing
6  requirements (if evidence of a "chilling" effect exists), plaintiffs are not relieved of
7  their obligation to demonstrate standing for purposes of equal protection.  *See*
8  *DaimlerChrysler Corp..* 547 U.S. 335, 352 (2006) ("[O]ur standing cases confirm
9  that a plaintiff must demonstrate standing for each claim he seeks to press.")

10      Second, as defendants explained in their motion, plaintiffs cannot meet their
11  threshold requirement of identifying a valid comparator – *i.e.*, an RSO that
12  submitted a similarly deficient ALF application, but received funding nonetheless.
13  *See Every Nation Campus Ministries at San Diego State Univ. v. Achtenberg*, 597 F.
14  Supp. 2d 1075, 1098-99 (S.D. Cal. 2018) (proper comparator for plaintiff-RSO at
15  CSU is another RSO that received recognition notwithstanding failure to meet
16  recognition criteria).  *Achtenberg* is directly on point—it holds that an appropriate
17  comparator for a CSU RSO is another CSU RSO that received favorable
18  treatment—and plaintiffs proffer no such comparator here.

19  **V.    PLAINTIFFS' DRACONIAN PROPOSAL—PERMITTING FEES**
20        **ONLY ON AN OPT-IN BASIS—RESTS ON A FLAGRANT**
21        **MISREADING OF *JANUS* AND *SOUTHWORTH*.**

22      Plaintiffs test the limits of colorable argument with their claim that public
23  universities may charge mandatory student fees only on an opt-in basis.  Opptn.
24  30:22-23.  Settled Supreme Court authority bars any such claim:

25      The University may determine that its mission is well served if students have
26      the means to engage in dynamic discussions of philosophical, religious,
27      scientific, social, and political subjects in their extracurricular campus life
    outside the lecture hall.  If the University reaches this conclusion, it is entitled
28      to impose a mandatory fee to sustain an open dialogue to these ends.

> If a university decided that its students' First Amendment interests were better protected by some type of optional or refund system it would be free to do so. We decline to impose a system of that sort as a constitutional requirement, however.

*Southworth*, 529 U.S. at 233.

Plaintiffs seek to evade the unambiguous holding of *Southworth*—*i.e.*, that mandatory student fees are perfectly permissible—with a tidy syllogism. As plaintiffs would have it, *Southworth* rests on *Abood*, and *Janus* overrules *Abood*, so *Southworth* is no longer good law. But the syllogism collapses at the outset, as the first premise is erroneous – *Southworth* does <u>not</u> rest on *Abood*. Indeed, *Southworth* expressly states that *Abood* does *not* provide an appropriate foundation in the academic context: "While [*Abood*] identifies the interests of the protesting students, the means of implementing First Amendment protections adopted in those decisions are neither applicable nor workable in the context of extracurricular student speech at a university." *Southworth*, 529 U.S. at 230. *See also id.* at 240 (Souter, J. concurring) ("I agree with the majority that the *Abood* and *Keller* line of cases does not control the remedy here, the situation of the students being significantly different from that of union or bar association members.").[23]

The unambiguous holding of *Southworth*—that public universities may charge mandatory student fees, and that objecting students have no constitutional right to opt-out—remains good law, and remains controlling here.

## VI.  CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment should be granted in its entirety, and plaintiffs cross-motion should be denied.

---

[23] Even the Petitioner in *Janus* recognized this. In arguing that *Abood* should be overruled, Petitioner noted: "Nor will overruling *Abood* undermine other lines of precedent. The Court expressly decided *not* to apply *Abood* to mandatory fees in . . . *Board of Regents v. Southworth* because of *Abood's* workability problems, among other reasons. *Abood* is an anomaly which can safely be excised from this Court's jurisprudence." PETITIONER'S REPLY, 2018 WL 835271 *16 (Feb. 12, 2018).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  November 12, 2018

PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP


By:     /s/  Jeffrey P. Michalowski
RICHARD A. PAUL
JEFFREY P. MICHALOWSKI
KARA SIEGEL
Attorneys for Defendants

1

## <u>CERTIFICATE OF SERVICE</u>

2      I hereby certify that on this 12th day of November, 2018, I electronically filed

3   the documents enumerated below:

4      **1.     CONSOLIDATED REPLY IN SUPPORT OF DEFENDANTS'
5   MOTIONS FOR SUMMARY JUDGMENT AND OPPOSITION TO
    PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT;**
6

7      **2.     DEFENDANTS OBJECTIONS TO EVIDENCE SUBMITTED BY
    PLAINTIFFS IN OPPOSITION TO DEFENDANTS' MOTION FOR
8   SUMMARY JUDGMENT;**

9
       **3.     THE SEVERAL SPECIFIED SUPPLEMENTAL
10  DECLARATIONS WITH ACCOMPANYING INDIVIDUAL EXHIBITS IN
    SUPPORT OF CONSOLIDATED REPLY REGARDING DEFENDANTS'
11  MOTIONS FOR SUMMARY JUDGMENT AND OPPOSITION TO
12  PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT,
    INCLUDING;**
13           **a.     Donna Bearman Declaration**
14           **b.     Ahmbra Austin Declaration;**
             **c.     Robert Aiello-Hauser Declaration;**
15           **d.     Ashley Fennell Declaration;**
16           **e.     Neal Hoss Declaration;**
             **f.     Annie Macias Declaration;**
17           **g.     Jeffrey P. Michalowski Declaration;**
             **h.     Abrahan Monzon Declaration**
18

19      with the Clerk of the Court using the CM/ECF system which will send
20   notification of such filing to the following:

21

22

23

24

25

26

27

28

1

Daniel Ray Watkins
**Watkins & Letofsky, LLP**
2900 S. Harbor Blvd., Ste. 240
Santa Ana, CA 92704-6418
Phone:  (866) 439-1295
Fax: (949) 476-9407
Email: dw@wl-llp.com

Attorneys for Plaintiffs,
Nathan Apodaca and Students
for Life at California State
University-San Marcos

2

3

4

5

Tyson C Langhofer
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, AZ 85260
480-444-0020
Fax: 480-444-0028
Email: tlanghofer@ADFlegal.org

*Pro Hac Vice Counsel* for
Plaintiffs,
Nathan Apodaca and Students
for Life at California State
University-San Marcos

6

7

8

9

10

11

Leslie Rivera Mason

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28