TYSON C. LANGHOFER, AZ Bar No. 32589*
tlanghofer@ADFlegal.org
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax

*Attorneys for Plaintiffs*
*admitted Pro Hac Vice*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **NATHAN APODACA; and STUDENTS FOR LIFE AT CALIFORNIA STATE UNIVERSITY-SAN MARCOS,**<br><br>*Plaintiffs*,<br><br>v.<br><br>**TIMOTHY P. WHITE**, Chancellor of California State University, in his official and individual capacities; **KAREN S. HAYNES**, President of California State University-San Marcos, in her official and individual capacities; and **ASSOCIATED STUDENTS, INC. OF CALIFORNIA STATE UNIVERSITY SAN MARCOS**, a California nonprofit corporation,<br><br>*Defendants*. | Case No. 3:17-cv-01014-L-NLS<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>(Special Briefing Schedule Ordered)<br><br>Date:    December 10, 2018<br>Time:    11:00am<br>Courtroom: 5B<br>Judge: Hon. M. James Lorenz |

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................. 1

ARGUMENT .................................................................................................... 3

I.  Defendants violate Plaintiffs' First Amendment rights by compelling them to join ASI, and to subsidize its expression. ....................................................... 3

    A.  The parties agree that *Southworth's* viewpoint-neutrality requirement applies to mandatory fees that fund the private expression of student groups. ............................................................................................... 4

    B.  Associated Students Inc.'s expression, including its Community Centers, is private student group expression, not University curriculum. .......................................................................................... 5

    C.  Defendants' claim that all non-ALF funding of expression is exempt from *Southworth's* viewpoint-neutrality standard merely places the funding under *Janus's* opt-in requirement. ........................................... 8

    D.  Defendants have unbridled discretion to distribute the ASI Fee, rendering the system viewpoint discriminatory. ................................. 10

II.  Defendants violated Plaintiffs' First Amendment right to free speech by exercising unbridled discretion to exclude them from a speech forum. ....... 11

III.  Defendants violated Plaintiffs' Fourteenth Amendment equal protection rights because Defendants favor Associated Students, Inc.'s expression over other student groups. ................................................................................. 12

IV.  Defendants' mandatory ASI Fee policy is not narrowly tailored to serve a compelling government interest. .................................................................. 13

V.  Plaintiffs have established both facial and as-applied claims and have standing. ..................................................................................................... 13

CONCLUSION ............................................................................................... 15

1

## **TABLE OF AUTHORITIES**

2

3

### **Cases:**

4

5

*Amidon v. Student Association of State Univ. of New York at Albany*,
    508 F.3d 94 (2d Cir. 2007).......................................................................11, 12

6

7

*Board of Regents of University. of Wisconsin Systems. v. Southworth*,
    529 U.S. 217 (2000) ......................................................................1-4, 7-8, 15

8

9

*Clark v. Jeter*,
    486 U.S. 456 (1988) ...................................................................................13

10

11

*Forsyth County v. Nationalist Movement*,
    505 U.S. 123 (1992) ...................................................................................11

12

13

*Janus v. American Federation of State, County, & Municpal Employees, Council 31*
    138 S. Ct. 2448 (2018) ...........................................................1, 2, 4, 6, 8-11

14

15

16

*Kaahumanu v. Hawaii*,
    682 F.3d 789 (9th Cir. 2012).........................................................10, 11, 14

17

18

*Plyler v. Doe*,
    457 U.S. 202 (1982) ...................................................................................13

19

20

*Reed v. Town of Gilbert, Arizona*,
    135 S. Ct. 2218 (2015) ...............................................................................13

21

22

*Rosenberger v. Rector & Visitors of University of Virginia*,
    515 U.S. 819 (1995) ...............................................................................11-12

23

24

*Shuttlesworth v. City of Birmingham*,
    394 U.S. 147 (1969) ...............................................................................10-11

25

26

*Southworth v. Board of Regents of the University of Wisconsin System*,
307 F.3d 566 (7th Cir. 2002) ...............................................................3, 8, 10, 14

27

28

1

**<u>Statutes:</u>**

2

3    Cal. Ed. Code §89913(c) ...................................................................................... 5

4    Cal. Ed. Code §89300(b)(2)(B) ........................................................................... 5

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Defendants compel every student to pay fees to and join a private student organization, Associated Students Inc. ("ASI"), that operates as a student union. This union engages in expression that Plaintiffs disagree with—including, for example, publishing posters in the union center's lounges stating that people with Students for Life's views on the sanctity of life are "f**kheads" who are "about to be f**ked" because of their beliefs. Knowing that compelling students to fund the private expression of a union violates the First Amendment, and that at a minimum students who pay fees that fund student organization expression are at least entitled to viewpoint-neutral access to the funding, Defendants attempt to paint the student union's expression as the University's own curricular speech. Thus, they claim that Plaintiffs have *no* First Amendment interest in how the funds are used at all.

