1
2
3
4
5
6
7
8              **UNITED STATES DISTRICT COURT**

9             **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   NATHAN APODACA; and                 Case No. 3:17-cv-01014-L-AHG
     STUDENTS FOR LIFE AT
12   CALIFORNIA STATE UNIVERSITY         **ORDER:**
     - SAN MARCOS,
13                                        **GRANTING IN PART AND**
                Plaintiffs,               **DENYING IN PART**
14                                        **DEFENDANTS' MOTION FOR**
          v.                              **SUMMARY JUDGMENT [Doc. 55]**
15
16   TIMOTHY P. WHITE, Chancellor of      **DENYING AS MOOT**
     California State University, in his  **DEFENDANTS' MOTION TO**
17   official and individual capacities;  **SEVER AND STRIKE JURY**
     KAREN S. HAYNES, President of        **DEMAND [Doc. 56]**
     California State University-San Marcos,
18   in her official and individual capacities;
     and ASSOCIATED STUDENTS, INC.        **GRANTING IN PART AND**
19   OF CALIFORNIA STATE                  **DENYING IN PART PLAINTIFFS'**
     UNIVERSITY SAN MARCOS, a             **MOTION FOR SUMMARY**
20   California nonprofit corporation,    **JUDGMENT [Doc. 58]**

21              Defendants.

22

23        Pending before the Court in this action alleging violations of constitutional

24   rights is a motion for summary judgment filed by Defendants Timothy P. White,

25   Karen Haynes, and Associated Students, Inc. of California State University San

26   Marcos ("ASI") (collectively "Defendants"). Additionally, Defendant filed a

27   conditional motion to sever jurisdictional issues and strike Plaintiffs Nathan Apodaca

28   and Students for Life at California State University-San Marcos ("Students for Life")

("CSUSM") (collectively "Plaintiffs") jury demand as it relates to those issues if they survive summary judgment. Plaintiffs filed a cross motion for summary judgment in combination with its opposition to Defendants' summary judgment motion. All motions have been fully briefed. For the reasons which follow, the Defendants' motion for summary judgment [doc. 55] is GRANTED IN PART and DENIED IN PART, Defendants' motion to sever and strike jury demand [doc. 56] is DENIED AS MOOT, and Plaintiffs' motion for summary judgment [doc. 58] is GRANTED IN PART and DENIED IN PART.

## I.    BACKGROUND

CSUSM is a public university organized and existing under the laws of the State of California, which receives funding from the State of California.

Plaintiff Nathan Apodaca[1] was a student at CSUSM and president of Students for Life at CSUSM ("Students for Life") from Fall 2016 until Fall 2017. Students for Life was a recognized student organization ("RSO") at CSUSM during the 2015-16, 2016-17, and 2017-18 academic years. Students for Life has three goals: "1. Make a compelling case for the pro-life view on the issue of abortion 2. Connect, equip, and train pro-life students to make that case. 3. To be a resource on campus for students in the midst of a crisis pregnancy, and to help those in need of healing after an abortion." Doc. 58-4 at 386-87. To achieve its goals, Students for Life assembles public outreach events, like on campus debates about abortion and host speakers.

Defendant Timothy P. White is the Chancellor of CSUSM and has been since December 2012. Defendant Karen S. Haynes is the President of CSUSM and has been since 2004. Defendant ASI is a nonprofit public benefit corporation. CSUSM recognizes ASI as an official auxiliary organization with its primary activity being

---

[1] Mr. Apodaca did not enroll in classes at CSUSM for the Spring or Fall 2018 semesters because he was notified that his Army National Guard unit would be deployed in Spring 2018. Mr. Apodaca has since been deployed overseas on active duty with the U.S. Army.

student body organization programs. Advocacy, one of ASI's core values, demands that ASI represent the student voice in the governance of the campus, community, and state of California. ASI is exclusively funded by the ASI Student Fee (the "ASI fee"). The ASI fee and any interest earned on ASI accounts are ASI's only sources of income, and the fee is held in trust for ASI's use only. The ASI fee is a mandatory fee that every undergraduate attending classes on campus pays as a condition of enrollment.[2] By enrolling at CSUSM and paying the ASI fee, students become members of ASI. Plaintiff Apodaca, like each Students for Life student member, paid the ASI fee each semester he attended CSUSM.

Student body organization funds generated through mandatory fees, like the ASI fee, may be expended, *inter alia*, for programs of cultural and educational enrichment and community service. ASI created two ASI-fee-funded community centers, the Gender Equity Center ("GEC") and the LGBTQA Pride Center ("Pride center") (collectively "the Centers"). The purpose of the GEC is to provide a space dedicated to gender equity in which students of all genders and diverse identities feel safe, valued, and respected. The purpose of the Pride Center is to create, sustain, and affirm an open, safe, and inclusive environment for lesbian, gay, bisexual, transgender, queer questioning, intersex, and ally individuals and communities at CSUSM. The Centers create their own programs and contribute funding to events put on by other organizations.

Student body organization funds generated through mandatory fees, like the ASI fee, also may be expended, *inter alia*, for assistance to RSOs. RSOs at CSUSM may seek to access ASI fee funds for event funding from four entities: (1) the ASI Leadership Fund ("ALF"), (2) the Centers, (3) the Campus Activities Board ("CAB"), or (4) the ASI Board of Directors ("BOD") directly. RSOs would receive ALF

---

[2] The ASI fee was $50 per student per semester for the 2016-17 academic year. After a student-approved referendum, the ASI fee was $75 per student per semester for the 2017-18 academic year.

funding in the form of a reimbursement for approved allocations, while the other three entities providing funding by cosponsoring events. The ALF funding application includes guidelines and criteria to which RSOs must satisfy to be eligible to receive ALF funding. Its funding eligibility guidelines prohibit ALF funding for honorariums and speaker fees and requires budgets to be itemized. The Centers have neither listed criterion from which to decide whether to fund an RSO event nor a written policy that governs whether either Center can or will cosponsor an RSO's proposed activity. Neither CAB nor BOD have an explicit written policy specifying its process for granting cosponsorship.