This case is about whether public universities may, without providing any constitutional safeguards for students who object, compel students to pay mandatory fees that are used to fund student organizations' expression—whether it be a single student organization such as Associated Students Inc., or many student organizations. The Supreme Court established in *Southworth* that when a mandatory fee is distributed to student organizations, the fee must at a minimum be controlled by viewpoint-neutral criteria. *Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth*, 529 U.S. 217, 231 (2000) ("*Southworth I*"). Giving a large amount of these same mandatory fees to one student organization does not exempt the University from its viewpoint neutral requirements, if anything they become more important as the multiplicity of voices is diminished. And the use of such compelled fees raises additional concerns found in *Janus*. *Cf. Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*, 138 S. Ct. 2448, 2459-60 (2018).

Defendants compel Plaintiffs to subsidize the student union's—ASI's—expression, yet cavalierly dismiss the core constitutional concerns raised by such compulsion, claiming that the University's oversight of the student union exempts it

from the First Amendment. Indeed, Defendants claim that by seeking the protections guaranteed under the Constitution, Plaintiffs pursue "draconian" regulations, and that "[a]s plaintiffs would have it, funds characterized as 'tuition' can constitute government speech, while funds characterized as 'fees' cannot." Defs.' Opp'n to Pls.' Cross-Mot. for Summ. J., ECF No. 62, at 17 ("Defs. Opp."). Defendants exaggerate Plaintiffs' claims, tilt at strawmen, and miss the mark.

In fact, the only draconian action in this case is compelling students to subsidize other students' expression against their will, while denying those same students equal access to those funds to express different views. *See Janus*, 138 S. Ct. at 2464 ("'to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves and abhor[s] is sinful and tyrannical.'"). On the other hand, Plaintiffs merely seek what the Constitution affirms: "some First Amendment protection," *Southworth I*, 529 U.S. at 231, from a viewpoint-discriminatory system that compels them to fund expression of other students which they disbelieve—a system that permits Defendants to exclude Plaintiffs from equal access to that funding. Plaintiffs' claims are modest and wholly supported by controlling law.

In sum, the government may not compel students to pay fees to subsidize other students' speech unless it allocates such fees pursuant to viewpoint-neutral criteria. Defendants compel Plaintiffs to pay a mandatory fee to subsidize ASI's expression. ASI's expression is student speech. Defendants essentially concede that the criteria are not viewpoint-neutral and they refuse to implement viewpoint-neutral criteria for the ASI Fee distributions that fund student expression. Thus, the University violates the First Amendment's mandate.

If the University believes that the messages expressed by ASI are essential to its mission, the University can express those messages directly through its own speech—as the University already does through its curriculum, departments, lobbying, public statements, programming, etc. But, the University cannot create a forum for student speech through mandatory fees and then favor ASI and its Centers'

messages over all other student messages. This is what it does here by funding only ASI and giving ASI discretion whether and when to fund other student organizations and their events. When mandatory fees are used to fund student expression, the fees must, at a minimum, be administered in a viewpoint-neutral manner, even when the student government uses it to fund student "centers." *Cf. Southworth I*, 529 U.S. at 224 (not exempting the student centers funded by the mandatory student fee from the viewpoint neutrality requirement). The University of Wisconsin implemented viewpoint-neutral criteria for the use of its mandatory student fees. *See Southworth v. Bd. of Regents of Univ. of Wisconsin Sys.*, 307 F.3d 566, 571 (7th Cir. 2002) ("*Southworth II*"). The University could do so as well but has refused. Accordingly, the Constitution does not permit it to compel the collection of the ASI Fee.[1]

## ARGUMENT

Defendants violate Plaintiffs' fundamental rights in three ways. First, Defendants compel Plaintiffs to join ASI and subsidize its expression without providing either viewpoint-neutral criteria or an opt-in provision. Second, Defendants created a speech-funding forum for student expression, but retain and use unbridled discretion to exclude Plaintiffs from that forum. Third, Defendants' policies treat student groups unequally by favoring ASI's expression over all other student groups.