On November 14, 2016, Plaintiffs emailed ASI seeking, *inter alia*, clarification on how to request funding to cover an honorarium and travel expenses for a speaker Students for Life invited to visit CSUSM and lecture about abortion (the "abortion lecture") the following semester. On November 23, 2016, ASI responded and pointed Plaintiffs to the Arts & Lectures department, who recently had led the efforts to bring Dr. Cornel West to CSUSM to speak, but informed Plaintiffs that the call for funding proposals for that school year had closed. Plaintiffs immediately responded to ASI requesting whether ASI would cosponsor their event. On December 8, 2016, ASI replied, "Due to our budget we are not able to offer any assistance." Doc. 58-10 at 10.

On or about February 2, 2017, Plaintiffs submitted an ALF funding application requesting $500 for "Event expenses/Logistics/Advertising" related to the abortion lecture despite Apodaca's knowledge that honorariums and speaker fees were not eligible expenses. On February 6, 2017, ASI denied Plaintiffs' application because there was no itemized budget. When Apodaca inquired whether Plaintiffs could resubmit to cover speaker travel expenses, ASI reminded him that ALF funds cannot pay for speaker fees or travel expenses. Plaintiffs did not submit a revised application. When Plaintiffs inquired whether the Centers can provide speaker funding, ASI informed Plaintiffs that the Centers may be able to fund a speaker if the Centers

cosponsor the event. Although Apodaca was skeptical of the Centers' desire to cosponsor the abortion lecture event, ASI encouraged Apodaca to inquire about the opportunity as the Centers are a part of ASI.

On February 24, 2017, Plaintiffs emailed the assistant director of the Centers to request the Centers cosponsor the abortion lecture as funding was needed to cover the anticipated speaker's travel expenses. The Centers' assistant director forwarded Plaintiffs' request to the director of the Centers to discuss how they should respond to Plaintiffs' cosponsorship request. Subsequently, the Centers assistant director replied to Plaintiffs' email and denied Plaintiffs' cosponsorship request. The Centers claimed no additional funds could be committed after review of its remaining events and informed Plaintiffs that its request did not provide enough notice as GEC had moved to planning its events about 14 months out. The same day, Plaintiffs replied to the email denying their request to ask what the Centers required to apply for cosponsorship. Plaintiffs' reply was sent to the Centers' director and assistant director and neither responded to Plaintiffs' email.

On May 17, 2017, Plaintiffs filed their original Complaint. On August 9, 2017, Plaintiffs filed an amended complaint against the above-mentioned Defendants alleging violations of the First Amendment right to freedom of speech based on compelled speech and viewpoint discrimination and violations of the Fourteenth Amendment's right to equal protection of the law. Subsequently, Defendants filed a motion for summary judgment along with a motion to sever certain issues and strike the jury demand. Plaintiffs opposed Defendants motion for summary judgment and filed their own cross motion for summary judgment. Defendants' reply to its summary judgment motion also served as the opposition to Plaintiffs' cross motion. Later, Plaintiffs opposed Defendants' motion to sever and filed their reply to the cross motion for summary judgment. Lastly, Defendants filed its reply to the motion to sever. After review, the Court found the matters suitable for determination on the papers and without oral argument pursuant to Civil Local Rule 7.1.d.1.

## II.   LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.  *Id.* at 322–23.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

"[T]he district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001).  Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (*citing Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247, 251 (7th Cir. 1995).  If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party meets this initial burden, the nonmoving party cannot defeat

summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elect. Indus. Co., Ltd. v Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmoving party must "go beyond the pleadings" and by "the depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ P. 56(e)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## III. DISCUSSION

### A. Standing

The Supreme Court places the constitutional burden of establishing standing on plaintiffs to demonstrate an injury in fact, causation, and likelihood that a favorable decision will redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Proof of an "injury in fact" requires plaintiffs to present "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent," not "conjectural" or "hypothetical." *Id.* at 560. Irrespective of an injury's magnitude, a plaintiff's "injury in fact" is particularized once it affects plaintiff in a "personal and individualized way." *See Council of Ins. Agents & Brokers v. Molasky-Arman*, 522 F.3d 925, 932 (9th Cir. 2008) (holding that "an identifiable trifle" sufficiently establishes standing) (quoting *U.S. v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 (1973); *Id.* at 561.

In an as-applied First Amendment challenge, the plaintiff must pinpoint some personal harm resulting from application of the challenged statute or regulation. *See e.g.*, *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998) ("An as-applied

challenge contends that the law is unconstitutional as applied to the litigant's particular speech activity, even though the law may be capable of valid application to others."). Distinctly, standing scrutiny focuses both on the plaintiffs and whether harm to the them is sufficient to give plaintiffs the "requisite personal interest" in the case. *See Jacobs v. Clark Cty. Sch. Dist.*, 526 F.3d 419, 425 (9th Cir. 2008). While, on the merits, the First Amendment analysis focuses on the government's or state's conduct, particularly the rationale for imposing the identified harm on the plaintiff. *See, e.g.*, *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-46 (1983). The differing analyses allow a court to hold that a party has standing to bring an as-applied First Amendment yet find that the government's conduct did not violate the First Amendment. *See, e.g.*, *Jacobs*, 526 F.3d at 426, 441-42 (finding standing existed but holding that a school's uniform policy did not violate the First Amendment).

Facial constitutional challenges can manifest in one of two forms. A plaintiff may argue that an ordinance "is unconstitutionally vague or . . . impermissibly restricts a protected activity." *Foti*, 146 F.3d at 635.; *see Nunez v. City of San Diego*, 114 F.3d 935, 949 (9th Cir. 1997) ("Plaintiffs may seek directly on their own behalf the facial invalidation of overly broad statutes that create an unacceptable risk of the suppression of ideas." (internal quotation marks and citation omitted)). Alternatively, "an individual whose own speech or expressive conduct may validly be prohibited or sanctioned is permitted to challenge a statute on its face because it also threatens others not before the court." *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503 (1985). The first type of facial challenge may be combined with the as-applied challenge from which a plaintiff argues that the law is unconstitutional as applied to plaintiff's speech or expressive conduct. *See Foti*, 146 F.3d at 635; *see also NAACP v. City of Richmond*, 743 F.2d 1346, 1352 (1985).