**I.    Defendants violate Plaintiffs' First Amendment rights by compelling them to join ASI, and to subsidize its expression.**

Here, the parties agree that *Southworth* requires viewpoint-neutral distribution for mandatory fees that fund student groups. Defendants, however, seek to exempt ASI (the campus's largest and only mandatory student organization) from that requirement. Defendants allege that if they funnel the mandatory fee through ASI

---

[1] In approximately fourteen pages of purported factual rebuttal, Defendants resort to repeated and unfounded accusations of lack of legal support for claims, misrepresentation of facts, etc. Defs. Opp. at 1-14. Without adequate space to refute each of these false accusations, Plaintiffs trust that a thorough review of the actual record and law will fully justify their positions.

(instead of granting all student organizations equal access to funding), then they can avoid *Southworth's* viewpoint-neutrality requirement. But this is not how the prohibition on compelled speech works. By compelling students to pay fees to fund student expression and then distributing those mandatory fees to ASI, the University triggers *Southworth's* viewpoint-neutrality requirement. Accordingly, the University must enact and enforce policies that allow all student groups to access that funding on a viewpoint-neutral basis—not just ASI. Alternatively, if the University wishes to maintain its current system of funding only one student organization (ASI), then *Janus* is applicable and prohibits funding such a system through a mandatory fee.

> ### A. The parties agree that *Southworth's* viewpoint-neutrality requirement applies to mandatory fees that fund the private expression of student groups.

The parties agree that "*Southworth* requires viewpoint neutrality . . . when mandatory fees are expended on the private speech of student groups." Defs. Opp. at 16:11-12. Defendants collect over $2,000,000 in mandatory ASI Fees that are *all* held in trust for the student union—ASI. Defendants wish to limit the viewpoint-neutrality principle to only the fees that the student union chooses to distribute to *other* student organizations, but not to the controversial expression of the largest student organization on campus itself: ASI. But that is inconsistent with the clear principles and purpose of the rule in *Southworth* and *Janus. Southworth I*, 529 U.S. at 233-34 ("Viewpoint neutrality is the justification for requiring the student to pay the fee in the first instance."). Indeed, when "the University conditions the opportunity to receive a college education, an opportunity comparable in importance to joining a labor union or bar association, on an agreement to support objectionable, extracurricular expression by other students . . . . [i]t infringes on the speech and beliefs of the individual[.]" *Id.* at 231; *see also Janus*, 138 S. Ct. at 2464 ("Because

the compelled subsidization of private speech seriously impinges on First Amendment rights, it cannot be casually allowed.").

To avoid *Southworth's* viewpoint-neutrality requirement, Defendants argue that only the $5,700 the student union chooses to distribute to other student groups (the "ALF Funding") is required to be distributed in a viewpoint-neutral manner and that the rest of ASI's expression is actually government speech. Defs. Opp. at 15. But *all* of the ASI Fee is given to the student union and the student union uses large portions to fund expression—including the ASI Community Centers' expression. The undisputed facts demonstrate that ASI's expression is *not* University expression.

### B. Associated Students Inc.'s expression, including its Community Centers, is private student group expression, not University curriculum.

While the facts are not in dispute, the parties interpret them differently. When taken as a whole, however, only one conclusion is possible: the ASI Fee is used solely by Associated Students Inc. for student expression—not University speech. The following facts are supported by the record:

1. ASI is a separate legal entity from the University and is governed by a student Board of Directors who are elected by students. Cal. Ed. Code §89913(c); Pls. MSJ Ex. 1-7 (ASI Bylaws, Art. 10).
2. ASI is a student membership organization and only students are members of ASI. Pls. MSJ Ex. 1-7(ASI Bylaws, Art. 8).
3. ASI was created in 1990 by a referendum vote of the students. Pls. MSJ Ex. 2-1 (Clark Dep. 40:20-42:8).
4. The students initially voted to not authorize the ASI Fee (by statute, a two-thirds majority vote of the students is required to authorize the fee), but later voted to authorize it. *Id.*
5. By statute, the ASI Fee may only be modified by a vote of the students. Cal. Ed. Code §89300(b)(2)(B); Pls. MSJ Ex. 2-1 (Clark Dep. 58:22-59:14).
6. By statute, if 10% of the students petition the president of the university, the ASI Fee will then be put to a student referendum vote. Cal. Ed. Code §89300(b)(2)(C).
7. The entire ASI Fee is held in trust for the sole use of ASI—the University may not spend the money apart from ASI's budget process. Pls. MSJ Ex. 2-1 (Clark Dep. 60:13-61:10, 89:11-22).
8. Although it consults with University officials, ASI develops its own budget regarding how to spend the ASI Fee. *Id.* (Clark Dep. 66:12-70:18).
9. The ASI Board of Directors created the ASI Community Centers ad hoc (separate from the University's Centers). *Id.* (Clark Dep. 82:2-6, 89:11-14,

121:16-124:14); Pls. MSJ Ex. 2-8 (Gender Equity Center Code §II), Pls. MSJ Ex. 2-9 (LGBTQA Pride Center Code §II).

10. The ASI Board of Directors has the authority to create or abolish the ASI Community Centers subject only to budget approval. MSJ Ex. 2-2 (Haynes Dep. 93:7-13).

11. The Centers' employees are employees of ASI subject to the ASI Board of Directors, not the University, Pls. MSJ Ex. 2-8 (Gender Equity Center Code §§II, VI)), Pls. MSJ Ex. 2-9 (LGBTQA Pride Center Code §§II, VI).

12. The events sponsored by the Centers are created and planned by students, Ex. 1-8 (Aiello-Hauser Dep. 29:21-30:8).

13. About six months after this litigation began, ASI entered into an agreement with the University to transfer the funding and control of the ASI Centers to the University-controlled "University Student Union" over the next three years, but ASI currently continues to fund the Centers through the ASI Fee. Pls. MSJ Ex. 2-2 (Haynes Dep. 85:13-91:14; 104:1-105:10).

14. ASI regularly passes resolutions taking positions opposed to the University.

In contrast, Defendants rely primarily on the University's general oversight of ASI to allege that all of ASI's expenditures that are not the $5,700 specifically distributed to other student groups constitute educational government speech and are not subject to *Southworth's* viewpoint-neutrality requirement, or to *Janus's* prohibition on compelled subsidy of private speech. Defs. Opp. at 28. Defendants rely on unsupported statements such as "ASI was not created by students." Defs. Opp. at 17:21-22. This is surprising since the undisputed evidence demonstrates that the students voted to create ASI, and by statute a student vote is required to authorize or alter the ASI Fee. Pls.' MSJ Ex. 2-1 (Clark Dep. 40-41).

In a creative twist, Defendants argue that President Haynes' veto and general oversight authority actually means that ASI's expression originates with and is converted to University expression. Defs. Opp. at 19, 25. This makes a mountain out of the molehill of the President's oversight authority. Defendants admit that ASI's Board of Directors can choose whether to fund the ASI Centers or not, *id.*, but claim that since President Haynes may veto ASI's budget, she could force ASI to fund the Centers, and therefore ASI expression would be the University's expression. *Id.* As a practical matter, however, such a stalemate would result in *no* budget being passed, in which case the fees would sit in trust for ASI; but neither President Haynes nor

the University has authority to violate the trust and spend ASI Fees independently from the budget passed by the student-run ASI Board. Indeed, President Haynes testified that ASI does *not* have to obtain approval from the University to create its centers, but that President Haynes would review a request to fund new ASI Centers if it was in a line-item on the budget. Pls.' Mem. in Supp. of Mot. for Summ. J., ECF No. 58-1 ("Pls. MSJ"), Ex. 2-2 (Haynes Dep. 93:7-13).