While Defendants assert that Plaintiffs' First Amendment claim here fails in its entirety because Plaintiffs lack standing, the Court finds that Plaintiffs clearly have

standing to set forth their First Amendment claim. As the Court will discuss below, Plaintiffs challenge Defendants' denial of funding, sourced from a mandatory student fee Plaintiffs paid, for the abortion lecture Plaintiffs planned to host on grounds that their viewpoint was discriminated against due to Defendants' unbridled discretion in funding decision making. Standing exists here in that Plaintiffs have "a First Amendment interest in not being compelled to contribute to an organization whose expressive activities conflict with their own personal beliefs." *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 228 (2000). Despite Defendants' contention that Plaintiffs because Plaintiffs cannot meet their burden to demonstrate the denial caused the alleged injury, the undisputed evidence shows Plaintiffs paid mandatory student fees, which may have amounted to compelled speech, to ASI and expressive activities by ASI conflicted with Plaintiffs' personal beliefs. Additionally, the undisputed evidence shows that Defendants' denial of Plaintiffs' funding request cut short Plaintiffs' fundraising efforts to bring a speaker to CSUSM for their proposed abortion lecture program.

Defendants also contend Plaintiffs lack standing to bring a facial challenge to the ALF funding process because Plaintiffs have not identified any viewpoint discrimination and there is no risk of suppression of speech. However, "when a [funding regulation] vests unbridled discretion in a government official over whether to permit or deny [funds related to] expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying [] for, and being denied, [funding]." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750755-56 (1988) (quote modified here) (citing *Freedman v. Maryland*, 380 U.S. 51, 56 (1965) ("In the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office . . . whether or not he applied for a license")). In this case, Plaintiffs applied for funding related in multiple ways and was denied by Defendant ASI each time. Now, Plaintiffs' challenge seeks to facially invalidate the broad

discretion given to Defendant ASI they claim creates an unacceptable risk of the suppression of ideas. Defendants' contentions concerning ALF funding strike at the merits of the case, not Plaintiffs' standing under the First Amendment. As such, this contention does not rebut Plaintiffs' showing of the requisite personal interest to bring their First Amendment challenge.

Defendants likewise attack Plaintiffs' Fourteenth Amendment Equal Protection Clause on standing and ripeness grounds. However, Plaintiffs demonstrate an injury in fact in that ASI funds the Centers in higher proportion in comparison to RSOs, the Centers can use ASI funds in ways Plaintiffs are prohibited, and Defendants generally favor the Centers' expressive activity over Plaintiffs' viewpoint. Plaintiffs personally encountered ASI's prohibition placed on CSUSM RSOs' use of ASI funds for speaker fees while the Centers can use the same funds to fund speaker expenses. The Centers' decision not to cosponsor Plaintiffs' abortion lecture program also prevented Plaintiffs from covering the desired speaker's travel expenses when groups with different viewpoints than Plaintiff had programs funded and speaker expenses paid.

Accordingly, the Court finds that Plaintiffs exhibited standing to bring an as-applied and facial challenge against Defendants' mandatory ASI fee, its attendant uses, and whether Defendant ASI created a speech forum by distributing mandatory ASI fees to fund expression on campus. Likewise, the Court finds the case ripe for Plaintiffs to challenge whether Defendants treat RSO's speech unequally by favoring the Centers' expressive activity through funding and other privileges.

**B. Whether Plaintiffs' First Amendment rights were violated by Defendants' ASI fee collection and distribution policies.**

The Supreme Court has repeatedly upheld that "the First Amendment generally precludes public universities from denying student organizations access to school-sponsored forums because of the groups' viewpoints." *Christian Legal Soc. Chapter of the Univ. of Cal., Hastings College of Law v. Martinez*, 561 U.S. 661, 667 (2010) (see citing *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819 (1995);

*Widmar v. Vincent*, 454 U.S. 263 (1981); *Healy v. James*, 408 U.S. 169 (1972). The Supreme Court cautions lower courts to resist "substitut[ing] their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Ed. Of Hendrick Hudson Central School Dist.*, *Westchester Cty. v. Rowley*, 458 U.S. 176, 206 (1982). Schools enjoy "a significant measure of authority over the type of officially recognized activities in which their students participate." *Bd. of Ed. of Westside Comm. Schools (Dist. 66) v. Mergens*, 496 U.S. 226, 240 (1990). It is pivotal that colleges independently exercise the license to choose among pedagogical approaches considering extracurricular programs are as integral to today's educational process as the classroom. *See Bd. of Ed. of Independent School Dist. No. 92 of Pottawatomie Cty. v. Earls*, 536 U.S. 822, 831 (2002). "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

Plaintiffs first contend that Defendants' policies violate the First Amendment by compelling students to subsidize private speech in a viewpoint discriminatory system. Plaintiffs' rely on *Janus v. American Fed. Of State, Cty., and Mun. Employees, Council 31*, 138 S.Ct. 2448 (2018), to assert that Defendant unconstitutionally compel Plaintiffs to fund ASI expression to which Plaintiffs object. In *Janus*, a non-union Illinois state employee challenged the constitutionality of mandatory non-union member agency fees (a percentage of the full union dues) accompanying an Illinois law which deemed a union the exclusive representative of all employees in a bargaining unit upon a majority vote. *Id.* at 2455-56. The union annually set the agency fee and sent nonmembers a notice providing a basis and breakdown of expenditures. *Id.* at 2456. The employee in *Janus* refused to join the union because he opposed many of its views, even those concerning collective bargaining. *Id.*