This oversight is similar to that in *Southworth* where every funding application for the centers and other student groups was reviewed by the chancellor and the board of regents for their approval. 529 U.S. at 222. But the university did not even attempt to argue that such oversight transformed the use of the fees into government speech. *Id.* at 229. Here, the University exercises even less oversight of the use of the Fee than the University in *Southworth*. President Haynes merely approves ASI's top-line budget items and has testified that she does not review specific applications or ASI programs. Pls. MSJ Ex. 2-2 (Haynes Dep. 99:22-103:23). Indeed, President Haynes's budget approval takes place in the spring prior to the development of most of ASI's programs and expression for the following year. When asked what educational learning outcome the ASI Centers' "Pussy Power" event furthered, she could not name one and was not even aware of the event, but stated she has to "believe in and assume" that someone is reviewing the programs "thoughtfully." *Id.* Thus, Defendants cannot rely on the University's minimal oversight of ASI to exempt themselves from *Southworth's* viewpoint-neutrality requirement.

Furthermore, in *Southworth*, a portion of the student fee was given to the student government which used it to fund, among other things, "a gay and bisexual student center, a community legal office, an AIDS support network, [and] a campus women's center." *Southworth I*, 529 U.S. at 224. The Supreme Court did not exempt these distributions from the viewpoint-neutrality requirement. Indeed, after the Supreme Court established the viewpoint-neutrality requirement, the University of Wisconsin revised its policies to require that the student government follow

viewpoint-neutral criteria for distributions for all fees used by the student government to fund expression—including the fee mechanisms that funded the centers. *See Southworth II*, 307 F.3d at 571. The University here must do the same.

    **C.**    **Defendants' claim that all non-ALF funding of expression is exempt from *Southworth's* viewpoint-neutrality standard merely places the funding under *Janus's* opt-in requirement.**

The only substantive difference between the facts in *Southworth*, and the facts in this case, is that in *Southworth*, the student government distributed almost all the allocable fees to other student organizations and did not retain the fees to engage in its own expression. 529 U.S. at 223. Here, however, ASI retains almost all of the $2,000,000 in mandatory fees to engage in its own activities and expression, and distributes only a minuscule portion to other student groups. Thus, as Defendants would have it, they may compel students to fund ASI's expression without being required to follow *Southworth's* viewpoint-neutrality requirement. But *Southworth* made no such exception to the First Amendment's prohibition on compelled speech and association. Indeed, Defendants' description of ASI's use of the fees would only bring them under *Janus* (compelled union fee not permitted), not excuse them from *Southworth* (compelled fee permitted only when distributed to all student groups in a viewpoint-neutral manner).

*Southworth* recognized that the general rule is that "[i]t infringes on the speech and beliefs of the individual to be required, by this mandatory student activity fee program, to pay subsidies for the objectionable speech of others." *Southworth I*, 529 U.S. at 231. It drew this principle from *Abood. Id.* at 230 ("The *Abood* and *Keller* cases . . . provide the beginning point for our analysis."). In *Abood*, the Court struck down the use of compelled fees for political speech but permitted it for distributions "germane" to providing union services. *Southworth I*, 529 U.S. at 231 (discussing *Abood*). But *Southworth* exempted the University of Wisconsin System from the germaneness requirement only because it "exacts the fee at issue for the sole purpose

of facilitating the free and open exchange of ideas by, and among, its students." *Id.* at 229. Thus, the germaneness standard was unworkable because by distributing the fees to many student organizations (instead of retaining the fee for just the student union), "the program . . . is distinguished not by discernable limits [like a union] but by its vast unexplored bounds." *Id.* at 231-32. In such a case, the Court held, the university could justify an exception to the rule against compelled subsidies only by ensuring that the fees are distributed in a viewpoint-neutral manner. *Id.* at 233-34 ("Viewpoint neutrality is the justification for requiring the student to pay the fee in the first instance."). In other cases, the rule against compelled subsidies is in full force and subject to the germaneness standard.

In *Janus*, however, the Supreme Court overturned *Abood* because it recognized that the germaneness standard did not adequately protect against compelled speech and association—holding that permitting the mandatory union fee "conflicts with other First Amendment decisions, and that subsequent developments have eroded its underpinnings" because "individuals are coerced into betraying their convictions." *Janus*, 138 S. Ct. at 2464, 2486. "Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning." *Id.*