The *Janus* Court held that the extraction of labor union fees from

nonconsenting public-sector employees violates the First Amendment. *Id.* at 2463-86. The Supreme Court reasoned that the compelling interest of "labor peace" could readily be achieved "'through means significantly less restrictive of associational freedom' than the assessment of agency fees." *Janus*, 138 S.Ct. at 2466 (citing *Harris v. Quinn*, 134 S.Ct. 2618, 2639 (2014). The Court further noted that "the First Amendment does not permit the government to compel a person to pay for another party's speech just because the government thinks that the speech furthers the interests of the person who does not want to pay." *Id.* at 2467. Notably, the *Janus* court chastised and overruled *Abood v. Detroit Bd. of Ed.*, 431 U.S. 209 (1977) as not well reasoned. *Id.* at 2481. The *Janus* Court points out that *Abood* failed to: (1) independently evaluate the strength of the government interests that purportedly supported the challenged union fee provision; or (2) inquire as to how well that provision promoted those interests; or (3) whether they could have been adequately served without impinging so heavily on the free speech rights of nonmembers. *Id.* at 2479-80. The *Janus* Court concluded that *Abood* made a serious mistake of assuming that promoting "labor peace" called for an imposition of mandatory union fees on non-union members because it failed to consider whether those fees were necessary to serve the asserted state interests. *Id.* at 2480. For this reason, *inter alia*, the Supreme Court decreed that "States and public-sector unions may no longer extract agency fees from nonconsenting employees . . . [u]nless employees clearly and affirmatively consent before any money is taken from them[.]" *Id.* at 2486.

In the present context, First Amendment rights "must be analyzed in light of the special characteristics of the school environment." *Widmar*, 454 U.S. at 268, n.5 (internal quotation marks omitted). In the public university context, the *Southworth* court analyzed "whether a public university may require its students to pay a fee which creates the mechanism for [] extracurricular speech[.]" *Id.* at 233. The *Southworth* court reasoned that if a university determines "its mission is well served if students have the means to engage in dynamic discussions [from philosophy to

societal politics] . . . it is entitled to impose a mandatory fee to sustain an open dialogue to the ends." *Id.* at 233. The Court made clear that, if a university conditions the opportunity to receive a college education on an agreement to support extracurricular expression by other students that the paying student finds objectionable, the speech and beliefs of the objecting student may be infringed. *Id.* at 231. The *Southworth* court balked however at imposing an optional or refund system as a constitutional requirement to protect students' First Amendment rights due to the unknown ramifications, but the Court expressed that universities are free to do so. *Id.* at 232. Nonetheless, the *Southworth* court concluded that a university "may sustain the extracurricular dimensions of its programs by using mandatory student fees with *viewpoint neutrality* as the operational principle." *Southworth*, 529 U.S. at 233-34 (emphasis added).

In *Southworth*, students were statutorily authorized to disburse a portion of a mandatory, nonrefundable activity fee each full-time student at the University of Wisconsin-Madison paid each year in excess of their tuition. *Southworth*, 529 U.S. at 222. The students mainly disposed of the funds through their student government, the Associated Students of Madison ("ASM") and its various subcommittees. *Ibid.* The board of regents designated approximately 80% of the fee as "nonallocable" to cover expenses and purposes not challenged in *Southworth*. *Id.* at 223. Meanwhile, the allocable portion of the fee maintained extracurricular activities of the university's RSOs. RSOs could seek allocable funds in three ways: (1) apply for funding from the Student Government Activity Fund ("SGAF"), administered by ASM, (2) apply for funding from the General Student Services Fund ("GSSF"), administered by ASM's finance committee, and (3) a student referendum where the student body votes either to approve or disapprove an allocation of funds for a particular RSO. *Id.* at 223-24. While RSOs obtained funding support by reimbursement after submitting receipts or invoices to the university, the university's policy specified certain purposes for which funds could not be allocated. *Id.* at 225. Among the prohibitions, RSOs were

prevented from receiving reimbursements for "activities which are politically partisan or religious in nature." *Ibid.* However, one RSO, WISPIRG, operated outside the bounds of the university's guidelines as it received lump sum payments from the university, reduced the amount of GSSF's available funds due to its funding allocation, and spent a portion of its activity fess on political lobbying and other efforts aimed at influencing legislation. *Id.* at 226. Notably, WISPIRG received $45,000 during the relevant academic year resulting from a student referendum. The parties in *Southworth* stipulated that SGAF's and GSSF's funding mechanism were viewpoint neutral but did not extend the stipulation to the referendum process. *Id.* at 224-25. The *Southworth* court found that students' constitutional protections would be infringed upon to the extent the referendum replaced majority voting for viewpoint neutrality. *Id.* at 235. As such, the Supreme Court remanded the case to the Seventh Circuit to reexamine *Southworth* in light of the Court's viewpoint neutrality principles. *Id,* at 235-36.

On remand, the Seventh Circuit clarified the viewpoint neutrality parameters by addressing a different, but related, issue of whether the unbridled discretion standard is a component of viewpoint neutrality.[3] *Southworth v. Bd. of Regents of University of Wisconsin Sys.*, 307 F.3d 566, 574 (7th Cir. 2002) ("*Southworth II*"). *Southworth II* was "a facial challenge to the unbridled discretion the University grant[ed] the student government for deciding which RSOs to fund[.]" *Ibid.* The *Southworth II* court noted the Supreme Court made clear that viewpoint neutrality is

---

[3] On remand, the parties stipulated to the dismissal of the students' claim challenging the constitutionality of the referendum on mootness grounds as the university had amended its student activity fee policy. *Southworth II*, 307 F.3d at 570. Also, the district court voided the earlier stipulation of viewpoint neutrality made in the original suit. *Ibid.* Following a bench trial, the district court held "the University's mandatory fee system violated the plaintiffs' First Amendment rights by granting the student government too much discretion for determining which student organizations to fund." *Ibid.*

threatened when a decisionmaker can use unduly broad discretion to favor or disfavor speech based on its viewpoint or content. *Id.* at 579 (citing *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002)). For that reason, the *Southworth II* court concluded that unbridled discretion is a component of the viewpoint-neutrality requirement because the risks the Supreme Court intended to protect with the unbridled discretion standard are analogous to the risks the viewpoint-neutrality mandate protects. *Ibid.*