Here, the University created a mandatory fee system much more akin to a union fee prohibited in *Janus*. Pls. MSJ at 28-30. At the University, students must pay a mandatory fee to fund the student union's expression—expression that Plaintiffs disagree with and do not wish to fund. Instead of making the funds equally available to all student organizations, like in *Southworth*, ASI, as a student union, uses these funds to engage in expression on a wide range of social and economic issues: including acting as the voice of the students at CSUSM on policy matters and opposing the positions of Defendant White and the University. Pls. MSJ at 4; *see also e.g.* Ex. 3-3 (ASI Resolution expressing that ASI stands with the California Faculty Association regarding a strike for wage increases and against the CSU Board of Trustees), Ex. 3-2 (ASI resolution opposing the CSU Chancellor's proposal to

increase tuition).[2] Thus, Defendants' policy that compels a student to pay the ASI Fee and join ASI as a condition for attending CSUSM either violates *Southworth's* viewpoint neutrality requirement or *Janus'* compelled dues prohibition.

Defendants' attempt to elude *any* constitutional protections for students who are compelled to fund ASI's expression is not compatible with *Southworth* or *Janus*. Defendants may either collect the fee and distribute it in a viewpoint-neutral manner to *all* student groups, not just ASI, as *Southworth* permits, or if they wish to fund only a student union (as they do now) under *Janus*, they must allow students to opt-in to payment of the fee because it compels students to fund private expression. *Janus*, 138 S. Ct. at 2486.

### D. Defendants have unbridled discretion to distribute the ASI Fee, rendering the system viewpoint discriminatory.

Distribution of student fees to fund private expression with unbridled discretion is viewpoint-discriminatory and unconstitutional. Pls. MSJ at 16-17. Defendants mistakenly claim that this principle is only applicable in the permit and licensing context and not in the mandatory fee context. Defs. Opp. at 30. To the contrary, "the unbridled discretion standard of permit and licensing cases would apply here to the mandatory fee system whether we viewed it as a component of viewpoint neutrality or as a separate constitutional mandate." *Southworth II*, 307 F.3d at 580; *Kaahumanu v. Hawaii*, 682 F.3d 789, 806 (9th Cir. 2012) (adopting *Southworth II's* analysis *en toto* and holding that "the viewpoint neutrality requirement includes the prohibition on . . . unbridled discretion.").

Viewpoint neutrality requires "narrow, objective, and definite standards to guide" officials' decisions. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 153 (1969);

---

[2] Defendants allege that no funds are expended on resolutions but ignore the fact that 1) the resolutions demonstrate that ASI speaks independently from the University and 2) the ASI Board of Directors that passes resolutions is paid from the ASI Fee. Pls. MSJ Ex. 2-1 (Clark Dep. 65:21-66:8).

*see also Amidon v. Student Ass'n of State Univ. of New York at Albany*, 508 F.3d 94, 104 (2d Cir. 2007) (discretion to distribute mandatory student fees must be bridled by an exhaustive list of objective criteria). Defendants concede that they do not implement any narrow, objective, and definite standards to guide the distribution of the portions of the ASI Fee that fund expression, but claim there is still no unbridled discretion. Defs. Opp. at 30-31. This is incorrect. Specifically, Defendants allege, ad hoc, that "the fact that a decision is complex and requires judgment does not mean that the decision-maker is afforded *unbridled* discretion." Defs. Opp. at 30:22-23. However, the Supreme Court held that a burden on speech rights cannot involve the "appraisal of facts, the exercise of judgment, and the formation of an opinion." *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (cleaned up); *see also*, *Kaahumanu*, 682 F.3d at 807 (holding that the First Amendment is violated if even the mere potential for abuse of discretion exists); *Amidon*, 508 F.3d at 103-04 (*Forsyth* and other precedents require an exhaustive list of objective criteria).

In essence, Defendants concede, as they must under the undisputed facts, that they do not provide viewpoint-neutral criteria for distributing the ASI Fee to fund expression. *See* Defs. Opp. at 31 ("the work of the Centers illustrates precisely why a viewpoint-neutrality standard makes no sense"). Under *Janus*, a mandatory union fee used to fund such private student union expression is not permissible, but at a minimum, *Southworth* requires viewpoint neutrality, and Defendants fail to provide even that minimal protection.

## II. Defendants violated Plaintiffs' First Amendment right to free speech by exercising unbridled discretion to exclude them from a speech forum.