In *Southworth II*, the Seventh Circuit found the university's fee system set numerous and specific standards that greatly limited the discretion of the ASM Finance Committee and the Student Services Finance Committee ("SSFC").[4] *Id.* at 587-89. Some of the funding standards included: (1) an express policy prohibiting viewpoint discrimination and requiring conformity with the *Southworth* requirements, (2) adopting specific deadlines for SSFC funding applications and ASM Finance Committee decisions, (3) specific, narrowly drawn and clear criteria to guide the student government in their funding decisions, (4) requiring notice of hearing and public hearings of the ASM Finance Committee and SSFC, and (5) recording the hearings. *Id.* at 587-91. However, the *Southworth II* court prohibited the university from using mandatory fees of objecting students for travel grants until the ASM Finance Committee adopted criteria governing the award of travel grants. *Id.* at 592. The Seventh Circuit reasoned that, "without knowing the standards [] applied to travel grants, a federal court would be unable to determine whether the ASM Finance Committee's discretion was exercised to discriminate against groups with unpopular viewpoints." *Ibid.* Therefore, the *Southworth II* court held "the mandatory fee system unconstitutionally grant[ed] the ASM Finance Committee unbridled discretion for awarding travel grants to organizations which engage in speech and expressive activities." *Ibid.* Otherwise, the *Southworth II* court concluded that the funding

---

[4] The ASM Finance Committee and the SSFC administered funding granted by SFGAF and GSSF, respectively. *Southworth II*, 307 F.3d at 569.

standards "sufficiently bridled the SSFC and ASM Finance Committee's discretion to satisfy the First Amendment's mandate of viewpoint neutrality and the prohibition on granting decisionmakers unbridled discretion[.]" *Ibid.*[5]

As an initial matter, this Court finds that the *Janus* court's prohibition of extracting union dues from nonunion members does not call for a wholesale invalidation of CSUSM's mandatory ASI fee. To the extent Plaintiffs contend mandatory student fees should be invalidated under *Janus* because it overruled *Abood*, the Court notes that *Abood* is only the beginning of the analysis here in that the reasoning *Abood* sets forth mandates that a university cannot require student to pay subsidies for speech of other students without some First Amendment protection. *Southworth*, 529 U.S. at 231. Along that line, this Court finds that *Janus* supplanting *Abood* did not undermine this safeguard. The *Southworth* court previously instructed that *Abood*'s germane speech standard is unworkable in the public university context as "[i]t is all but inevitable that the fees will result in subsidies to speech which some students find objection and offensive to their personal beliefs." *Id.* at 232. The Court here believes *Janus* bears little significance in the public university context where the case law and the parties all agree that schools have expansive latitude in the manner educational missions are implemented. *See Rosenberger*, 515 U.S. at 833. Thus, Plaintiffs' reliance on *Janus* to invalidate the mandatory student fee system is misplaced here.

However, it is appropriate to evaluate the constitutionality of the ASI fee as a speech forum in that payment of the ASI fee is required to enroll at CSUSM and Plaintiffs object to certain expressive activities supported by the ASI fee. *See Southworth II*, 307 F.3d at 580 ("[W]hile a mandatory fee system is 'a forum more in a metaphysical than in a spatial or geographic sense . . . the same principles are

---

[5] The Ninth Circuit adopted the *Southworth II* standard in *Kaahumanu v. Hawaii*, 682 F.3d 789, 806 (9th Cir. 2012)

applicable.'") (quoting *Rosenbeger*, 515 U.S. at 830)); *see also The Koala v. Khosla*, 2019 WL 3311148, at *11 (9th Cir. July 24, 2019). The ASI fee is a mandatory fee that every CSUSM student undergraduate student pays a condition of enrollment. Doc. 58-7 at 225. Plaintiffs paid the ASI fee and object to Defendant ASI's expressive activities, specifically the Centers' pro-abortion viewpoint and viewpoints which advocate for sexual acts beyond sexual activity between a man and a woman in a marital relationship. Plaintiffs do not want to fund these activities. Defendant ASI and its attendants entities are authorized statutorily to fund extracurricular activities. As such, Defendants are required to allocate the mandatory ASI fee in a viewpoint neutral manner to safeguard Plaintiffs from "furnish[ing] contributions of money for the propagation of opinions which he disbelieves and abhor[s][.]" *Janus*, 128 S. Ct. at 2464 (citing A Bill for Establishing Religious Freedom, in 2 Papers of Thomas Jefferson 545 (J. Boyd ed. 1950).

### 1. ASI's ALF Funding Process

While Plaintiffs sought funding from three separate ASI-funding entities, only ASI's ALF funding process can be evaluated by the Court against Plaintiffs' as-applied challenge. "Standards provide the guideposts that check the [decisionmaker] and allow courts quickly and easily to determine whether the [decisionmaker] is discriminating against disfavored speech." *City of Lakewood*, 486 U.S. at 758. "[W]ithout standards to fetter [a decisionmaker's] discretion, the difficulties of proof and the case-by-case nature of "as applied" challenges render the [decisionmaker's] action in large measure effectively unreviewable." *Id.* at 759. "[W]ithout standards governing the exercise of discretion, a govern[ing] official may decide who may speak and who may not based on the . . . viewpoint of the speaker." *Id.* at 763-64. For our purposes here, a court cannot effectively review a challenged provision if it does not "contain adequate standards to guide the official's decision[.]" *Southworth II*, 307 F.3d at 578 (quoting *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002)).

Defendants contend Plaintiffs sought ALF funding for a speaker fee despite

knowing that speaker fee expenses were not eligible.  The eligibility criteria for ALF funding on-campus events funding reads as follows:

1.  Student Organization must be officially recognized by CSUSM through Student Life & Leadership (SLL).

2.  Student event coordinator MUST work with their SLL Coordinator to plan the event.

3.  Events must be held on-campus.

4.  If the event is not open to the entire campus community, the maximum ALF amount is $250.  This includes graduation ceremonies.

5.  If the event is open to the campus community, the maximum ALF amount is $500.

6.  Funding is available for consumable items and facility costs, which support the event such as food for attendees, paper products, and advertising specific for the event.