ASI distributes the mandatory Fee to other organizations through four different methods, including directly from the Board of Directors, the ALF fund, the Campus Activities Board, and the Centers. Pls. MSJ at 21-25. By distributing these fees to fund the expression of student organizations, ASI has created at least a limited public forum for student speech. *Id.*; *Rosenberger v. Rector & Visitors of Univ. of Virginia*,

515 U.S. 819, 830 (1995); *see also Amidon*, 508 F.3d at 100 ("The denial of funding in a viewpoint-discriminatory manner is as impermissible as the denial of access to a physical forum in a viewpoint-discriminatory manner."). Defendants baldly state that they do not create a forum, Defs. Opp. at 29, but do not dispute that 1) they distribute the ASI Fee to fund others' expression and 2) the case law establishes that such distribution creates a forum. Pls. MSJ at 21-25. Students for Life members not only fund this forum, but they also applied for funding from the Board of Directors, the ALF Fund, and the Centers, and were denied at every turn. Pls. MSJ at 23-25. It is undisputed that Defendants have no written criteria governing when the Board of Directors, the Campus Activities Board, or the Centers, will grant or deny a funding request—because none exist. Thus, Defendants concede that they retain unbridled discretion to discriminate when they distribute funds through the Board of Directors, the Campus Activities Board, or the Centers. Such unbridled discretion facially violates the First Amendment. Pls. MSJ at 23-25. In addition, as applied, Defendants exercised that discretion to exclude Students for Life from the funding forum. *Id*.

**III. Defendants violated Plaintiffs' Fourteenth Amendment equal protection rights because Defendants favor Associated Students, Inc.'s expression over other student groups.**

As demonstrated, the University collects mandatory student fees and favors the expression of ASI (the largest and only mandatory student organization on campus) over all other student organizations, including Plaintiffs. Specifically, the University distributes the entire mandatory fee to ASI and allows ASI to choose whether and when to fund any other student organization. Pls. MSJ at 30-31. In turn, ASI favors the expression of the ASI Centers over other student organizations by funding the Centers at an approximately 51:1 ratio, and granting them special privileges. Defendants attempt to limit the "comparators" to other RSOs that applied for ALF funding, Defs. Opp. at 34, but Equal Protection is not so cabined. Defendants' policies facially and as applied favor ASI and the ASI Centers over all other student organizations, including Students for Life. This differential treatment of student

organizations deprives them of their First Amendment rights, is "presumptively invidious," *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982), and is subject to strict scrutiny. *Clark v. Jeter*, 486 U.S. 456, 461 (1988).

## IV. Defendants' mandatory ASI Fee policy is not narrowly tailored to serve a compelling government interest.

When Defendants' policies burden First Amendment rights, they bear the burden of proof. *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2231 (2015). Defendants do not provide any evidence of a narrowly-tailored compelling interest, and thus concede their failure to meet their burden of proof.

Although not alleging a compelling interest, Defendants do make sweeping claims that requiring viewpoint-neutrality for the ASI Fee would jeopardize what it calls "*bona fide* resource centers" such as the Black Student Center, the Latin@ Center, etc. Defs. Opp. at 2. What Defendants fail to acknowledge is that *those* Centers were created by the University, not ASI, and operate under the complete control of the University—not ASI. Despite Defendants' repeated equating of the ASI Community Centers and the University's centers, Defendants acknowledge that these are two separate types of centers: University centers and ASI Centers. Pls. MSJ Ex. 2-2 (Haynes Dep. 85:24-91:14). In fact, soon after this litigation began, ASI entered into an agreement to transfer funding and oversight of the ASI Community Centers to the University over the next three years in phases. Pls. MSJ Ex. 2-2 (Haynes Dep. 85:24-91:14, 104:1-105:10). In the meantime, however, the ASI Community Centers remain just that—ASI's Centers, not the University's. Plaintiffs do not here challenge the University's ability to speak with its own fisc, and control its own Centers and entities. ASI, however, is not the University.