7.  Programs must **not** make a profit.  Event must be free to attend.

8.  ASI Leadership Funding (ALF) up to $500 per student organization per semester.

9.  Student organizations may co-sponsor an event with another student organization.  ALF contribution for co-sponsored events up to $1,000.

10. Funding is **not** available for individual student organization members.

11. Funding is **not** available for door prizes, raffles, or opportunity drawings. It also is **not available** for honorariums, speaker fees, donations, gifts, or give-away items.

12. Only original forms and signatures are accepted.

13. Incomplete applications will be rejected.

Doc. 58-6 at 6.  The ALF Application and Guidelines ("Guidelines") direct student organizations to describe its program, including the event's purpose, benefit to students, whether the organization held the event before, and, if so, the need to hold

the event again.  *Ibid.*  The Guidelines also directed applicants to "include an itemized budget of event allowable expenses.  Fill in your itemized budget on the attached application form. Include as much detail as possible."  *Ibid.* Moreover, the ALF Guidelines provided due dates before which a student organization was required to submit its ALF application.  *Ibid.*

Here, Defendants' denial ALF funding for the abortion lecture and the ALF Guidelines as applied to Plaintiffs' ALF application were not based on viewpoint-neutral criteria.  Plaintiffs knowingly submitted an incomplete application seeking $500 for general event, logistic, and advertising expenses.  Plaintiffs' application failed to satisfy the Guidelines as it did not include an itemized budget and provided no detail regarding the expenses.  The record shows that, in rejecting Plaintiffs' application, Defendants' made a notation on the application, "Please be more specific with items in Budget. Ex: pizza[,] flyers[.]"  Doc. 55-10 at 41.  As such, the Court finds that the application could be deemed incomplete and permissibly rejected on that viewpoint-neutral ground alone.  Yet, Plaintiffs attempted to cloak its funds request for a speaker fee/honorarium as a general expense request until Plaintiff Apodaca admitted the true intention for the ALF funds.  The Guidelines make clear that ALF funding is not available for honorariums or speaker fees.  Accordingly, Defendants' preclusion of a revised ALF application submitted by Plaintiffs to fund speaker-related expenses was also legitimate.  Moreover, the record demonstrates that ALF funding was not granted for speaker fees to other organizations and ALF funding was granted to other religious-based RSOs that fully complied with the ALF Guidelines.  *See* ECF No. 55-10 at 26, 29-30, 32.  In light of the record, the Court finds that Defendants' denial of Plaintiffs' ALF funding application was not based on Plaintiffs' viewpoint.  Therefore, Plaintiffs' as-applied challenge to ASI's ALF funding denial of Plaintiffs' ALF application is **DENIED** and Defendants' motion for summary for summary judgment is **GRANTED** on this ground.

In a facial challenge to Defendants' funding mechanisms, Plaintiffs' contend

their First Amendment rights right were violated by Defendants' exercise of unbridled discretion to discriminate against Plaintiffs' in a speech forum. With respect to Plaintiffs' facial challenge, Defendants maintains ASI administers its ALF funding process pursuant to viewpoint-neutral criteria. "[T]he success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests [on] . . . whether there is anything in the ordinance preventing him from [exercising his discretion]." *Southworth II*, 307 F.3d at 577-78 (citing *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 133 n. 10 (1992)). The ASI Executive Vice President and professional staff members, who meet five times a semester, determine the allocation of the funds after reviewing all eligible applications. *Ibid.* The ALF application states, "Funding is based on eligibility per the ALF Guidelines and Instructions[]" and "awarded on first come, first served basis." Doc. 58-6 at 6.

The Court disagrees with Defendants that the ALF funding process disburses the mandatory ASI fee based on viewpoint-neutral criteria. Like *Southworth II*, ASI's ALF Application and Guidelines dictate "specific, narrowly drawn and clear criteria" to regulate the ASI Executive Vice President's and professional staff members' funding allocation decisions. However, the Court finds the criteria above mainly strike at the applicant's burden in applying and the logistics of the ALF funding application process, but the criteria fail to provide "reasonable and definite standard[s], guiding the hand of the [ ] [ ] administrator." *Forsyth*, 505 U.S. at 132. Although the ALF Guidelines set forth deadlines by which the ALF applications must be submitted by RSOs and a policy to distribute ALF funding on a first come, first served basis, which the Court find are viewpoint neutral, the Guidelines do not contain any express policy prohibiting viewpoint discrimination and/or a required conformity with *Southworth*. While the Court recognizes that most ALF Guidelines' prohibitions apply evenhandedly to all CSUSM RSOs eligible for ALF funding regardless of viewpoint or content, nothing in the guidelines "prevent[] the official[s] from

encouraging some views and discouraging others through arbitrary [grants of funding]." *Id.* at 133. For example, the Guidelines mandate that applicant RSOs describe its program, including the event's purpose, benefit to students, whether the organization held the event before, and, if so, the need to hold the event again. The Court finds that this requirement is an impermissibly viewpoint-based criterion without standards dictating viewpoint-neutral considerations for this information. The consideration of these factors is unconstitutional as the factors naturally relate to the content of the speech and have the effect of excluding unpopular viewpoints. The "purpose" and "student benefit" inquiries allow officials the discretion to pass judgment on the content, merit, and potential impact of a program. Programs benefitting a larger number may wind up receiving more favorable consideration than programs effecting a smaller population of students in violation of the First Amendment as "minority views are [to be] treated with the same respect as [ ] majority views[.]" *Southworth II*, 307 F.3d at 594-95 (citing *Southworth*, 529 U.S. at 235). Similarly, consideration of a program's history and need to return to campus is improper under the First Amendment as a governing entity "may not discriminate . . . in favor of [or against] established parties[.]" *Southworth II*, 307 F.3d at 594 (modified). The Court finds that these aspects of the ALF funding process provide the decision-making officials unbridled discretion to promote or suppress certain viewpoints through the allocation of ALF funds. To that end, CSUSM, at its election, can modify to, but is not limited to, implement viewpoint-neutral regulations to guide the consideration of such information, eliminate this directive for the Guidelines, make explicit to grant all ALF applications that meet the valid-remaining criteria as a matter of course, or any other constitutional valid remedy. To the extent the Guidelines are unrelated to a program's content or otherwise facially valid, this order should have no effect. However, the ALF Fund cannot use the mandatory fees of objecting students until specific and detailed standards guiding decision making is adopted. For the foregoing reasons, Plaintiffs' facial challenge to ASI's ALF funding

process is **GRANTED IN PART** and **DENIED IN PART** and Defendants' motion for summary for summary judgment is **GRANTED IN PART** and **DENIED IN PART** on this ground.