## V. Plaintiffs have established both facial and as-applied claims and have standing.

Plaintiffs have established standing. Pls. MSJ at 33-34. Plaintiff Apodaca and each member of Students for Life pay the mandatory ASI Fee. Like in *Southworth*,

"[i]n this case, the plaintiffs' alleged concrete and particularized interest is an assurance that their mandatory student activity fees are distributed in a viewpoint-neutral manner. The Supreme Court's decision in *Southworth* makes clear that this is a legally protected interest." *Southworth II*, 307 F.3d at 573; *see also*, *Kaahumanu*, 682 F.3d at 807 (discretionary power alone is inconsistent with the First Amendment even if it is never abused). Defendants' allegations to the contrary, Defs. Opp. at 23:16-18, merely repeat the same arguments the Seventh Circuit considered and rejected in *Southworth II*. 307 F.3d at 573-75, 580-81 ("the Supreme Court has long held that when a licensing scheme vests unbridled discretion in a government official, a plaintiff has standing to facially challenge that regulation without applying for a license. . . . A straightforward application of those principles to the case at hand, then, demonstrates that the plaintiffs have standing to facially challenge the mandatory fee system on the grounds that it grants the student government unbridled discretion; . . . these students have standing to present a facial challenge to the University's mandatory fee system without applying for, or being denied, funding.").

In addition, Plaintiffs have applied for and been denied funding from the ASI Fee and have thus established standing for their as-applied claims as well. Defendants attempt to explain away their denials of funding by arguing non-discriminatory intent, but when unbridled discretion is used, one need not prove discriminatory intent. Pls. MSJ at 22-23. And the facts remain that ASI has unbridled discretion to fund or not fund groups like Students for Life, and ASI has chosen to fund other groups while denying ASI's application. Pls. MSJ at 10-12.

Defendants claim that Plaintiffs were not harmed because, under Defendants' reading of the facts, Students for Life's event was already cancelled when it applied to the Centers for funding in February. Defs. Opp. at 31. This ignores that Students for Life applied for and was denied funding by ASI in November well before the planned March event, Pls. MSJ at 10; when Students for Life and Mike Adams agreed that the early March dates would not work, that did *not* cancel the event, it

merely meant the March dates would not work, Pls. MSJ at 12-13; Students for Life still persevered in seeking the last few hundred dollars of funding needed to put on the event later in the year (they had collected $2100 out of $3000 needed), but Defendants' denials of funding prevented the event from happening and Defendants refused to respond to Students for Life's additional request for information on how to seek funding for an event. *Id.*

Lastly, Defendants claim that they invited Students for Life to follow up to request funding for a later date and that they did not. Defs. Opp. at 3. This claim is incredible when the undisputed evidence shows that Students for Life emailed the Centers' Director and Assistant Director the same day they asked it to follow up, but *it is the Centers' Directors* that refused to respond to Students for Life's follow up. Pls. MSJ at 11. Students for Life asked what they could do to request funding in the future, and Defendants exercised their discretion to not even reply. *Id.*

## CONCLUSION

This case is about whether the government may force students to join and financially support a union that expresses messages they disagree with, and whether the University can only fund one student organization, or whether it must give viewpoint-neutral access to all student organizations. It "does not raise the issue of the government's right, or, to be more specific, the state-controlled University's right, to use its own funds to advance a particular message." *Southworth I*, 529 U.S. at 229. Instead, Nathan Apodaca and Students for Life ask this court to apply the well-established principles that the government may not compel them to subsidize a private union's speech, and that at a minimum, if the government may compel them to fund other students' expression, they have the right to be protected by viewpoint-neutral distribution criteria. Other universities have established criteria that meet this standard. The University here should—indeed it must—do the same.

Plaintiffs respectfully request that the Court grant summary judgment in favor of Plaintiffs on all issues, and deny Defendants' motion for summary judgment.

Respectfully submitted this 3rd day of December, 2018.


By: s/ Tyson C. Langhofer

DANIEL R. WATKINS
CA Bar No. 163571
WATKINS & LETOFSKY, LLP
2900 S. Harbor Blvd., Ste. 240
Santa Ana, CA 92704-6418
(866) 439-1295
(949) 476-9407 Fax
dw@wl-llp.com

J. CALEB DALTON
D.C. Bar No. 1033291*
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 Fax
cdalton@ADFlegal.org

TYSON C. LANGHOFER
AZ Bar No. 32589*
RYAN J. TUCKER
AZ Bar No. 34382*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0021 Fax
tlanghofer@ADFlegal.org
rtucker@ADFlegal.org

*Admitted Pro Hac Vice
Attorneys for Plaintiffs

Plaintiffs' Reply in Support of Motion for Summary Judgment
(3:17-cv-01014-L-NLS)