### 2. ASI's Board of Director's Cosponsorship Funding

Plaintiffs also contend Defendants' distribution of the mandatory ASI fee is viewpoint discriminatory because Defendant ASI's Board of Directors has unbridled discretion. "A standardless discretion [ ] makes it difficult to detect, and protect the public form, unconstitutional viewpoint discrimination by the [sponsoring] official." *Kaahumanu v. Hawaii*, 682 F.3d 789, 807 (9th Cir. 2012) (citing *City of Lakewood*, 486 U.S. at 759).

It is undisputed that Defendant ASI's Board of Directors has its own budget to host their own programs through its budget and through cosponsorship. Docs. 58-5 at 289; 58-7 at109-111. Also, it is evident after review of Defendant ASI's Bylaws that there is no explicit provision to facilitate how Defendant ASI should distribute its funds in a viewpoint neutral manner. *See* Doc. 58-4 at 2-18. This is exactly the type of unbridled discretion the *Forsyth* court cautioned us against; a scenario where there are no articulated standards in ASI's Bylaws or its established practice, the ASI's Board of Directors is not required to rely on any objective factors, and it need not provide any explanation for its decision. As such, the Court finds that Defendant ASI's Bylaws confer upon Defendant ASI's Board of Directors virtually unbridled discretion to allocate CSUSM students' mandatory ASI fee in violation of the First Amendment.

Defendants respond that ASI Board of Director's distribution of the mandatory ASI fee is government speech. This Court is not persuaded by Defendants' assertion. Government speech comes into play when the challenged speech was (1) financed by tuition dollars and (2) the University and its officials were responsible for its content. *Southworth*, 529 U.S. at 229. As the *Southworth* court stated, "That is not the case before us." *Ibid.*

The Preamble of Defendant ASI's Bylaws reads, in part,

"We, *the students of [CSUSM]*, in order to provide: . . . (4) fiscal means and the management procedures that allow the campus to carry on activities providing those instructional and service aids *not normally furnished by the state budget* . . .as a campus auxiliary organization . . .exercise all right and powers . . . to improve the quality of student life[.]"

Doc. 58-4 at 5. As follows, it is undisputed that Defendant ASI's sole source of funding is the mandatory ASI fee and any accrued interest. For that reason alone, the challenged speech here (ASI's use of the mandatory ASI fee) is outside the realm of government speech. Moreover, like the university in *Southworth*, CSUSM's "whole justification for fostering the [ASI and its ability to cosponsor RSO activities] is that it springs from the initiative of the students, who alone give it purpose and content in the course of their extracurricular endeavors." *Southworth*, 529 U.S. at 229. The Court is troubled that the ASI Bylaws in fact permit the ASI Board of Directors to hold closed sessions to consider ASI matters, without a prohibition that all funding considerations must be considered in a open session or include some type of recordation. No mandate exists to ensure the ASI Board of Directors consider and/or fund cosponsorship requests in a viewpoint-neutral manner. Therefore, Plaintiffs' facial challenge to ASI's Board of Director's cosponsorship funding process is **GRANTED** and Defendants' motion for summary for summary judgment is **DENIED** on this ground. Accordingly, the ASI Board cannot use the mandatory fees of objecting students for cosponsorshisp until specific and detailed standards guiding Defendant ASI's Board of Directors' discretion.

### 3. The Centers' Funding

Plaintiffs also contend the Centers exercise unbridled discretion to favor specific viewpoints in violation of Plaintiffs' First Amendment rights. The undisputed evidence reveals that the Centers have neither a formal funding request form nor a written policy governing whether a community center will grant an RSO's request. Docs. 58-5 at 52; 58-7 at 113. The evidence also reveals that cosponsorship

consideration is made on a case-by-case basis by the Centers' director and assistant director based on their assessment of whether the proposed content serves the Centers' learning objectives. Doc. 58-7 at 115, 127, 364. However, neither Centers' governing codes express what those learning objectives are. Doc. 58-7 at 323-28. The Court finds that this is unconstitutionally unbridled discretion and exactly the kind of behavior the First Amendment is in place to prevent. For example, Plaintiffs contacted GEC to request a cosponsorhsip of the abortion lecture on February 24, 2017. Doc. 58-8 at 42. Upon receipt Plaintiffs' request, Abrahán Monzón emailed Robert Aiello-Hauser, Director of Student Engagement & Inclusion for ASI at CSUSM, about how to compile an appropriate response. After a closed-door meeting concerning Plaintiffs' request, Monzón eventually responded to Plaintiffs' denying the funding request for budgetary reasons. Now, the Court is precluded for verifying the veracity of the denial reasoning because this meeting was neither recorded audibly nor in writing. These "back room deliberations" are exactly type of considerations the First Amendment is designed to prevent. Nothing prevents these officials from encouraging some views while suppressing others through cosponsorship funding. Thus, the unbridled discretion the Centers have in cosponsorship funding violates Plaintiffs' First Amendment rights against compelled speech. Therefore, Plaintiffs' facial challenge to the Centers' cosponsorship funding process is **GRANTED** and Defendants' motion for summary for summary judgment is **DENIED** on this ground. Consequently, until narrowly drawn, reasonable, and definite standards are adopted, the Centers cannot use the mandatory ASI fee of objecting students for cosponsorships.

Accordingly, until narrowly drawn, reasonable, and definite standards are adopted by Defendant ASI and its ASI committees responsible for student activity funding through the ASI fee, ASI RSO-funding entities cannot use the mandatory fees

of objecting students.[6]

### C. Whether CSUSM's emphasis on the Centers violates the Fourteenth Amendment Equal Protection Clause.

Under the Equal Protection Clause of the Fourteenth Amendment, "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 439 (1985). Collectively, the equal protection progeny instructs: When a barrier "makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing." *Northeastern Fla. Chapter of Associated Gen. Contractors of America v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993). "Parties allegedly treated differently in violation of the Equal Protection Clause are similarly situated when they are arguably indistinguishable." *Erickson v. Cty. of Nevada ex rel. Bd. of Supervisors*, 607 Fed.Appx. 711 (2015).

Here, Plaintiffs and the Centers are not arguably indistinguishable. The Court finds that undisputed record reveals distinctions between their distinct missions, purposes, and derivations. For example, ASI's Vision Statement states, "ASI strives to provide representation, to offer an inclusive environment, and to promote campus pride for *all* students." Doc. 58-5 at 6. ASI fulfills its vision by employing each element of its Core Values: "Advocacy, Solidarity, and Integrity." *Id.* at 7. Additionally, The Centers were specifically contemplated in the ASI Bylaws to fulfill ASI's Mission, Values and Bylaws. *Id.* at 13. Meanwhile, Plaintiff SFL's Purpose is "to engage, equip and empower our fellow classmates to make the best decision when

---

[6] The Court notes that a Memorandum of Agreement became effective July 1, 2018, which calls for a gradual three-year defunding of the Centers through the ASI fee. The Centers' funding will come from the general tuition budget, and the Centers' director and assistant director will become employees of CSUSM, not ASI. Docs. 58-5 at 31; 58-7 at 264.

faced with an unexpected pregnancy." Doc. 58-4 at 378. Plaintiff SFL fulfills its Purpose by "engaging in events that share knowledge and education about abortion and its effects on women and men." *Ibid.* Defendants point out several other contrasting aspects these campus organizations, from the size and staff to oversight. Doc. 55-1 at 34. The Court finds that these distinctions demonstrate that Plaintiff SFL and the Centers are not similarly situated as envisioned in the Equal Protection cases. Therefore, Plaintiffs' Equal Protection Clause claim fails. Accordingly, Plaintiffs' motion for summary judgment is **DENIED** and Defendants' motion for summary for summary judgment is **GRANTED** on this ground.

### D. Whether Qualified Immunity applies to the Individual Defendants.

The threshold question a court considers when determining qualified immunity is, taken in the light most favorable to the party asserting injury, whether the challenged conduct by the party asserting qualified immunity violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If no constitutional right was infringed upon, then no further inquiry is required. *See e.g.*, *Scott v. Harris*, 550 U.S. 372 (2007). However, if evidence of a constitutional right violation is found, the court then "ask[s] whether the right was clearly established" such that "it would be clear to a reasonable officer that [his or her] conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 201-202. "[E]xisiting precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "The dispositive question is whether the violative nature of the *particular* conduct is clearly established." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (internal quotation marks and citation omitted) (emphasis in original). The burden is on the plaintiff to show the challenged conduct violated a clearly established federal right. *Davis v. Scherer*, 468 U.S. 183, 197 (1984).

As explained above, the Court finds that the evidence demonstrated that Plaintiffs' First Amendment right against compelled speech was violated by Defendants' unbridled discretion to disburse the ASI fee in support of viewpoints to

which Plaintiffs object without having narrowly drawn, reasonable, and definite standards.

Plaintiffs assert that the law mandating that universities allocate mandatory student fees in a viewpoint-neutral manner has been clearly established for almost two decades. Defendants contend individual Defendants Chancellor White and President Hayes are entitled to qualified immunity because they acted lawfully at the time or with at least a reasonable belief that their conduct was lawful. This Court agrees with Plaintiffs as Defendants do not touch on the relevant standard guiding the Court's determination. On March 22, 2000. the *Southworth* Court set out the viewpoint neutral standard in a case challenging conduct identical to the challenged conduct here. *See Southworth*, 529 U.S. at 233-34. Although not binding, on October 2, 2002, the Seventh Circuit clarified that a university's absence of criteria governing the use of mandatory student fees gave the decision-making official unbridled discretion to awards funds based on viewpoint; thus, the conduct violates the viewpoint neutrality principle and the objecting students First Amendment rights. *See Southworth II*, 307 F.3d at 592. On June 6, 2012, the Ninth Circuit adopted the *Southworth II* unbridled discretion standard. *See Kaahumanu*, 682 F.3d at 806. Defendant Haynes began her career as a university president in 1995 and became the president at CSUSM in February 2004. Due to the development and state of the law in this area when President Haynes joined CSUSM, the Court expects that she should have been aware the violative nature of the ASI fee funding mechanisms, especially since she is tasked to supervise the ASI under the ASI bylaws. *See* Doc. 58-4 at 18. Likewise, Chancellor White, having been at CSUSM since 2012, is also on notice due to his position of approving all mandatory student and campus-based fees and tenure that viewpoint neutrality is an operational principle when disbursing mandatory student fees. Doc. 58-7 at 221-23. Thus, qualified immunity does not shield the individual Defendants in this case. Accordingly, Plaintiffs' motion for summary judgment is **DENIED** and Defendants' motion for summary for summary judgment is

1 **GRANTED** on this ground.

2 **IV.**   C<small>ONCLUSION</small>

3      Based on the foregoing reasons, the hereby orders in accordance with the

4 reasoning above. As such, Defendants' motion for summary judgment [doc. 55] is

5 GRANTED IN PART and DENIED IN PART. Defendants' conditional motion to

6 sever and to strike jury demand [doc. 56] is DENIED AS MOOT as the standing,

7 ripeness, and qualified immunity issues have been disposed. Plaintiffs' motion for

8 summary judgment [doc. 58] is GRANTED IN PART and DENIED IN PART.

9      **IT IS SO ORDERED.**

10

11 Date: August 13, 2019

12

13 Hon. M. James Lorenz
        United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28